<u>FOR PUBLICATION</u>

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JOHN S. MACDONALD,** | |
| *Plaintiff*, | **Civil Action No. 16-2781** |
| v. | **OPINION** |
| **CASHCALL, INC, et al.,** | |
| *Defendants.* | |

**THIS MATTER** comes before the Court by way of Defendants CashCall, Inc. ("CashCall"), WS Funding, LLC ("WS Funding"), Delbert Services Corp. ("Delbert"), and J. Paul Reddam's ("Reddam") (collectively, "Defendants") motion to compel arbitration, or alternatively, to dismiss Plaintiff John S. MacDonald's ("Plaintiff") Complaint. Dkt. No. 11. For the reasons set forth below, the motion to compel arbitration is **DENIED** and the motion to dismiss is **GRANTED** in part and **DENIED** in part.

## I.   BACKGROUND[1]

The instant case concerns the controversial lending practices of Defendants and non-party Western Sky Financial, LLC ("Western Sky"), which work together to issue high-interest payday loans to customers across the United States. Western Sky, the entity that initially issues the loans, is owned by Martin Webb, a member of the Cheyenne River Sioux Tribe of South Dakota

---

[1] The following facts are drawn from the Complaint, and are taken as true for the purposes of this motion. Dkt. No. 1. The Court also considers an Order to Cease and Desist issued by the State of New Hampshire Banking Department, which was attached as an exhibit to the Complaint. Compl. at 5 n.1 (incorporating <u>In Re Cashcall, Inc. et al., LLC</u>, No. 12-308, 2013 WL 3465250 (N.H. Banking Dept. June 4, 2013), Ex. 1, Dkt. No. 1-1); <u>see</u> <u>Mayer v. Belichick</u>, 605 F.3d 223, 230 (3d Cir. 2010) (stating that courts may consider "exhibits attached to the complaint" on a motion to dismiss) (quotation omitted).

("CRST"). Based in large part on this tribal affiliation, Defendants seek to enforce numerous provisions in borrowers' loan agreements that attempt to, among other things, restrict borrowers' remedies to arbitration, compel the adjudication of disputes before the CRST, mandate the application of CRST law, and waive any application of state or federal law. Yet Plaintiff argues that Defendants' claims of tribal affiliation are a sham, and nothing more than a front to enable Defendants to circumvent the application of state and federal laws. He urges the Court not to enforce these provisions.

**A. Facts of the Case**

Plaintiff's experience epitomizes Defendants' lending scheme. On December 18, 2012, Plaintiff borrowed $5,000 from Western Sky's website, which he accessed from a computer located in New Jersey. Compl. ¶ 38. As part of that process, Plaintiff executed the "Western Sky Consumer Loan Agreement" (the "Loan Agreement"). Id. Pursuant to the Loan Agreement, Plaintiff would receive the loan subject to certain fees and an Annual Percentage Rate of 116.73%. Id. ¶ 39. Over the seven-year life of the loan, the finance charge would be $35,994.28. Id.

On December 26, 2012, Plaintiff was notified that Western Sky had assigned his loan to WS Funding, and that CashCall would handle the servicing of the loan and collect the first payment. Id. ¶ 40. On August 13, 2013, Plaintiff was informed that Delbert would take over servicing of the loan. Id. ¶ 41. As of April 2016, Defendants had collected a total of $15,493.00 from Plaintiff on his $5,000 loan. Id. ¶ 42. This included $38.50 in principal, $15,256.65 in interest, and $197.85 in fees. Id. At the time of the filing of the Complaint, Plaintiff still owed more than $7,833.91. Id.

If Plaintiff wished to challenge any aspect of the Loan Agreement, he would have to comply with a number of important provisions. Most notably, the Loan Agreement contained an

arbitration clause, which provided as follows:

> You agree that any Dispute, except as provided below, will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement.

Loan Agreement at 8.[2]  The Loan Agreement also featured a forum selection clause, which stated, among other things, that the contract was "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation."  Id. at 2.  In addition, a choice-of-law clause provided that the Loan Agreement "shall be subject to and construed in accordance only with the provisions of the laws of the Cheyenne River Sioux Tribe, and that no United States state or federal law applies to this Agreement."  Id. at 7.

None of the Defendants have a connection to the CRST.  CashCall is a Delaware corporation with its principal place of business located in Orange, California.  Compl. ¶ 7.  Reddam is its President, CEO, sole director, and sole owner.  Id.  WS Funding is a wholly owned subsidiary of CashCall, and Reddam serves as its president.  Id. ¶ 8.  Delbert is a Nevada corporation with its principal place of business located in Las Vegas, and Reddam serves as its sole director and owner. Id. ¶ 9.  Reddam is a resident of California.  Id. ¶ 6.

On May 17, 2016, Plaintiff filed the instant Complaint.  Plaintiff's primary contention is that the loans at issue are void because the collection of a usurious rate of interest violates New Jersey law, and that Defendants' attempts to contractually circumvent the application of federal and state law should not be enforced.  To that end, the Complaint asserts a variety of federal and state claims, including under: (1) New Jersey usury laws, see N.J. Stat. Ann. § 31:1-1; (2) the New

---

[2] A separate provision in the Loan Agreement ostensibly allowed the borrower to select the American Arbitration Association ("AAA"), JAMS, or any other organization agreed to by all parties to administer the arbitration.  Loan Agreement at 9.

Jersey Consumer Finance Licensing Act ("CFLA"), N.J. Stat. Ann. §§ 17:11C-1, *et seq.*; (3) the New Jersey Consumer Fraud Act ("CFA"), N.J. Stat. Ann. §§ 56:8-1, *et seq.*; (4) restitution and unjust enrichment; (5) a declaration that the forum selection and choice of law clauses do not apply, that the arbitration clause is void, and that any purported class waiver is void; and (6) the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*[3] See Compl. ¶¶ 55-91.

On September 9, 2016, Defendants moved to compel arbitration, or alternatively, to dismiss. Defendants argue that: (1) the Loan Agreement's arbitration provisions, including a delegation clause that requires that the issue of arbitrability be submitted to an arbitrator, should be enforced, and all of Plaintiff's claims submitted to arbitration; (2) the Complaint should be dismissed for improper venue because the Agreement's forum selection clause requires adjudication in the CRST Tribal Court or, in the alternative, the Court should abstain from hearing Plaintiff's claims until the CRST Court has had an opportunity to consider the venue question; (3) Plaintiff's state law claims must be dismissed because the Agreement's choice-of-law provision requires the application of CRST law; (4) Counts I, II, III, IV, and VI of the Complaint should be dismissed for failure to state a claim; and (5) Defendant Reddam should be dismissed because the Court lacks personal jurisdiction over him. Each will be discussed in turn.

### B. Defendants' Litigation History

Because the instant case is just the latest iteration in an ongoing saga concerning Defendants' business practices, it is helpful to first put this case in some broader context. Over the last few years, Defendants have become enmeshed in a spate of civil lawsuits and other proceedings across the country. At first, Defendants and related entities prevailed before various

---

[3] The Complaint refers to Count V twice, so the Court will refer to the RICO claim as Count VI.

courts with many of the same arguments advanced in the instant motion.  See Banks v. CashCall, Inc., No. 14-488, 2016 WL 3021749 (M.D. Fla. May 26, 2016); Yaroma v. Cashcall, Inc., 130 F. Supp. 3d 1055 (E.D. Ky. 2015); Kemph v. Reddam, No. 13-6785, 2015 WL 1510797 (N.D. Ill. Mar. 27, 2015); Williams v. CashCall, Inc., 92 F. Supp. 3d 847 (E.D. Wis. 2015); Chitoff v. CashCall, Inc., No. 14-60292, 2014 WL 6603987 (S.D. Fla. Nov. 17, 2014); Chitoff v. CashCall, Inc., No. 14-60292, 2014 WL 6603985 (S.D. Fla. Nov. 7, 2014); Narula v. Delbert Servs. Corp., No. 13-15065, 2014 WL 3752797 (E.D. Mich. July 30, 2014); Heldt v. Payday Fin., LLC, 12 F. Supp. 3d 1170 (D.S.D. 2014).

Yet the recent trend has tilted decidedly in favor of parties challenging Defendants' questionable business practices.  Numerous courts, including two within this circuit and several Courts of Appeals, have rejected Defendants' arguments and refused to compel arbitration, tribal exhaustion, litigation in the CRST Court, or the application of tribal law.  See Parnell v. W. Sky Fin., LLC, 664 F. App'x 841 (11th Cir. 2016); Parm v. Nat'l Bank of California, N.A., 835 F.3d 1331 (11th Cir. 2016); Hayes v. Delbert Servs. Corp., 811 F.3d 666 (4th Cir. 2016); Inetianbor v. CashCall, Inc., 768 F.3d 1346 (11th Cir. 2014); Jackson v. Payday Fin., LLC, 764 F.3d 765 (7th Cir. 2014); Ryan v. Delbert Servs. Corp., 15-05044, 2016 WL 4702352 (E.D. Pa. Sept. 8, 2016); Consumer Fin. Prot. Bureau v. CashCall, Inc., No. 15-7522, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016); Inetianbor v. Cashcall, Inc., No. 13-60066, 2016 WL 4702370 (S.D. Fla. Aug. 18, 2016); Inetianbor v. Cashcall, Inc., No. 13-60066, 2016 WL 4250644 (S.D. Fla. Apr. 5, 2016); Smith v. W. Sky Fin., LLC, 168 F. Supp. 3d 778 (E.D. Pa. 2016), appeal dismissed (Apr. 19, 2016); Parnell v. CashCall, Inc., 181 F. Supp. 3d 1025 (N.D. Ga.), aff'd sub nom., Parnell v. W. Sky Fin., LLC, 664 F. App'x 841 (11th Cir. 2016); Inetianbor v. CashCall, Inc., No. 13-60066, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015), reconsideration denied, No. 13-60066, 2016

WL 4249938 (S.D. Fla. Jan. 26, 2016); <u>Parm v. Nat'l Bank of California, N.A.</u>, No. 14-0320, 2015

WL 11605748 (N.D. Ga. May 20, 2015), <u>aff'd</u>, 835 F.3d 1331 (11th Cir. 2016); <u>Inetianbor v.</u>

<u>CashCall, Inc.</u>, 962 F. Supp. 2d 1303, 1309 (S.D. Fla. 2013), <u>aff'd</u>, 768 F.3d 1346 (11th Cir. 2014);

<u>W. Sky Fin., LLC v. State ex rel. Olens</u>, 300 Ga. 340, 348 (2016); <u>State ex rel. Cooper v. W. Sky</u>

<u>Fin., LLC</u>, No. 13-16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015).[4]  The Court

finds the latter line of cases persuasive, and their analysis undergirds the Court's holding here.

## II.  ANALYSIS

### A.  Arbitration Clause

#### 1.  Enforceability of the Delegation Provision

Defendants first argue that the Court may not assess the enforceability of the arbitration

clause because pursuant to the Agreement's delegation provision, issues concerning the validity,

enforceability, and scope of the arbitration clause must be determined by an arbitrator.  The Court

disagrees.

The Loan Agreement provides, in relevant part, that issues "concerning the validity,

enforceability, or scope of this loan or the Arbitration agreement" must be submitted to arbitration.

Loan Agreement at 9, Compl. Ex. 3, Dkt. No. 1-3.  Under this so-called delegation provision,

parties must submit even threshold disputes concerning the validity or scope of an arbitration

clause to the arbitrator.  <u>See</u> <u>Rent-A-Ctr., W., Inc. v. Jackson</u>, 561 U.S. 63, 68-69 (2010) (holding

that "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties

have agreed to arbitrate or whether their agreement covers a particular controversy") (quotations

---

[4] The Complaint also details at least one of Defendants' prior lending practices, which was referred to as a "rent a bank" scheme and enjoined by courts in West Virginia.  <u>See</u> Compl. ¶¶ 34-36.  And other courts have noted that "[t]he Federal Trade Commission and similar agencies from a number of states have filed complaints against [] Western Sky Financial and other affiliated companies, many resulting in consent agreements."  <u>Smith</u>, 168 F. Supp. 3d at 781.

omitted).  Such delegation clauses are simply "an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce." Id. at 70.  For this reason, if a plaintiff wishes to challenge a delegation provision, he must do so specifically.  Id. at 72; see also Ryan, 2016 WL 4702352, at *4.  If the plaintiff fails to challenge the delegation provision itself, "the federal courts must treat the delegation provision" as valid, and "leav[e] any challenge to the validity of the Agreement as a whole for the arbitrator."  Parnell v. CashCall, Inc., 804 F.3d 1142, 1146-47 (11th Cir. 2015) (quotation omitted).

Defendants maintain that Plaintiff has not asserted a challenge to the delegation clause itself.  But the Complaint specifically states that "[b]ecause the arbitration procedure described in the agreement is fabricated and illusory, any provision requiring that the enforceability of the arbitration procedure must be decided through arbitration is also illusory and unenforceable."  Compl. ¶ 32.  In addition, Plaintiff dedicated a section of his opposition brief to an argument against enforcement of the delegation clause.  Opp'n at 14-15.  This is more than sufficient to challenge the delegation provision.  See Parm, 835 F.3d at 1335 n.1 (holding that a challenge to the delegation clause raised in an opposition brief is sufficient); Smith, 168 F. Supp. 3d at 785-86 (same); Ryan, 2016 WL 4702352, at *5 n.8 (holding that by urging the Court in a notice of supplemental authority to follow Smith, which had refused to enforce the delegation provision, the plaintiff had sufficiently challenged the delegation clause).

The delegation clause is unenforceable for virtually the same reason as the underlying arbitration agreement—the Loan Agreement's wholesale waiver of the application of federal and state law makes it invalid.  As further explained below, even if the question of the enforceability of the arbitration clause were sent to an arbitrator, he or she would be categorically prohibited from applying any federal or state law to arrive at an answer.  In other words, "enforcing the delegation

provision would place an arbitrator in the impossible position of deciding the enforceability of the agreement *without* authority to apply any applicable federal or state law." <u>Smith</u>, 168 F. Supp. 3d at 786. This prohibition renders the clause invalid. <u>See id.</u> (holding that because there would be "no benchmark for JAMS or any other arbitrator to follow," the delegation clause was "illusory" and unenforceable); <u>Ryan</u>, 2016 WL 4702352, at *4-6 (holding that the delegation provision was unenforceable due to the agreement's "wholesale waiver of federal and state law," which would prohibit the arbitrator from determining whether the arbitration clause violated federal or state law, and effectively allow Defendants "to insulate an unenforceable arbitration clause from attack"); <u>cf.</u> <u>Parm</u>, 835 F.3d at 1335 (affirming the district court's conclusion that "the delegation clause is unenforceable because the arbitration agreement provides no available forum for an arbitrator to decide threshold issues of arbitrability"). Therefore, the Court will deny Defendants' motion to compel on this basis, and will proceed to address the enforceability of the arbitration provision.[5]

2. Enforceability of the Arbitration Clause

Next, Defendants contend that the Loan Agreement mandates arbitration of all of Plaintiff's claims. The Court disagrees, and holds that the arbitration agreement is unenforceable.

The Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.* ("FAA"), provides that "[a] written provision . . . to settle by arbitration a controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision reflects "a strong federal policy in favor of resolving disputes through

---

[5] The Court also holds that the unenforceable segments of the Loan Agreement's arbitration and other provisions are not severable, as they "defeat the central purpose of the contract," which was to insulate Defendants from the application of state and federal law. <u>Jacob v. Norris, McLaughlin & Marcus</u>, 128 N.J. 10, 33 (1992); <u>see also</u> <u>Hayes</u>, 811 F.3d at 676 (holding that the agreement's "errant provisions" were not severable because they went to the "essence" of the contract); <u>Inetianbor</u>, 768 F.3d at 1352-53 (same); <u>Parnell</u>, 181 F. Supp. 3d at 1044 (same).

arbitration." Century Indem. Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 522 (3d Cir. 2009). Thus, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or any allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983).

Initially, Defendants' loan agreements stated that any dispute would be resolved by arbitration, which "shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." Loan Agreement at 8. Several courts interpreting this provision held that it was unenforceable because it was illusory, in that the CRST did not actually conduct arbitrations and had no rules for the conduct of the arbitration. See Jackson, 764 F.3d at 779; Inetianbor, 962 F. Supp. 2d at 1307; Inetianbor, 768 F.3d at 1354.

Seemingly aware of this shortcoming, Defendants added an additional provision to their loan agreements, which purports to allow the borrower to select AAA, JAMS, or any other organization agreed to by all parties to administer the arbitration. Loan Agreement at 9; see Hayes, 811 F.3d at 672-73; Smith, 168 F. Supp. 3d at 785. Based on this clause, Defendants argue that an arbitral forum is available for Plaintiff, and that the agreement is therefore enforceable. This clause, however, does not save it.

Critically, the Loan Agreement categorically prohibits the arbitrator from applying any federal or state law to Plaintiff's claims. It states that: "no other state or federal law or regulation shall apply"; "[n]either this Agreement nor Lender is subject to the laws of any state of the United States of America"; "this Agreement shall be subject to and construed in accordance only with the provisions of the laws of the Cheyenne River Sioux Tribe and . . . no United States state or federal

law applies to this Agreement"; the arbitration may be governed by the arbitral organization's rules only "to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe"; and "[t]he arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement." Loan Agreement at 2, 7, 9, 10. The Loan Agreement also provides that while the arbitration may be conducted within thirty miles of the plaintiff's residence, such an accommodation should "not be construed in any way . . . to allow for the application of any law other than the law of the Cheyenne River Sioux Tribe of Indians to this Agreement." Id. at 9-10. In other words, the Loan Agreement ensures that no matter who the arbitrator is or where the arbitration occurs (including if a plaintiff selects AAA or JAMS), federal and state law may not be applied.

It is difficult to imagine a more transparent attempt to hijack the FAA to deprive aggrieved parties of an opportunity to meaningfully adjudicate their claims. Although the FAA has a broad reach, "courts will not enforce a prospective waiver" of statutory rights, "whether in an arbitration agreement or any other contract." Am. Exp. Co. v. Italian Colors Rest., 133 S. Ct. 2304, 2313-14 (2013); see also Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 540 (1995) (noting that if an arbitration provision operated as a "prospective waiver of a party's right to pursue statutory remedies," the Court would have "little hesitation in condemning the agreement as against public policy") (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 n.19 (1985)). Accordingly, numerous courts have held that the Loan Agreement's wholesale renunciation of federal and state law renders the arbitration agreement unenforceable. See Hayes, 811 F.3d at 673 (holding that the arbitration agreement is unenforceable "for the fundamental reason that it purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims"); Smith, 168 F. Supp. 3d at 785 ("The purpose of the arbitration

agreement at issue here is not to create a fair and efficient means of adjudicating Plaintiff's claims, but to manufacture a parallel universe in which state and federal law claims are avoided entirely."); Ryan, 2016 WL 4702352, at *5 (holding that "[t]he wholesale waiver of federal and state law . . . dooms both the delegation provision and the arbitration clause"); Parnell, 181 F. Supp. 3d at 1044 (agreeing with the Fourth Circuit that the "Loan Agreement has attempted to 'convert a choice of law clause into a choice of no law clause'") (quoting Hayes, 811 F.3d at 675). As the Fourth Circuit recently remarked:

> With one hand, the arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away. The just and efficient system of arbitration intended by Congress when it passed the FAA may not play host to this sort of farce.

Hayes, 811 F.3d at 673-74. The Court agrees, and likewise declines to endorse the Loan Agreement's sham dispute resolution procedures.[6] Defendants' motion to compel arbitration is denied.[7]

---

[6] Plaintiff also argues that even with the AAA/JAMS provision, the arbitration agreement is illusory and unenforceable because it still requires the involvement of an authorized tribal representative and application of CRST consumer dispute rules, neither of which exist. Opp'n at 7-8. Indeed, while the arbitration clause permits the plaintiff to choose AAA, JAMS, or another arbitrator agreed to by the parties to *administer* the arbitration, it apparently must still be "*conducted* by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." Loan Agreement at 8 (emphasis added). Several courts have therefore held that even with the AAA/JAMS provision, the arbitration agreement is unenforceable because the CRST forum and consumer dispute rules do not exist. See Parm, 2015 WL 11605748, at *8-11; Parm, 835 F.3d at 1336; Parnell, 664 F. App'x at 843-44. But because the Court holds that the arbitration clause fails for other reasons, it need not address this alternative argument at this time. See Hayes, 811 F.3d at 673, 675 (calling the interplay between the AAA/JAMS provision and the other requirements of the arbitration clause a "conundrum," but declining to address the issue because the arbitration clause failed for other reasons) (quotation omitted).

[7] The Court also questions whether the arbitration clause and other provisions may be unenforceable under basic contract law principles. See, e.g., Ryan, 2016 WL 4702352, at *5 (holding that the delegation provision in Defendants' loan agreements was unenforceable as a matter of basic contract law principles); Parm, 835 F.3d at 1336-37 (refusing to adopt a reading of

### B. Forum Selection Clause and Tribal Exhaustion

The Loan Agreement provides that it "is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation," and that the borrower consents to "the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court." Loan Agreement at 2. Defendants argue that, pursuant to this forum selection clause, Plaintiff should be required to proceed in the CRST Court. The Court disagrees.

Native American "tribes do not, as a general matter, possess authority over non-Indians who come within their borders: '[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.'" Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 328 (2008) (quoting Montana v. United States, 450 U.S. 544, 565 (1981)). Pursuant to two limited exceptions under Montana, tribes may exercise subject matter jurisdiction over non-Indians on their reservations: (1) "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements"; and (2) "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U.S. at 565.

The forum selection clause is unenforceable because the CRST Court does not have subject

---

the arbitration provision that ignored a "principle of English usage" and was, at best, ambiguous); see also NAACP of Camden Cty. E. v. Foulke Mgmt. Corp., 421 N.J. Super. 404, 431 (App. Div. 2011) (holding that an arbitration provision was unenforceable because it was "too plagued with confusing terms and inconsistencies to put a reasonable consumer on fair notice of their intended meaning"). However, because this issue was not raised by the parties and the clauses fail for other reasons, the Court declines to reach it at this time.

matter jurisdiction over Plaintiff's claims.  A tribe's ability to exercise jurisdiction is "tethered to the *nonmember's* actions, specifically the *nonmember's actions on the tribal land*." Jackson, 764 F.3d at 782 n.42 (emphasis in original); see also Montana, 450 U.S. at 565 (noting that "tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians *on their reservations*") (emphasis added).  Yet, as the Seventh Circuit and numerous other courts have explained, few if any of the relevant activities occurred on tribal land:

> [T]he Plaintiffs have not engaged in *any* activities inside the reservation. They did not enter the reservation to apply for the loans, negotiate the loans, or execute loan documents. They applied for loans in Illinois by accessing a website. They made payments on the loans and paid the financing charges from Illinois. Because the Plaintiffs' activities do not implicate the sovereignty of the tribe over its land and its concomitant authority to regulate the activity of nonmembers on that land, the tribal courts do not have jurisdiction over the Plaintiffs' claims.

Jackson, 764 F.3d at 782; see also Smith 168 F. Supp. 3d at 783 (citing to Jackson and calling the tribe's connection to the underlying commercial dispute a "legal fiction" insufficient to implicate the sovereignty of the tribe); Ryan, 2016 WL 4702352, at *2 (citing Hayes and Smith and holding that the forum selection clause was unenforceable); Inetianbor, 2016 WL 4702370, at *7 (holding that "Plaintiffs' actions do not fall within the Tribe's adjudicative authority, and without subject matter jurisdiction, the CRST Court is not a proper venue to adjudicate Plaintiffs' claims"); Hayes v. Delbert Servs. Corp., No. 14-258, 2015 WL 269483, at *3 (E.D. Va. Jan. 21, 2015), rev'd and remanded on other grounds, 811 F.3d 666 (4th Cir. 2016) ("The conduct at issue in this action did not involve an Indian-owned entity, did not occur on the CRST reservation, and did not threaten the integrity of the tribe. The Montana requirements for exhaustion simply do not apply."); CashCall, Inc. v. Massachusetts Div. of Banks, No. 13-1616, 2015 WL 5173531, at *3 (Mass. Super. Sept. 1, 2015) ("The tribal courts utterly lack jurisdiction, which cannot be granted through a contract, and thus, the choice of forum clauses are a nullity.").  The Court agrees with the

reasoning in these opinions,[8] and likewise holds that the forum selection clause is unenforceable due to the Tribe's conspicuous lack of connections to the underlying dispute.

Defendants also cursorily argue that even if the Court declines to dismiss pursuant to the forum selection clause, it must permit the CRST Court to decide the venue issue in the first instance, pursuant to the doctrine of tribal exhaustion. But tribal exhaustion is not required because Defendants have "not presented a 'colorable' claim that CRST courts have jurisdiction over Plaintiff." Smith, 168 F. Supp. 3d at 783-84 (quoting Jackson, 764 F.3d at 786); see also Jackson, 764 F.3d at 784-86 (holding that tribal exhaustion was not required because "[t]he present dispute does not arise from the actions of nonmembers on reservation land and does not otherwise raise issues of tribal integrity, sovereignty, self-government, or allocation of resources"); Hayes, 811 F.3d at 676 n.3 (adopting the district court's holding that tribal exhaustion was not required because, among other things, "the conduct at issue in this action did not involve an Indian-owned entity, did not occur on the [Tribe's] reservation, and did not threaten the integrity of the [T]ribe"); Ryan, 2016 WL 4702352, at *2 (citing to Hayes and Smith and holding that tribal exhaustion was not required).

### C. Choice of Law

Defendants argue that Plaintiff's claims under New Jersey law fail because the Loan Agreement's choice-of-law provision states that the laws of the CRST govern the Loan Agreement. The Court disagrees.

A federal district court sitting in diversity applies the choice-of-law rules of the forum state

---

[8] Defendants' reliance on Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians, 746 F.3d 167 (5th Cir. 2014) is unavailing. There, the Fifth Circuit held that it was "within the tribe's regulatory authority to insist that a child working for a local business not be sexually assaulted by the employees of the business." Id. at 173-74. Here, "there is no equivalent tribal concern that satisfie[s] the requirement of Plains Commerce Bank." Jackson, 764 F.3d at 783 n.43.

to determine what substantive law applies.  <u>Maniscalco v. Brother Int'l (USA) Corp.</u>, 709 F.3d 202, 206 (3d Cir. 2013).  Under New Jersey law, a choice-of-law provision will be enforced unless it violates public policy.  <u>Instructional Sys., Inc. v. Computer Curriculum Corp.</u>, 130 N.J. 324, 342 (1992).  Applying the Restatement (Second) of Conflict of Laws § 187, New Jersey courts have held that the law of the chosen state applies unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.

<u>Id.</u> (quoting Restatement (Second) of Conflict of Laws § 187(2) (1971)); <u>see also</u> <u>N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., a Div. of Keller Sys.</u>, 158 N.J. 561, 568-69 (1999)).

The Court will focus on the Restatement's second exception.  For the second exception to apply, the Court must find: (1) "that the application of [CRST] law would be contrary to a fundamental policy of New Jersey"; (2) "that New Jersey has a materially greater interest than [the CRST] in the determination of the particular question at issue"; and (3) "that under the general choice of law considerations of § 188 of the Restatement (Second) of Conflict of Laws, New Jersey law would apply."  <u>Christy v. We The People Forms & Serv. Centers, USA, Inc.</u>, 213 F.R.D. 235, 239 (D.N.J. 2003) (citations omitted).  Because the Court holds that each of these requirements is met, the choice-of-law provision will not be enforced and New Jersey law will apply to this dispute.

1. Application of CRST Law Would be Contrary to New Jersey's Fundamental Interest in Preventing Usurious and Unlicensed Lending

The Court holds that application of CRST law would be contrary to New Jersey's

fundamental public policy of protecting its citizens from usurious loans and unlicensed lenders.[9]

On this issue, two cases are particularly instructive. In <u>Turner v. Aldens, Inc.</u>, 179 N.J. Super. 596 (App. Div. 1981), the New Jersey Appellate Division considered whether to apply the usury provision of New Jersey's Retail Installment Sales Act ("RISA"), despite the parties' contractual selection of Illinois law. After finding that the New Jersey Legislature "intended to offer New Jersey consumers the protection of RISA no matter from where the seller deals," the Court concluded that to apply Illinois law would "contravene fundamental policy of [New Jersey] as it appears documented in RISA." <u>Id.</u> at 601-04. It therefore held that the Illinois choice-of-law provision was unenforceable, and applied RISA to the transaction. <u>Id.</u> at 604. Similarly, in <u>Kaneff v. Delaware Title Loans, Inc.</u>, 587 F.3d 616, 621-22 (3d Cir. 2009), the Third Circuit applied § 187 of the Restatement to determine whether Pennsylvania law, which prohibited usury, or the loan agreement's selection of Delaware law, which did not prohibit usury, should be applied to determine whether the contract's arbitration clause was unconscionable. The Court held that Pennsylvania had a materially greater interest than Delaware in the determination of whether the arbitration clause was unconscionable, and that "Pennsylvania's interest in the dispute, particularly its antipathy to high interest rates such as the 300.01 percent interest charged in the contract at issue, represents such a fundamental policy that we must apply Pennsylvania law." <u>Id.</u> at 624.[10]

As in <u>Kaneff</u>, New Jersey has demonstrated an opposition to usurious interest rates like the

_____

[9] The parties do not dispute that a conflict exists between CRST and New Jersey law: New Jersey has civil usury and licensing laws, and the CRST apparently does not.

[10] Although it did not involve a choice-of-law provision, the decision in <u>Dopp v. Yari</u>, 927 F. Supp. 814 (D.N.J. 1996) is additionally instructive. Applying New Jersey's "most significant relationship" test, the Court held that given New Jersey's demonstrated interest in protecting its residents from out-of-state lenders seeking to lend money at usurious rates, New Jersey's criminal usury law would apply to a transaction between a California lender and New Jersey borrower. <u>Id.</u> at 818-19 (citing <u>Turner</u>, 179 N.J. Super. at 601 and <u>Oxford Consumer Disc. Co. of N. Philadelphia v. Stefanelli</u>, 104 N.J. Super. 512, 523 (App. Div. 1969), <u>aff'd</u>, 55 N.J. 489 (1970)).

116.73% interest rate charged under Plaintiff's Loan Agreement.  The State has expressed this public policy by expressly prohibiting interest rates higher than 16% for consumer contracts.  N.J. Stat. Ann. § 31:1-1(a); see Schwartz v. Battifarano, 2 N.J. 478, 483 (1949) (stating that the "public policy of this State" is "expressed in its statutes"); Turner, 179 N.J. Super. at 601 (concluding that despite RISA's silence, the New Jersey Legislature evidently "intended to offer New Jersey consumers the protection of RISA no matter from where the seller deals, and that this intent constitutes a statutory directive respecting choice of law").  New Jersey has also further evidenced this public policy by criminalizing lending at rates greater than 30% for non-corporate entities and 50% for corporate entities.  N.J. Stat. Ann. § 2C:21-19; see Madden v. Midland Funding, LLC, No. 11-8149, 2017 WL 758518, at *11 (S.D.N.Y. Feb. 27, 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy.").  And courts have observed that "New Jersey has a specific interest in protecting its residents from out-of-state lenders who seek to lend money to New Jersey residents on terms which are usurious under New Jersey law." Dopp, 927 F. Supp. at 818 (citation omitted); see also Ellison v. Evergreen Cemetery, 266 N.J. Super. 74, 84 (App. Div. 1993) (stating that New Jersey has a "strong public policy against usury") (citation omitted).[11]  There is little question that New Jersey has a strong public policy against usury and licensing that would be contravened by application of CRST law.

      2.   New Jersey Has a Materially Greater Interest Than the CRST in Having its Laws Applied Here

It is also apparent that New Jersey has a materially greater interest than the CRST in the application of its laws to the Loan Agreement.  To determine which forum has a materially greater

---

[11] New Jersey also requires that consumer lenders be licensed by the State, N.J. Stat. Ann. § 17:11C-3, and provides that loans made by unlicensed lenders "shall be void and the lender shall have no right to collect or receive any principal, interest or charges," id. § 17:11C-33(b).

interest, courts generally look to factors such as "place of negotiation, place of execution, place of performance, citizenship of the parties, and the policy behind the law at issue." Fin. Cas. Sec. Co. v. Mascola, No. 11-04316, 2013 WL 3793929, at *3 (D.N.J. July 19, 2013). Plaintiff is a citizen of New Jersey, was shown advertising regarding the loan while located in New Jersey, entered into the contract from his computer in New Jersey, received the proceeds of his loan in New Jersey, and alleges that Defendants' breached New Jersey laws concerning usury, licensing, and unconscionable commercial practices. Compl. ¶¶ 5, 12, 13, 17, 19, 19 n.3, 37, 38, 55-72. In addition, New Jersey has an interest in "seeing that its consumer protection law[s] be applied" because "[s]tate consumer protection laws are designed to protect the residents of the states in which the statutes are promulgated." Stone St. Servs., Inc. v. Daniels, No. 00-1904, 2000 WL 1909373, at *5 (E.D. Pa. Dec. 29, 2000); see also Kaneff, 587 F.3d at 623; Dopp, 927 F. Supp. at 818.

Conversely, Defendants have not shown that the CRST has any significant interest in having its law applied to this dispute. Although Western Sky, a party to the transaction, was owned by a CRST member and operated on tribal property, its involvement was nominal and brief. CFPB, 2016 WL 4820635, at *8 (holding that "the CRST does not have a significant interest in the application of its law when Western Sky is neither a tribally-owned corporation, nor the true lender"); see also Kaneff, 587 F.3d at 623 (holding that Pennsylvania had a materially greater interest in having its usury laws applied than Delaware, despite the fact that the loan agreement contained a Delaware choice-of-law provision, was entered into and signed in Delaware, required repayment in Delaware, and the lender was incorporated and had its only offices in Delaware). Defendants also maintain that the "CRST and its tribal members have a strong interest in promoting tribal entrepreneurship with the certainty that contractual choice-of-law provisions

applying CRST law will be honored." Reply at 6. This argument is unpersuasive. Going forward, there is little reason why CRST members may not seek to enforce CRST choice-of-law provisions where CRST law actually has a substantial relationship to the parties or the underlying transaction and its application would not contravene a state's fundamental public policy. But perhaps more importantly, this argument fails to explain how the CRST has any interest "in the determination of the particular issue" here. Restatement (Second) of Conflict of Laws § 187(2). A jurisdiction's general interest in having its choice-of-law provisions applied is simply not relevant—such an interest would necessarily be present in every dispute concerning the enforcement of a choice-of-law provision. As to the specific issues here, Defendants do not even attempt to mention what, if any, CRST laws concerning usury, licensing, or unconscionable commercial practices would apply to the underlying loan transactions. See CFPB, 2016 WL 4820635, at *8.

Accordingly, the Court concludes that application of CRST law would contravene New Jersey's fundamental public policy of preventing usurious lending, and that New Jersey's demonstrated interest far exceeds any purported interest of the CRST.

### 3. Absent an Enforceable Choice-of-Law Provision, New Jersey Law Would Apply

Finally, New Jersey law would otherwise apply to Plaintiff's Loan Agreement. In the absence of an enforceable choice-of-law provision, "New Jersey courts ask which forum has the most significant relationship with the parties and the contract." Forestal Guarani S.A. v. Daros Int'l, Inc., 613 F.3d 395, 401 (3d Cir. 2010) (citations omitted). To that end, New Jersey courts have adopted the analysis set forth in Sections 188 and 6 of the Restatement (Second) of Conflicts of Laws. Id. (citing Gilbert Spruance Co. v. Pa. Mfrs. Ass'n Ins. Co., 134 N.J. 96 (1993)). Section 188 provides that courts should consider: "'(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract,

and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.'" Jackson v. Midland Funding LLC, 468 F. App'x 123, 126-27 (3d Cir. 2012) (quoting Restatement (Second) of Conflict of Laws § 188(2)).

For the same reasons that New Jersey has a materially greater interest than the CRST in having its law applied, New Jersey law would apply absent an effective choice-of-law provision. Plaintiff is a resident of New Jersey, and the vast majority of the contracting and performance of the Loan Agreement occurred in New Jersey. Other than the CRST, which clearly does not have the "most significant relationship" to the parties and the contract, the parties have not identified any other law that should apply to this contract. The Court concludes that New Jersey has the most significant relationship to the underlying transaction, and that its law would apply absent an enforceable choice-of-law provision.

Therefore, at this stage in the litigation, the Court declines to enforce the Loan Agreement's choice-of-law provision and will instead apply New Jersey law to this dispute. The Court notes that this holding is consistent with the Restatement, which counsels that courts should decline to enforce choice-of-law provisions that were intended to evade the public policy of the state whose law would otherwise apply. See Restatement (Second) of Conflict of Laws § 187, Rptr. cmt. g ("In the . . . usury area[], choice-of-law provisions have not been permitted to override protective statutes of the state whose local law would have been applied in the absence of an effective choice of law by the parties."); Restatement (Second) of Conflict of Laws § 203, cmt. e (1971) ("A choice of law by the parties will not secure application of a law that would not otherwise be applicable to sustain a contract against the charge of usury."). It is also in line with numerous other courts that have refused to enforce the choice-of-law provision in Defendants' loan agreements because doing so would contravene state public policy. See, e.g., CFPB, 2016 WL 4820635, at *8 (holding that

the laws of the borrowers' home states, including New Jersey, applied because "application of CRST law would be contrary to a fundamental policy of the Subject States, . . . the Subject States have a materially greater interest than the CRST in the enforcement of its usury and licensing laws," and the borrowers' home states had the "most significant relationship to the transactions"); State ex rel. Olens, 300 Ga. at 347 (holding that "the police power to enforce the criminal laws of [Georgia] cannot be defeated by the efforts of parties to an agreement to contract around it," and refusing to apply CRST law); State ex rel. Cooper, 2015 WL 5091229, at *10 (noting that enforcing Defendants' choice-of-law provision would undermine North Carolina's fundamental public policy of prohibiting usury, and refusing to apply CRST law); see also Jackson, 764 F.3d at 775-76 n.23 (declining to decide the choice-of-law question but noting that "a more-than-colorable argument can be made that the loan agreements' choice of law clause should not be enforced and that Illinois law ought to govern the parties' dispute," in part because the contracts violated Illinois' public policy against usury). Accordingly, the Court will apply New Jersey substantive law to the instant dispute.[12]

---

[12] For many of the same reasons, the choice-of-law provision is also unenforceable under the first Restatement exception. In this case, both of the Restatement's exceptions dovetail—because Defendants only minimally involved a CRST-related entity in an attempt to evade state usury laws, the CRST lacks a substantial relationship to the relevant parties and transactions. In fact, another section of the Restatement sets forth an illustration strikingly similar to the facts here:

> A loan transaction has its principal contacts with states X and Y. The contract provides, however, that it is to be governed by the local law of state Z, which has no contact with the contract other than the fact that it is the state of incorporation of the lender. Effect will not be given to the choice-of-law provision, and the Z usury statute will not be applied since Z has no substantial relationship to the contract.

Restatement (Second) of Conflict of Laws § 203, illus. 8; see also Madden, 2017 WL 758518, at *9 ("A party may not evade New York's usury laws, however, by merely nominally operating in another jurisdiction.") (quotation omitted). Likewise here, other than Western Sky's ownership by a member of the CRST, operation on CRST land, and routine business licensure by the CRST, the Tribe appears to have had no other involvement in Plaintiff's loan transaction. See Compl. ¶

### D. Failure to State a Claim

Defendants argue that even if New Jersey law applies, Plaintiff's usury, CFLA, CFA, and RICO claims must be dismissed because they fail to state a claim.[13]

In considering a motion to dismiss, the Court accepts as true all of the facts in the complaint and draws all reasonable inferences in favor of the nonmoving party. Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). Dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Id. at 231. However, the facts alleged must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Thus, a complaint will survive a motion to dismiss if it provides a sufficient factual basis such that it states a facially plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

#### 1. New Jersey Consumer Finance Licensing Act

Defendants contend that Plaintiff's claim under the CFLA must be dismissed because, as Plaintiff acknowledges, courts in this district have held that there is no private right of action for violation of the CFLA. See Jubelt v. United N. Bankers, Ltd., No. 13-7150, 2015 WL 3970227, at *14 (D.N.J. June 30, 2015); Veras v. LVNV Funding, LLC, No. 13-1745, 2014 WL 1050512, at *7-9 (D.N.J. Mar. 17, 2014). The Court sees no reason to depart from those decisions, and dismisses Plaintiff's CFLA claim.

---

18. It is quite evident that Western Sky's involvement was nominal in nature, and merely intended to evade New Jersey and other states' laws. The Court therefore alternatively holds, as other courts have, that Defendants' choice-of-law provision fails due to the CRST's lack of a substantial relationship to the parties and transactions at issue. See, e.g., CFPB, 2016 WL 4820635, at *5-8; Inetianbor, 2015 WL 11438192, at *4; State ex rel. Olens, 300 Ga. at 348.

[13] Defendants also argue that Plaintiff's unjust enrichment claim fails because it depends "on the incorrect premise that New Jersey's interest rate limits apply to Plaintiff's loan." Defs.' Br. at 12. Because the Court holds otherwise, Plaintiff's unjust enrichment claim will not be dismissed.

2. New Jersey Usury Laws

Defendants argue that Plaintiff has failed to state a claim for usury under New Jersey law. The Court disagrees.

To state a claim for usury in New Jersey, "a party must establish three elements: (1) a loan of money, (2) an absolute obligation to repay the principal and (3) the exaction of a greater compensation than that allowed by law for the use of the money." Dopp, 927 F. Supp. at 820; see also N.J. Stat. Ann. § 31:1-1 (civil usury); N.J. Stat. Ann. § 2C:21-19 (criminal usury).

Defendants first argue that Plaintiff fails to state a claim because New Jersey's usury statute does not apply to interest on defaulted obligations and Plaintiff has not alleged whether he is in default of his obligation. It is true that in New Jersey, "it is not illegal to provide for an interest rate higher than that permitted by the usury laws if the rate is only applied after default." Stuchin v. Kasirer, 237 N.J. Super. 604, 612 (App. Div. 1990). But Plaintiff's usury claim is not reliant on post-default interest rates or penalties—the interest on the face of the loan is 115% per annum and the Annual Percentage Rate is 116.73%. Compl. ¶ 39; see also Loan Agreement at 3, 5. The Complaint also clearly alleges that Plaintiff actually paid usurious rates of interest for at least three years. Compl. ¶¶ 39-43; see also id. Ex. 4. Accordingly, the Complaint adequately states a usury claim.

Defendants also contend that even if New Jersey's usury law applies, Plaintiff's remedy would be limited to repayment of interest above the legal limit so long as such interest was not received by an unlawful or corrupt intent. Putting aside that this argument does not go to whether Plaintiff states a claim, but rather to the appropriate measure of damages, the Complaint explicitly states that Defendants "routinely charged Plaintiff . . . interest rates in excess of the maximum rates allowed under New Jersey law" and that its actions were "knowing, deliberate, intentional, and

willful," with the "purpose . . . to take more than the legal rate of interest for the money loaned to Plaintiff." Compl. ¶ 56; see also id. ¶ 64 ("Defendants' conduct was not the result of a good faith error but instead was a deliberate, willful, and intentional scheme to circumvent New Jersey law and to collect interest at rates well in excess of that allowed under the law."). And the Complaint and its exhibits assert that "'Western Sky is nothing more than a front to enable CashCall to evade licensure by state regulators and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators.'" Id. ¶ 20 (quoting In Re Cashcall, 2013 WL 3465250, at *3). To the extent such pleading is even required, Plaintiff has satisfactorily alleged that Defendants did not collect a usurious rate of interest by way of a good faith mistake or miscalculation.

Defendants' motion to dismiss Plaintiff's usury claim is denied.

3. New Jersey Consumer Fraud Act

Defendants maintain that Plaintiff has failed to state a claim under the CFA. The Court disagrees.

The CFA was passed with a "clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud." Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 264 (1997). "To prevail on a CFA claim, a plaintiff must establish three elements: '1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." Zaman v. Felton, 219 N.J. 199, 222 (2014) (quoting Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557 (2009)). The CFA defines "unlawful practice" as follows:

> The act, use or employment by any person of any unconscionable
> commercial practice, deception, fraud, false pretense, false promise,
> misrepresentation, or the knowing, concealment, suppression, or
> omission of any material fact with intent that others rely upon such

> concealment, suppression or omission, in connection with the sale
> or advertisement of any merchandise or real estate, or with the
> subsequent performance of such person as aforesaid, whether or not
> any person has in fact been misled, deceived or damaged thereby….

N.J. Stat. Ann. § 56:8-2. An "unconscionable commercial practice" is not defined in the CFA, but contemplates a "lack of 'good faith, honesty in fact and observance of fair dealing.'" Cox v. Sears Roebuck & Co., 138 N.J. 2, 18 (1994) (quoting Kugler v. Romain, 58 N.J. 522, 544 (1971)). The CFA applies to the "offering, sale, or provision of consumer credit." Lemelledo, 150 N.J. at 265.

The parties disagree as to whether Rule 9(b)'s heightened pleading standards apply to claims of unconscionable commercial conduct under the CFA. But the Court need not address this issue because even if the Court assumes that Rule 9(b)'s heightened pleading standard applies, the Complaint states a claim under the CFA. To meet this standard, the plaintiff must plead his claims with "sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged . . . . [T]he plaintiff must plead or allege the date, time and place" of the alleged fraud or unconscionable commercial conduct or "otherwise inject precision or some measure of substantiation'" into the allegations. Zodda v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., No. 13-7738, 2015 WL 926221, at *9 (D.N.J. Mar. 4, 2015) (quoting Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007)). If there are multiple defendants, "the complaint must plead with particularity by specifying the allegations of [impropriety] applying to each defendant." MDNet, Inc. v. Pharmacia Corp., 147 F. App'x 239, 245 (3d Cir. 2005).

A close review of the Complaint shows that it sufficiently sets forth the details of the alleged scheme, see Compl. ¶¶ 15-33, 37-43, 66-72; its time period, see id. ¶¶ 37-43; and each Defendant's alleged role, see id. ¶¶ 2, 7, 8, 15, 17-26, 34-35, 40-41, 68, 81-82 (CashCall); id. ¶¶ 8, 15, 18, 22, 40, 41 (WS Funding); id. ¶¶ 9, 15, 22-23, 41 (Delbert); id. ¶¶ 6-9, 13, 15, 21, 23, 25, 77, 82 (Reddam). The Complaint also attaches and incorporates an Order to Cease and Desist by

the State of New Hampshire Banking Department, which sets forth detailed factual findings and conclusions regarding Defendants' dubious business practices. See In Re Cashcall, Inc., 2013 WL 3465250. And the Complaint specifically cites to and quotes decisions by other federal courts that have outlined Defendants' various schemes. Compl. ¶¶ 31-36. Among other things, the Complaint and its attachments allege that each of the Defendants participated in a scheme to use Western Sky as a "front" to deceive customers and regulators and circumvent New Jersey's usury and licensing laws, actually charged or collected a usurious rate of interest and were not properly licensed under New Jersey law, continued to do business in New Jersey after their predecessor "rent a bank" scheme was deemed unlawful in other states, and inserted and attempted to enforce numerous illusory and unenforceable provisions in their loan agreements. These allegations are sufficient to place Defendants on notice of the precise conduct with which they are charged, and are enough overcome the pleading requirements of Rule 9(b). See Inetianbor, 2016 WL 4250644, at *6 (holding that allegations similar to Plaintiff's were sufficient to state common law fraud and Florida Deceptive and Unfair Trade Practices Act claims against CashCall and Reddam); see also CFPB, 2016 WL 4820635, at *10 (holding on summary judgment that "CashCall and Delbert Services engaged in a deceptive practice" in violation of the Consumer Financial Protection Act by "creat[ing] the 'net impression' that the loans were enforceable and that borrowers were obligated to repay the loans in accordance with the terms of their loan agreements").

Defendants' motion to dismiss Plaintiff's CFA claim is denied.

4. Racketeer Influenced and Corrupt Organizations Act

Defendants argue that the Complaint fails to state a claim under RICO. The Court again disagrees.

The Complaint contains two RICO claims. First, Plaintiff alleges that Defendants

participated in the conduct of an association-in-fact enterprise (the "Western Sky Enterprise") for the purpose of collecting unlawful debts, in violation of 18 U.S.C. § 1962(c). The statute provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). To state a RICO claim under § 1962(c), a plaintiff must allege that a RICO defendant participated in (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity or collection of unlawful debt. Goldenstein v. Repossessors Inc., 815 F.3d 142, 147 (3d Cir. 2016). Plaintiff also alleges that Defendants are liable under 18 U.S.C. § 1962(d) for participating in a conspiracy to collect unlawful debts in violation of 18 U.S.C. § 1962(c).

First, Defendants argue that the Complaint fails to plead sufficient facts to demonstrate the collection of "unlawful debt" under § 1962(c). Defendants reason that because the Loan Agreement's choice-of-law provision precludes the application of New Jersey law, there can be no collection of "unlawful debt." But the Court has declined to enforce the choice-of-law provision and will apply New Jersey law, so this argument fails. In addition, the Complaint satisfactorily alleges that Defendants charged and collected interest at more than twice New Jersey's legal limit in violation of § 1962(c). Compl. ¶¶ 39-43, 88; see also 18 U.S.C. § 1961(6) (a debt is "unlawful" under RICO if the interest is more than twice the legal limit); N.J. Stat. Ann. § 31:1-1(a) (setting the maximum relevant interest rate in New Jersey at 16%); United States v. Eufrasio, 935 F.2d 553, 576 (3d Cir. 1991) ("Only one act of collecting or attempting to collect unlawful debt is necessary to establish that predicate act.").

Second, Defendants contend that the Complaint does not sufficiently allege that CashCall, WS Financial, and Delbert each conducted or participated in the alleged enterprise. To state a claim under § 1962(c), a plaintiff must allege that each defendant has "'participated in the

operation or management of the enterprise itself.'" In re Ins. Brokerage Antitrust Litig., 618 F.3d

300, 371 (3d Cir. 2010) (quoting Reves v. Ernst & Young, 507 U.S. 170, 183 (1993)).  In this way,

§ 1962(c) does not "reach complete 'outsiders' because liability depends on showing that the

defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own*

affairs."  Reves, 507 U.S. at 185 (emphasis in original).  Plaintiff counters that this requirement is

met because Defendants each had "substantial involvement in the criminal activities" of the

enterprise.  Opp'n at 30 n.16 (quoting United States v. Parise, 159 F.3d 790, 796-97 (3d Cir.

1998)).

    As previously discussed, the Complaint and its exhibits provide detailed allegations

regarding CashCall, WS Funding, and Delbert's individual roles in the scheme.  Among other

things, CashCall provided Western Sky with resources and support in furtherance of the scheme,

purchased usurious loans from Western Sky, and serviced and performed collection efforts on the

usurious loans; WS Funding entered into agreements with Western Sky, purchased usurious loans

from Western Sky, performed servicing and collection on usurious loans, and assigned usurious

loans to Delbert; and Delbert serviced and performed collections on usurious loans.  See supra Part

II.D.3; see also Compl. ¶¶ 89-90 (alleging that Defendants each knowingly participated in "the

conduct of the Western Sky Enterprise's affairs in the collection of unlawful debt").  These

allegations indicate that all three entities were "deeply involved in—and integral to—the operation

of" the enterprise, with each of them performing specific acts in furtherance of a scheme with the

express purpose of making, servicing, and collecting on usurious loans.  Parise, 159 F.3d at 797;

see also Eufrasio, 935 F.2d at 576 (holding that it is unlawful under RICO to engage in a "single

act which would tend to induce another to repay on an unlawful debt"); Goldenstein, 815 F.3d at

148-49 (holding that because "the prohibition on the 'collection of unlawful debt' under the statute

encompasses efforts to collect on a usurious loan," even a legitimate repossession company that repossessed collateral for an unlawful debt could be liable under RICO). The Complaint satisfactorily pleads CashCall, WS Funding, and Delbert's participation in the enterprise.

Third, Defendants maintain that because the Complaint defines the enterprise as coextensive with the Defendants and their agents, it fails to satisfy the distinctiveness requirement under § 1962(c). To overcome the distinctiveness requirement, a plaintiff must plead the existence of a RICO enterprise that is "distinct" from the RICO defendants themselves. Thus, "to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001); see also Zavala v. Wal-Mart Stores, Inc., 447 F. Supp. 2d 379, 383 (D.N.J. 2006), aff'd sub nom., Zavala v. Wal Mart Stores Inc., 691 F.3d 527 (3d Cir. 2012) ("If the members of the enterprise are the same as the persons, the distinctness requirement has not been met, as the 'person' and the 'enterprise' must not be identical."). A "person" includes "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). An "enterprise" includes any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Id. § 1961(4).

Here, the Complaint specifically states that although each named Defendant is a "person" under RICO, the alleged "enterprise" is an association-in-fact consisting of each named Defendant *along with non-party Western Sky Financial*. Compl. ¶¶ 82, 85-86. Western Sky is a "limited liability company organized under the laws of the State of South Dakota" and "wholly owned by Martin 'Butch' Webb, a member of the Tribe." Id. ¶ 16. In addition, Western Sky allegedly entered on its own behalf into contracts with the RICO Defendants and received a percentage of

the face value of each executed loan, with a guaranteed minimum of $100,000 per month. <u>Id.</u> ¶ 19. Due to the inclusion of third party Western Sky, a separate legal entity with a different owner than Defendants, Plaintiff has alleged a RICO enterprise that is "not simply the same 'person' referred to by a different name." <u>Cedric Kushner</u>, 533 U.S. at 161; <u>see also</u> <u>Devon Drive Lionville, LP v. Parke Bancorp, Inc.</u>, No. 15-3435, 2016 WL 7475816, at *10 (E.D. Pa. Dec. 29, 2016) (noting that "inclusion" of a "third party" in the alleged enterprise "tends to negate the notion that the enterprise" is merely a RICO person, simply called by another name) (quotation omitted); <u>Mega Concrete, Inc. v. Smith</u>, No. 09-4234, 2013 WL 3716515, at *13 (E.D. Pa. July 15, 2013) (holding that an enterprise that included an individual outside of the other RICO defendants' "corporate sphere" was sufficient to overcome the distinctiveness requirement).

Defendants argue that two allegations in the Complaint undermine this distinctiveness. First, Defendants point to the Complaint's allegation that the Western Sky Enterprise was the "alter ego" of Reddam and CashCall. Compl. ¶¶ 23, 82. However, the Complaint explicitly states that the RICO claim is pled as an alternative theory to Plaintiff's "alter ego" claim, which does not survive this motion. <u>Id.</u> ¶ 82.[14] Second, Defendants point to the Complaint's numerous assertions

---

[14] To the extent Plaintiff asserts an "alter ego" claim in an attempt to pierce the corporate veil, it fails to state a claim and will be dismissed. As Defendants note, the Complaint does not allege facts suggesting that Reddam abused the corporate form, such as "gross undercapitalization . . . failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, [or] the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders." <u>Craig v. Lake Asbestos of Quebec, Ltd.</u>, 843 F.2d 145, 150 (3d Cir. 1988) (quotation omitted); <u>see also</u> <u>CHNJ Inv'rs, LLC v. Koger</u>, No. 12-1467, 2013 WL 1192400, at *8-9, n.17 (D.N.J. Mar. 21, 2013) (where the Court dismissed plaintiff's "alter ego" claim but permitted its RICO claim to go forward, and observed that it is "incongruous [for the Defendants] to argue, on the one hand, that the Plaintiff cannot assert a claim for piercing the corporate veil because [he] has not pled that [the companies] were alter egos and then, on the other hand, to argue that the RICO claim must fail because [the companies] are alter egos").

that Western Sky was a "front" for CashCall and that Defendants supported many of Western Sky's relevant operations. But these allegations are not fatal to Plaintiff's RICO claim because it is plausible that while Western Sky was used by Defendants as a "front" for the scheme (i.e., that Western Sky's tribal connection was used by Defendants to evade state and federal laws), it nonetheless existed, outside Defendants' "corporate sphere," as a separate legal entity for the purpose of alleging a RICO enterprise distinct from the RICO Defendants. Mega Concrete, 2013 WL 3716515, at *13; see also United States v. Bergrin, 650 F.3d 257, 266 (3d Cir. 2011) (stating that "'association-in-fact' enterprise can exist—and satisfy the 'distinctiveness' requirement—when it is comprised of members that are a mixture of individual persons and 'entities that they control'") (citing United States v. Masters, 924 F.2d 1362, 1366 (7th Cir. 1991)). Thus, the Court will not dismiss Plaintiff's RICO claim for lack of distinctiveness at this time.

Defendants' motion to dismiss Plaintiff's RICO claim is denied.[15]

### E. Personal Jurisdiction Over Reddam

Reddam argues that the Court lacks personal jurisdiction over him. Other than some visits to New Jersey "related to horseracing," Reddam claims he has no connections to the forum. Reddam Aff. ¶ 3.[16] Plaintiff contends that the Court need not analyze whether Reddam has

---

[15] Defendants also argue that Plaintiff's RICO conspiracy claim under § 1962(d) fails because his claims under § 1962(c) must be dismissed. Because the Court holds that Plaintiff states a claim under § 1962(c), this argument fails. They further maintain that the Complaint fails to state a RICO conspiracy claim because it fails to distinguish between Defendants and the alleged enterprise. Yet as the Court has already explained, this argument is unavailing. Plaintiff's RICO conspiracy claim will not be dismissed.

[16] The Court notes that Defendants do not dispute that CashCall, WS Funding, and Delbert are subject to specific personal jurisdiction based on their contacts with New Jersey relating to the origination, servicing, and collection of Plaintiff's loan. See Compl. ¶¶ 5, 12, 13, 17, 19, 19 n.3, 37, 38, 55-72. Nor does Reddam contest that he has minimum contacts with the United States since, among other things, he readily concedes that he is a domiciliary of California. See, e.g., Compl. ¶¶ 6-9, 15, 21, 23, 25; Reddam Aff. ¶¶ 2-3, Dkt. No. 11-4.

sufficient contacts with New Jersey because it may assert personal jurisdiction over him pursuant to RICO's nationwide service of process provision.  See 18 U.S.C. § 1965(b), (d).  Reddam raises only two arguments against the exercise of personal jurisdiction under this provision.

First, Reddam contends that because Plaintiff fails to state a claim under RICO, personal jurisdiction cannot be predicated on the RICO statute.  In light of the Court's holding that Plaintiff has stated a RICO claim, this argument fails.

Second, Reddam states that "[i]n the event the Court denies the motion to dismiss in whole or in part as to the RICO claim, Reddam reserves the right to argue that the exercise of jurisdiction under § 1965 poses 'extreme inconvenience or unfairness' to Reddam in violation of due process." Defs.' Br. at 28 (quoting ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 627 (4th Cir. 1997)); see also Reply at 11 (noting that "if the RICO claim is not dismissed, personal jurisdiction is proper only if it does not create 'extreme inconvenience or unfairness,' in violation of due process, an inquiry not yet before the Court").  But it is unclear when Reddam intends to "reserve" this argument for or why the inquiry is "not yet before the Court," considering that Reddam explicitly argues in the instant motion that the Court does not have personal jurisdiction over him—as he must to avoid waiver under the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 12(h) (providing that a party waives the defense of personal jurisdiction by failing to raise it in the party's answer or a responsive pleading); see also Fed. R. Civ. P. 12(g)(2) (stating that "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion"); Boston Telecommunications Grp., Inc. v. Deloitte Touche Tohmatsu, 249 F. App'x 534, 536 (9th Cir. 2007) (holding that a defendant waived his right to assert the defense of personal jurisdiction where he did not raise it in his first motion to dismiss, even when he inserted a footnote in his brief stating

that he "reserves his rights and objections to file a supplemental motion to dismiss" based on personal jurisdiction). This was clearly the appropriate juncture to consider Reddam's personal jurisdiction defense.

Under the test proposed by Reddam, the burden is on the defendant to demonstrate that the exercise of jurisdiction under 18 U.S.C. § 1965 would result in "such extreme inconvenience or unfairness" as to violate the Due Process Clause of the Fifth Amendment. See ESAB Grp., 126 F.3d at 627 (holding that personal jurisdiction existed pursuant to the RICO statute because the Court could "discern[] no evidence from the record in this case of such extreme inconvenience or unfairness as would outweigh the congressionally articulated policy of allowing the assertion of *in personam* jurisdiction in South Carolina"); Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 948 (11th Cir. 1997) (holding that "[t]he burden is on the defendant to demonstrate that the assertion of jurisdiction in the forum will 'make litigation so gravely difficult and inconvenient that [he] unfairly is at a severe disadvantage in comparison to his opponent'") (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478 (1985)). Reddam has submitted no such evidence. Therefore, Reddam's motion to dismiss based on a lack of personal jurisdiction is denied.[17]

## III.    CONCLUSION

For the reasons set forth herein, the motion to compel arbitration is **DENIED** and the motion to dismiss is **GRANTED** in part and **DENIED** in part. An appropriate Order accompanies this Opinion.

*/s Madeline Cox Arleo*
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**

---

[17] Any further motions relating to jurisdiction shall not be filed without leave of the Court.