# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN S. MACDONALD and JESSICA C. SPEARMAN, | Civil Action No. 2:16-cv-02781 MCA-LDW |
| Plaintiffs, | **First Amended Class Action Complaint** |
| v. | |
| CASHCALL, INC.; WS FUNDING, LLC; DELBERT SERVICES CORP.; and J. PAUL REDDAM, | |
| Defendants. | |

Patricia A. Barasch, NJ Bar No. 0055480
**SCHALL & BARASCH, LLC**
Moorestown Office Center
110 Marter Ave, Suite 302
Moorestown, NJ 08057
Telephone: (856) 914-9200
Facsimile: (856) 914-9420
pbarasch@schallandbarasch.com

[Additional counsel listed below]

*Attorneys for Plaintiffs*

Plaintiffs John S. MacDonald and Jessica C. Spearman allege as follows:

## I. Local Civil Rule 10.1 Statement

1.     The mailing addresses of the parties to this action are:

John S. MacDonald
19 Iron Forge Village S
Pompton Lakes, NJ 17442

Jessica C. Spearman
15 Noble Road
Sicklerville, NJ 08081

CashCall, Inc.
One City Boulevard West, Suite 1000
Orange, CA 92868

WS Funding, LLC
c/o CashCall, Inc.
One City Boulevard West, Suite 1000
Orange, CA 92868

Delbert Services Corp.
7125 Pollock Drive
Las Vegas, NV 89119

J. Paul Reddam
c/o CashCall, Inc.
One City Boulevard West, Suite 1000
Orange, CA 92868

## II. Introduction

2.     Plaintiffs bring this class action lawsuit on behalf of themselves and all other consumers in New Jersey who borrowed money from the "Western Sky" consumer lending enterprise under terms and conditions that render the loans usurious, unconscionable, and otherwise unlawful under New Jersey law. The loans at issue in this case were made in amounts of less than $50,000.00—and often for only a few thousand dollars—and carried extremely high interest rates, often in excess of 100%. The Western Sky Enterprise, described more fully below,

was a sham of related corporate entities created, controlled, owned, and exploited by Defendant J. Paul Reddam to avoid state and federal regulation and to prey upon vulnerable consumers in the State of New Jersey and elsewhere by exacting unconscionable and usurious rates of interest from these consumers, all to the substantial financial benefit of CashCall and Reddam. No member of the Western Sky Enterprise was ever licensed as a consumer lender in New Jersey, as is required under New Jersey law, and all members of the proposed classes received loans at unconscionable rates of interest that violate New Jersey usury laws.

3.      Plaintiffs, on behalf of themselves and members of the proposed Classes defined below, bring this action seeking a declaration that the loans at issue are void under New Jersey law, and to recover all amounts collected by the Defendants, along with damages, restitution, attorneys' fees, statutory penalties, and such other relief as allowed by law or equity.

4.      Mindful of the illegal nature of their enterprise under New Jersey law, Defendants sought to shield themselves from liability by declaring that the enterprise was immune from the application of any State or Federal law under tribal immunity afforded to the Cheyenne River Sioux Tribe of South Dakota (the "Tribe"). However, the Tribe did not own or operate the enterprise, and Western Sky did not make loans to tribal members because such loans would be illegal under tribal law. Instead, the entire Western Sky Enterprise was a "front" for the Defendants, and in particular Reddam, the mastermind of the illegal scheme and sole owner and director of the other Defendant entities.

### III. Parties

5.      Plaintiff MacDonald is a citizen of New Jersey and a resident of Pompton Lakes, New Jersey.

6.      Plaintiff Spearman is a citizen of New Jersey and a resident of Sicklerville, New Jersey.

7.      Defendant J. Paul Reddam is a resident of California.

8.      Defendant CashCall, Inc. ("CashCall") is a Delaware corporation with its principal place of business located in Orange, California. Reddam is the President, CEO, sole director, and sole owner of CashCall.

9.      Defendant WS Funding, LLC ("WS Funding") is a Delaware limited liability company with its principal place of business located in Orange, California. WS Funding is a wholly owned subsidiary of CashCall. Reddam is the president of WS Funding.

10.     Defendant Delbert Services Corp. ("Delbert") was a Nevada corporation with its principal place of business located in Las Vegas, Nevada. Reddam is the sole director and owner of Delbert.

## IV. Jurisdiction & Venue

11.     This Court has subject matter jurisdiction over Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq,* pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

12.     In addition, this Court has subject matter jurisdiction over all of Plaintiffs' claims under 28 U.S.C. § 1332(d) as the matter in controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and is a class action in which Plaintiffs and class members are citizens of states different from at least one defendant. Specifically, Plaintiffs are citizens of the State of New Jersey and no defendant is a citizen of the State of New Jersey.

13.     This Court has personal jurisdiction over Defendants because Defendants marketed, offered, made, serviced and/or collected loans in the State of New Jersey. This Court also has personal jurisdiction over Defendants under 18 U.S.C. § 1965(b) because each Defendant is subject to service of process in a judicial district of the United States and the ends of justice will be served by litigating all issues in a single forum.

14.     This Court has personal jurisdiction over Reddam for the additional reasons that Reddam purposefully availed himself of the privilege of conducting business in the State of New Jersey and took action to create a substantial connection between himself and the State of New Jersey. As alleged herein, Reddam intentionally orchestrated and controlled the actions of the other defendants and directed their activities to the marketing, offering, making, servicing, and collecting of unlawful loans in this state. Reddam was the architect of the sham corporate structures that facilitated the unlawful Western Sky Enterprise and was the key player responsible for the perpetration of the unlawful and harmful conduct complained of herein.

15.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this district.

## V. Factual Allegations

**A.     J. Paul Reddam & the Western Sky Enterprise**[1]

16.     Defendant J. Paul Reddam is the central figure in a web of corporate entities designed to deceive regulators and consumers and obscure deceptive and unlawful conduct in the consumer-lending industry. Reddam is the President and CEO of Defendant CashCall and owns

---

[1] The allegations in this section are primarily based on the findings and conclusions of the State of New Hampshire Banking Department in *In re CashCall, Inc., et al.*, Case No. 12-308, Order to Cease and Desist (N.H. Banking Dep't June 4, 2013) (attached hereto as **Exhibit 1**). This Order is specifically incorporated herein by reference.

100% of CashCall's corporate stock. Defendant WS Funding is a wholly-owned subsidiary of CashCall, and therefore also subject to the ultimate control and direction of Reddam. Defendant Delbert is also entirely owned by and subject to the control of Reddam.

17.     Non-Party Western Sky Financial, LLC ("Western Sky Financial") is or was a limited liability company organized under the laws of the State of South Dakota. Western Sky Financial is wholly owned by Martin "Butch" Webb, a member of the Tribe.

18.     The Defendants, along with Western Sky Financial, have engaged in an enterprise to make, service, and collect unlawful, usurious, and unconscionable consumer loans (referred to herein as the "Western Sky Enterprise") in the State of New Jersey. While the loan agreements were nominally in the name of Western Sky Financial, CashCall "is the actual or de facto lender."[2]

19.     Western Sky Financial operated principally as a front for CashCall. Pursuant to an agreement between WS Funding and Western Sky Financial, CashCall (1) provided website hosting and support services for Western Sky Financial; (2) reimbursed Western Sky Financial for all costs and maintenance for Western Sky Financial's server; (3) reimbursed Western Sky Financial for its office, personnel, and postage expenses and provided a toll free telephone and fax number; (4) provided marketing services for Western Sky Financial including advertising and other promotional materials; (5) indemnified Western Sky Financial for all civil, criminal, or administrative actions; and (6) tracked consumer complaints regarding Western Sky loans.

20.     During the relevant timeframe, consumers in the State of New Jersey could apply for loans from the Western Sky Enterprise through a call center, CashCall's website, or

---

[2] *Id.* at 7.

www.westernsky.com.[3] When a loan application was approved, Western Sky Financial executed a loan agreement with the consumer that identified Western Sky Financial as the lender. The loans were funded through a bank account set up in the name of Western Sky Financial, but CashCall set up, funded, and maintained this account. After the loan funded, CashCall was obligated to purchase the note from Western Sky Financial, usually within one business day of the loan application. Western Sky Financial does not accept any payments from consumers on the loans made by the Western Sky Enterprise. Instead, as compensation, Western Sky Financial was entitled to a percentage of the face value of each executed loan transaction, with a guaranteed minimum of $100,000 per month.

21.     In 2013, in a Cease and Desist Order, the State of New Hampshire Banking Department concluded that Reddam, CashCall, and WS Funding "have taken substantial steps to conceal this business scheme from consumers and state and federal regulators" and that "Western Sky is nothing more than a front to enable CashCall to evade licensure by state regulators and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators."[4] Remarking on the deceptive design of this scheme, the New Hampshire Banking Department further stated:

> Western Sky [Financial] holds itself out to the public as a stand- alone tribal entity which provides small loans and payday loans to consumers. In reality, however, CashCall creates all advertising and marketing materials for Western Sky and reimburses Western Sky for administrative costs. CashCall reviews consumer applications for underwriting requirements. CashCall funds the loans. CashCall services the loans. Western Sky does not receive any payment from consumers for the loans.[5]

---

[3] At some point prior to the filing of this Complaint, it appears that the Western Sky Enterprise ceased originating new loans within the State of New Jersey. Existing loans continue to be serviced and collected by the Enterprise within the State of New Jersey.

[4] *Id.* at 5.

[5] *Id.*

22.     At all relevant times, Reddam was the founder, sole shareholder, sole director, president, and CEO of CashCall. Reddam approved and signed the key documents facilitating the Western Sky Enterprise and setting up Western Sky Financial as the sham "front" for this Enterprise.

23.     Delbert's role in the Western Sky Enterprise was to act as collection agent for Western Sky loans. Upon information and belief, at various times CashCall or WS Funding assigned various loans to Delbert for loan servicing, and to perform collection services on past-due loans made by the Western Sky Enterprise.

24.     Reddam was directly involved in the Western Sky Enterprise at all relevant times. He actively managed the activities of CashCall, WS Funding, and Delbert and devised major company policies. He directed the formal and informal agreements that established the Western Sky Enterprise. Collectively, Defendants operated as a single, integrated entity with respect to the Western Sky Enterprise, and as the alter ego for Reddam, the sole owner and director of CashCall, WS Funding, and Delbert.

### B.    The Western Sky Enterprise's False Claims of Tribal Affiliation

25.     Despite the real, *de facto* lender being CashCall, a corporation headquartered in California and operating throughout the United States, during its existence the Western Sky Enterprise has falsely claimed to operate solely within the exterior boundaries of the Cheyenne River Indian Reservation, and to be governed solely by the laws of the Cheyenne River Sioux Tribal Nation. Defendants' form loan agreement contains the following language:

> This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation. By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other

state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation.

You further agree that you have executed the Loan Agreement as if you were physically present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation; and that this Loan Agreement is fully performed within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation.

* * *

**GOVERNING LAW**. This Agreement is governed by the Indian Commerce clause of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe. We do not have a presence in South Dakota or any other states of the United States. Neither this Agreement nor Lender is subject to the laws of any state of the United States of America. By executing this Agreement, you hereby expressly agree that this Agreement is executed and performed solely within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation. You also expressly agree that this Agreement shall be subject to and construed in accordance only with the provisions of the laws of the Cheyenne River Sioux Tribe, and that no United States state or federal law applies to this Agreement. You agree that by entering into this Agreement you are voluntarily availing yourself of the laws of the Cheyenne River Sioux Tribe, a sovereign Native American Tribal Nation, and that your execution of this Agreement is made as if you were physically present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation.

26.     Notwithstanding these representations, the vast majority of the resources used to make, service, and collect loans made by the Western Sky Enterprise were located in California and other locations **outside** the boundaries of the Cheyenne River Indian Reservation. In addition, the vast majority of the profits generated on loans to Plaintiffs and members of the Classes flowed to CashCall and, ultimately, Reddam, in California.

27.     The Western Sky Enterprise is not shielded by tribal immunity. The Tribe did not own or operate the Western Sky Enterprise, the Enterprise did not exist for the benefit of the Tribe or its members, and no entity that was part of the Enterprise was organized under Tribal law. As noted above, Western Sky Financial, the only aspect of the Enterprise with even a tangential connection to the Tribe, was "nothing more than a front to enable CashCall to evade licensure by

state regulators and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators."[6] Recognizing the fraudulent nature of this scheme, the Native American Financial Services Association has disavowed both the Western Sky Enterprise's purported tribal connection and its unlawful lending practices, describing the Enterprise as a "profiteer" and noting that Western Sky Financial "is not an enterprise wholly owned by a federally-recognized tribe, is not regulated by a tribal regulatory lending authority, does not operate according to tribal law, and breaks the covenants meant to benefit tribal governments and their members." **Exhibit 2.**

    **C.**    **The Western Sky Enterprise's Illusory Arbitration Procedure**

    28.    The form loan agreements used by the Western Sky Enterprise include false and deceptive representations regarding an illusory arbitration procedure that include class and jury-trial waivers. In addition to the language quoted above, the agreement further states:

> **Agreement to Arbitrate**. You agree that any Dispute, except as provided below, will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement.
>
>              \* \* \*
>
> **Applicable Law and Judicial Review**. THIS ARBITRATION PROVISION IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE CHEYENNE RIVER SIOUX TRIBE. The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement.

    29.    These and the other provisions of the agreement related to arbitration and class waiver are part of boilerplate contractual language drafted by Defendants that are not subject to bargaining or negotiation by borrowers.

---

[6] *Id.* at 5.

30.     The arbitration procedure described in the agreement is completely fabricated and illusory. The Tribe does not authorize arbitration, does not employ arbitrators, and does not have "consumer dispute rules."

31.     In addition to these procedural infirmities, the agreement contains repeated and pervasive substantive waivers of all state and federal rights. The agreement states:

- "Neither this Agreement nor Lender is subject to the laws of any state of the United States of America."

- "[T]his agreement shall be subject to and construed in accordance only with the provisions of the laws of the Cheyenne River Sioux Tribe, and that no United States state or federal law applies."

- That the arbitrator may not apply "any law other than the law of the Cheyenne River Sioux Tribe of Indians."

- "The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement."

32.     In light of these facts, several courts, including three federal appellate courts, have refused to enforce Defendants' arbitration provision, with the Seventh Circuit finding that "there simply [is] no prospect of a meaningful and fairly conducted arbitration; instead, this aspect of the loan agreements [is] a sham and an illusion." *Jackson v. Payday Financial, LLC*, 764 F.3d 765, 779 (7th Cir. 2014) (quotation omitted); *see also Hayes v. Delbert Svcs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016) (describing the Western Sky arbitration provision as a "farce," "plainly forbidden," and "invalid and unenforceable"); *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1354 (11th Cir. 2014) (refusing to compel arbitration).

33.     Because the arbitration procedure described in the agreement is fabricated and illusory, any provision requiring that the enforceability of the arbitration procedure must be decided through arbitration is also illusory and unenforceable.

11

34.     Like nearly every other aspect of Defendants' loan agreements, the arbitration and waiver provisions are procedurally and substantively unconscionable, illusory, and unenforceable.

**D.     CashCall's Long History of Unlawful Lending Practices**

35.     The Western Sky Enterprise, which has been colloquially described as a "rent a tribe" arrangement, is not the first time Defendants have established a spurious and deceptive scheme to profit from unlawful, usurious consumer loans. Prior to forming the Western Sky Enterprise under the "rent a tribe" model, CashCall exploited an analogous "rent a bank" scheme through an agreement with the First Bank & Trust of Milbank, a state-chartered bank in South Dakota.[7]

36.     West Virginia's Attorney General brought a civil suit challenging CashCall's deceptive and unlawful rent-a-bank scheme. Following a court trial, the West Virginia trial court concluded that CashCall "was the true lender … not the Bank" and that "the purpose of the lending program was to allow CashCall to hide behind the Bank's charter … in an attempt to evade the lender licensing and usury laws."[8] The West Virginia court further held that CashCall "engaged in unfair or deceptive acts and practices" and "a course of repeated and willful violations" of West Virginia law.[9] Accordingly, the court issued a permanent injunction against CashCall, awarded over $10 million in damages and civil penalties plus costs and fees, and declared all CashCall loans in West Virginia void.[10] This judgment was affirmed in its entirety by the West Virginia Supreme Court of Appeals.[11]

---

[7] *West Virginia v. CashCall, Inc.*, No. 2008C1964, 2012 WL 11875220, *1 (W. Va. Cir. Ct. Sept. 10, 2012), *aff'd sub nom. CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014).

[8] *Id.* at *13.

[9] *Id.*

[10] *Id.* at *15-16.

[11] *CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014).

37.     The fact that Defendants' previous "rent-a-bank" scheme, which mirrors the current rent-a-tribe arrangement, was found to be willfully unlawful, unfair, and deceptive, further demonstrates that the unlawful nature of the Western Sky Enterprise was the product of knowing, willful, and intentional conduct by Defendants.

### E.     Plaintiffs' Western Sky Loans

#### 1.     Plaintiff MacDonald

38.      In late 2012, Plaintiff John MacDonald was in need of a small loan to cover personal expenses resulting from a divorce. While researching online he was shown an advertisement from the Western Sky Enterprise that touted their ability to process and fund a small personal loan very quickly and with minimal hassle. While located in New Jersey, Plaintiff MacDonald was directed to the Western Sky website where he was shown advertising material and provided with the ability to complete an online loan application.

39.     On December 18, 2012, Plaintiff MacDonald borrowed $5,000 from the Western Sky Enterprise. As part of the process, Plaintiff electronically executed an online "Western Sky Consumer Loan Agreement" (the "Agreement"). A printed copy of the Agreement is attached as **Exhibit 3**. Plaintiff completed all aspects of the transaction in the State of New Jersey and disclosed to Defendants his physical address within New Jersey during the application process.

40.     The Agreement identifies the lender as "Western Sky Financial." Per the Agreement, the interest on Plaintiff's loan is an Annual Percentage Rate of 116.73%, resulting in a finance charge of $35,994.28 over the seven-year life of the loan. The loan is also subject to an origination fee of $75.

41.     On December 26, 2012, Plaintiff MacDonald received an email informing him that Western Sky Financial had sold his loan to WS Funding, and that CashCall would handle the

servicing of his loan and would collect the first payment. Between January and August 2013, WS Funding and/or CashCall regularly collected monthly payments from Plaintiff at usurious rates of interest well in excess of double the maximum rate allowed by law.

42.     On August 13, 2013, Plaintiff MacDonald received an email informing him that Delbert would take over the servicing of his loan, and instructing Plaintiff to direct future loan payments to Delbert. Thereafter, Delbert, WS Funding, and/or CashCall regularly collected monthly payments from Plaintiff at usurious rates of interest well in excess of double the maximum rate allowed by law.

43.     As of April 2016, Defendants had collected a total of $15,493.00 from Plaintiff MacDonald on his $5,000 loan. **Exhibit 4** contains the payment history on Plaintiff's loan. The breakdown of how Defendants have applied these payments to Plaintiff's loan is as follows:

| Principal | $38.50 |
|-----------|--------|
| Interest | $15,256.65 |
| Fees | $197.85 |
| **Total** | **$15,493.00** |

44.     Nevertheless, despite payments to Defendants of more than $15,000, because of the usurious and unconscionable rate of interest on Plaintiff MacDonald's loan, the current payoff amount of Plaintiff's loan is $7,833.91. This is $2833.91 **more** than the original $5,000 loan amount.

### 2.     Plaintiff Spearman

45.     Plaintiff Spearman has obtained three separate loans from the Western Sky Enterprise. All of the loans were subject to usurious rates of interest well in excess of the maximum rate allowed by law.

46.     In late 2012, Plaintiff Spearman, then Jessica Williams, obtained her first loan from the Western Sky Enterprise. She was in need of a small loan to pay for expenses that she incurred during a time period when she was unable to work. She received an advertisement from the Western Sky Enterprise that, among other things, directed her to the Western Sky website. She later went to the Western Sky website, where she was shown advertising material and provided with the ability to complete an online loan application.

47.     On October 16, 2012, Plaintiff Spearman borrowed $2,525 from the Western Sky Enterprise. As part of the process, Plaintiff electronically executed an online "Western Sky Consumer Loan Agreement" (the "Agreement"). A printed copy of the Agreement is attached as **Exhibit 5**. Plaintiff completed all aspects of the transaction in the State of New Jersey and disclosed to Defendants her physical address within New Jersey during the application process.

48.     The Agreement identifies the lender as "Western Sky Financial." Per the Agreement, the interest on Plaintiff's loan was an Annual Percentage Rate of 139.13%, resulting in a finance charge of more than $11,000 over the roughly four-year life of the loan. The loan was also subject to an origination fee of $75.

49.     On October 25, 2012, Plaintiff Spearman received an email informing her that Western Sky Financial had sold her loan to WS Funding, and that CashCall would handle the servicing of her loan and would collect the first payment. Thereafter, WS Funding and/or CashCall

collected payments from Plaintiff at usurious rates of interest well in excess of double the maximum rate allowed by law.

50.     Plaintiff Spearman made her first payment on November 5, 2012, and paid her loan in full on November 27, 2012. Because of the usurious and unconscionable rate of interest on Plaintiff's loan, Defendants had collected a total of $2,970.50 on the $2,525 loan, including $370.50 in interest, in just over one month.

51.     In early 2013, while still living in New Jersey, Plaintiff Spearman obtained her second loan from the Western Sky Enterprise. She again went to the Western Sky website, where she was provided with the ability to complete an online loan application.

52.     On January 15, 2013, Plaintiff Spearman borrowed another $2,525 from the Western Sky Enterprise. Again, as part of the process, Plaintiff electronically executed an online "Western Sky Consumer Loan Agreement." A printed copy of the Agreement is attached as **Exhibit 6**. Plaintiff again completed all aspects of the transaction in the State of New Jersey and disclosed to Defendants her physical address within New Jersey during the application process.

53.     The Agreement identifies the lender as "Western Sky Financial." Per the Agreement, the interest on Plaintiff's loan was an Annual Percentage Rate of 139.13%, resulting in a finance charge of $11,470.62 over the roughly four-year life of the loan. The loan was also subject to an origination fee of $75.

54.     On January 23, 2013, Plaintiff Spearman received an email informing her that Western Sky Financial had sold her loan to WS Funding, and that CashCall would handle the servicing of her loan and would collect the first payment. Thereafter, WS Funding and/or CashCall collected monthly payments from Plaintiff at usurious rates of interest well in excess of double the maximum rate allowed by law.

55.     Plaintiff Spearman made her first payment on February 1, 2013, and paid her loan in full on April 11, 2013. Because of the usurious and unconscionable rate of interest on Plaintiff's loan, Defendants had collected a total of $3,428.39 on the $2,525 loan, including $828.39 in interest, in just under four months.

56.     In mid-2013, while still living in New Jersey, Plaintiff Spearman obtained her third loan from the Western Sky Enterprise. She again went to the Western Sky website, where she was provided with the ability to complete an online loan application.

57.     On August 26, 2013, Plaintiff Spearman borrowed $5,000 from the Western Sky Enterprise. As with her previous loans, Plaintiff electronically executed an online "Western Sky Consumer Loan Agreement." A printed copy of the Agreement is attached as **Exhibit 7**. Plaintiff completed all aspects of the transaction in the State of New Jersey and disclosed to Defendants her physical address within New Jersey during the application process.

58.     The Agreement identifies the lender as "Western Sky Financial." Per the Agreement, the interest on Plaintiff's loan is an Annual Percentage Rate of 116.57%, resulting in a finance charge of $35,864.59 over the seven-year life of the loan. The loan was also subject to an origination fee of $75.

59.     On September 18, 2013, Plaintiff Spearman received an email informing her that Western Sky Financial had sold her loan, and that Delbert would handle the servicing of her loan and would collect the first payment. Plaintiff Spearman made her first payment on October 1, 2013. Between October 2013 and November 2014, WS Funding and/or Delbert Services collected monthly payments from Plaintiff at usurious rates of interest well in excess of double the maximum rate allowed by law.

60.     On November 10, 2014, Plaintiff received an email informing her that CashCall would take over the servicing of her loan, and instructing Plaintiff to direct future loan payments to CashCall. Thereafter, Delbert, WS Funding, and/or CashCall collected monthly payments from Plaintiff at usurious rates of interest well in excess of double the maximum rate allowed by law.

61.     Plaintiff Spearman paid her loan in full on May 29, 2015. Because of the usurious and unconscionable rate of interest on Plaintiff's loan, Defendants had collected a total of $14,728.08 on the $5,000 loan, including $9,653.08 in interest, in under two years.

**F.     Class Allegations**

62.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Rules of Civil Procedure.[12]

63.      Plaintiffs assert their claims in Counts I, II, III, and IV on behalf of the "Six Year Class" defined as follows:

<u>**Six Year Class**</u>
All individuals who, on or after May 17, 2010, made payments to one or more Defendants on loans originated by the Western Sky Enterprise where the borrower was located in the State of New Jersey at the time the loan was originated.

64.     Plaintiffs assert their claims in Count V on behalf of the "Four Year Class" defined as follows:

<u>**Four Year Class**</u>
All individuals who, on or after May 17, 2012, made payments to one or more Defendants on loans originated by the Western Sky Enterprise where the borrower was located in the State of New Jersey at the time the loan was originated.

---

[12] Plaintiffs reserve the right to amend this class definition or propose other or additional classes or subclasses in their motion for class certification or an amended pleading.

65.     The proposed Classes exclude Defendants' officers, directors, and employees, as well as any judicial officer who presides over this action and members of the judicial officer's immediate family.

66.     **Numerosity.** This action is suitable for class resolution because there are too many class members for joinder of all of them to be practicable. Upon information and belief, there are hundreds, and possibly thousands, of members of the proposed Classes. Defendants are in possession of records the precise number and identities of Class members may be ascertained.

67.     **Commonality.** There are issues of fact and law common to all class members, including but not limited to:

- whether Defendants' conduct described herein was unfair;

- whether Defendants' conduct described herein was unlawful;

- whether Defendants' conduct described herein was deceptive or misleading;

- whether loans made by the Western Sky Enterprise were usurious;

- whether loans made by the Western Sky Enterprise violate the CFA;

- whether Defendants have been unjustly enriched through loans made to members of the Classes;

- whether the arbitration and waiver provisions of Defendants' form loan agreement are enforceable;

- whether Defendants engaged in or conspired to form an enterprise for the purpose of collecting unlawful debts;

- the proper measure of monetary relief; and

- the proper form of any declaratory or injunctive relief.

68.     **Typicality**. Plaintiffs' claims are typical of other members of the Classes. Defendants engaged in a uniform scheme of false, deceptive, and unlawful conduct in the State of

New Jersey. Plaintiffs were victimized by this scheme in a manner consistent with other members of the Classes, and has no interests antagonistic to the interests of the other members of the Classes.

69.     **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the Classes, and have retained counsel experienced in complex class action litigation, including litigation involving consumer law.

70.     This action is maintainable as a class action because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

71.     This action is also maintainable as a class action because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Defendants' conduct as described herein stems from common and uniform conduct. Individual class members do not have an interest in pursuing individual actions against Defendants' because the amount of each individual's claim is relatively small compared to the expense and burden of individual prosecution. Class certification will also obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single action in this forum.

72.     Plaintiffs intend to send notice to all members of the Classes to the extent required by Rule 23. The names and addresses of the members of the Classes are readily available from Defendants' business records.

## VI. Claims for Relief

### Count I – Usury
### (Asserted on Behalf of Plaintiffs and the Six Year Class)

73.     The maximum interest rate chargeable to consumers under New Jersey law is 16%.

N.J. Stat. § 31:1-1(a). Charging consumers a rate of interest greater than 30% is a criminal act

under New Jersey law. N.J. Stat. § 2C:21-19.

74.     Defendants routinely charged Plaintiffs and members of the Six Year Class interest

rates in excess of the maximum rates allowed under New Jersey law. Defendants' conduct in doing

so was knowing, deliberate, intentional, and willful. Defendants' purpose was to take more than

the legal rate of interest for the money loaned to Plaintiffs and members of the Six Year Class.

75.     N.J. Stat. § 31:1-4 provides that where "more than lawful interest was taken or

reserved the lender shall be obliged to accept his principal money … without any interest or other

consideration, and to pay costs." Under N.J. Stat. § 31:1-4, Plaintiffs and members of the Six Year

Class are entitled to a declaration that their loans are unlawful and usurious, and restitution of all

amounts paid to Defendants in excess of the principal amount, plus the costs of bringing this action.

### Count II – Violation of the
### New Jersey Consumer Fraud Act
### (Asserted on Behalf of Plaintiffs and the Six Year Class)

76.     The New Jersey Consumer Fraud Act ("CFA") prohibits, among other things, the

"act, use or employment by any person of any unconscionable commercial practice, deception,

fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression

or omission of any material fact … in connection with the sale or advertisement of any

merchandise." N.J. Stat. § 56:8-2. The requirements of the CFA extend to the offering, sale, or

provision of consumer credit.

77.     Defendants' unlawful, criminal consumer lending practices constitute "unconscionable commercial practices" within the meaning of the CFA.

78.     In addition, Defendants' engaged in other false and deceptive practices in operating the Western Sky Enterprise, including:

- Organizing and utilizing a deceptive scheme using Western Sky Financial as the "front" to conceal Defendants' unlawful consumer lending operation from consumers and regulators;

- Continuing to do business in the State of New Jersey after the Western Sky Enterprise and its predecessor "rent a bank" scheme were found to be unlawfully and ordered to cease doing business in other states with laws and regulations similar to New Jersey;

- Using CashCall personnel in California and other locations outside the boundaries of the Reservation of the Cheyenne River Sioux Tribe of South Dakota to perform servicing, collection, and other work on the subject loans, and taking the overwhelming share of the revenues and profits made off the loans, while meanwhile falsely claiming that the loans are governed by Tribal law;

- Including purported tribal arbitration, jurisdiction, and class action ban provisions in the form loan agreement while knowing that such provisions were a sham and no meaningful arbitration mechanism exists under Tribal law.

79.     Defendants' conduct caused an ascertainable loss to Plaintiffs and members of the Six Year Class by, among other things, forcing Plaintiffs and members of the Six Year Class to pay excessive, unlawful, unconscionable, and usurious rates of interest on consumer loans.

80.     The losses caused to Plaintiffs and members of the Six Year Class by Defendants' conduct are definite, certain, and measurable. In particular, Defendants' records of loans to individuals in New Jersey and payments made under those loans will establish the definite, certain, and measurable amount of loss incurred by Plaintiffs and members of the Six Year Class.

81.     The CFA allows for the recovery of actual damages and equitable relief, along with an "award of threefold the damages sustained," as well as "reasonable attorneys' fees, filing fees and reasonable costs of suit." N.J. Stat. § 56:8-19.

82.     As a result of Defendants' knowing and willful violations of the CFA, Plaintiffs and members of the Six Year Class are entitled to an award of threefold their actual damages, plus reasonable attorneys' fees and costs.

### Count III – Restitution and Unjust Enrichment
### (Asserted on Behalf of Plaintiffs and the Six Year Class)

83.     Defendants received a benefit from Plaintiffs and members of the Six Year Class in the form of payments of excessive, unconscionable, and usurious interest payments on unlawful loans.

84.     Due to the unlawful, unconscionable, usurious, and criminal nature of these loans, Defendant was unjustly enriched at the expense of Plaintiffs and members of the Six Year Class. Retention of that benefit by Defendants would be unjust.

85.     Accordingly, Plaintiffs and members of the Six Year Class are entitled to restitution of all funds unlawfully and unjustly obtained by Defendants.

### Count IV – Declaration that
### Tribal Law and Forum Does Not Apply, that Arbitration Clause is Void,
### and that Any Purported Class Waiver is Void
### (Asserted on Behalf of Plaintiffs and the Six Year Class)

86.     Western Sky Financial is not a Tribal corporation. It is organized under the law of South Dakota and privately owned by Martin A. Webb.

87.     Defendants have no relation to the Tribe. Defendants' profits from the Western Sky Enterprise do not benefit the Tribe. Rather, they primarily serve to enrich Reddam.

88.     Tribal law is limited and generally applies to disputes on the reservation among tribal members. The Western Sky Enterprise did not market or loan to members of the Tribe. The loans at issue were made to non-members of the Tribe in various locations in the State of New Jersey, and were funded by Defendants' in California and other locations outside the reservation.

89.     The arbitration mechanism described in the form agreement used by the Western Sky Enterprise is illusory. There is no provision for arbitration under Tribal law, there are no arbitrators, no arbitration rules, and no meaningful opportunity for an impartial resolution of disputes related to the Western Sky Enterprise through arbitration.

90.     The form agreement also states that the "validity, effect, and enforceability of this waiver of class action lawsuit and classwide Arbitration is to be determined solely by a court of competent jurisdiction located within the Cheyenne Rivers Sioux Tribal Nation, and not by the arbitrator." There is no Tribal court of "competent jurisdiction." Tribal courts do not have subject-matter jurisdiction over disputes between non-Tribal members related to loans made outside the boundaries of the Tribal reservation.

91.     CashCall fraudulently sought to ban court claims and class action claims while knowing that the alternative dispute resolution procedure meant to take the place of those in the contract, *i.e.* tribal arbitration, was fraudulent and a sham. Because the loan agreement and its pertinent terms are riddled with false, fraudulent and unfair and deceptive provisions and because the loan agreement is an unconscionable contract as well as one that is impossible to perform, none of its dispute resolution provisions, including the class action ban, should be enforced.

**Count V – Civil RICO**
**(Asserted on Behalf of Plaintiffs and the Four Year Class)**

92.     As alleged above, the Western Sky Enterprise was a sham organization that operated as a front for CashCall and Reddam to obscure and shield the illegal making, servicing, and collecting of usurious consumer loans within the State of New Jersey. The Western Sky Enterprise therefore acted as the "alter ego" for Reddam and CashCall, and Reddam and CashCall are personally liable, jointly and severally, for the damages alleged herein. In the alternative, to the extent the Court concludes that the Western Sky Enterprise did not operate as the alter ego of

Reddam and/or CashCall, then the Western Sky Enterprise was an enterprise of individual persons/entities that formed an association-in-fact for the purpose of engaging in criminal activity, including the collection of unlawful debt, as prohibited by the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

93.     RICO prohibits the use of an enterprise for the collection of unlawful debt:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

94.     RICO also prohibits a conspiracy to use an enterprise for the collection of unlawful debt. 18 U.S.C. § 1962(d).

95.     Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

96.     The Western Sky Enterprise, consisting of each named Defendant along with Western Sky Financial, is an "enterprise" as that term is defined in 18 U.S.C. § 1961(4).

97.     The Western Sky Enterprise is an enterprise engaged in interstate commerce including, without limitation, the making, servicing, and collecting of loans throughout the United States.

98.     Loans made by the Western Sky Enterprise constitute "unlawful debt" as that term is defined in 18 U.S.C. § 1961(6) because (i) the debt resulting from the loans is unenforceable in whole or in part as to principal or interest under New Jersey laws relating to usury and (ii) the debt was incurred in connection with the business of lending money at a usurious rate of interest that is more than twice the enforceable rate under New Jersey law.

99.     Defendants violated 18 U.S.C. § 1962(c) by participating, directly or indirectly, in the conduct of the Western Sky Enterprise's affairs in the collection of unlawful debt. Money

25

consisting of unlawful debts collected by Defendants was re-invested in the business of the Western Sky Enterprise.

100.    Defendants also violated 18 U.S.C. § 1962(d) by conspiring to use the Western Sky Enterprise to collect unlawful debt. Each Defendant knowingly agreed to participate in the scheme alleged herein that allowed the Western Sky Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under New Jersey's usury laws.

101.    Plaintiffs and members of the Four Year Class have sustained injury to their property directly caused by Defendants violations of 18 U.S.C. § 1962 in the form of, among other things, the payment of unlawful and usurious rates on interest on loans made by the Western Sky Enterprise. Under 18 U.S.C. § 1964(c), Plaintiffs and members of the Four Year Class are entitled to threefold damages, along with costs and attorneys' fees.

## VII. Prayer for Relief

102.    Wherefore, Plaintiffs pray on behalf of themselves and members of the Classes, for entry of Judgment finding and awarding the following:

A.    certifying the Classes under Rule 23;

B.    declaring the arbitration, forum selection, choice of law, and class action ban provisions in the loan agreement are void and unenforceable;

C.    finding that loans made by the Western Sky Enterprise to consumers in New Jersey are void and unenforceable;

D.    declaring that no money may be collected by Defendants from consumers in the State of New Jersey on loans made to consumers in New Jersey by the Western Sky Enterprise;

E.    ordering Defendants to pay Plaintiffs and members of the Classes all amounts collected on loans to consumers in the State of New Jersey

F.    awarding Class members actual and threefold damages;

G.    awarding reasonable attorneys' fees and expenses;

26

H.   awarding such other legal and equitable relief as this Court may deem proper.

103.   Plaintiffs, on behalf of themselves and members of the Classes, demand a trial by jury.

September 25, 2018

s/Patricia A. Barasch
Patricia A. Barasch, NJ Bar No. 0055480
**SCHALL & BARASCH, LLC**
Moorestown Office Center
110 Marter Ave, Suite 302
Moorestown, NJ 08057
Telephone: (856) 914-9200
Facsimile: (856) 914-9420
pbarasch@schallandbarasch.com

Matthew H. Morgan, MN Bar No. 0304657*
Anna P. Prakash, MN Bar No. 0351362*
Brock J. Specht, MN Bar No. 0388343*
Robert L. Schug, MN Bar No. 0387013*
**NICHOLS KASTER, PLLP**
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878
morgan@nka.com
aprakash@nka.com
bspecht@nka.com
schug@nka.com

Matthew W.H. Wessler, MA Bar No. 664208*
Gupta Wessler PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
matt@guptawessler.com

*Attorneys for Plaintiffs*

*admitted pro hac vice