# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN S. MACDONALD and JESSICA C. SPEARMAN, | Civil Action No. 2:16-cv-02781-MCA-LDW |
| Plaintiffs, | Motion Date: May 6, 2019 |
| v. | **ORAL ARGUMENT REQUESTED** |
| CASHCALL, INC.; WS FUNDING, LLC; DELBERT SERVICES CORP.; and J. PAUL REDDAM, | |
| Defendants. | |

**Plaintiffs' Memorandum of Law in Support of Motion for Class Certification Pursuant to Fed. R. Civ. P. 23**

Patricia A. Barasch, NJ Bar No. 0055480
**SCHALL & BARASCH, LLC**
Moorestown Office Center
110 Marter Ave, Suite 302
Moorestown, NJ 08057
Telephone: (856) 914-9200
Facsimile: (856) 914-9420
pbarasch@schallandbarasch.com

[Additional counsel listed below]

*Attorneys for Plaintiffs John S. MacDonald and Jessica Spearman*

**TABLE OF CONTENTS**

**INTRODUCTION**................................................................................................1

**RELEVANT BACKGROUND** ........................................................................2

**I.     FACTUAL BACKGROUND**........................................................................2

    **A. The Parties**...........................................................................................2

    **B. The Western Sky Enterprise Operated Uniformly Throughout
    the Country to Illegally Circumvent State and Federal Law**..............4

       1.  Defendants Formed the Western Sky Enterprise to Circumvent
          State and Federal Law .........................................................4

       2.  Under the Western Sky Enterprise, CashCall Operated As the
          True Lender .........................................................................6

       3.  The Western Sky Enterprise Was Not Affiliated with the
          Cheyenne River Sioux Tribe ................................................9

    **C. The Western Sky Enterprise Greatly Affected New Jersey
    Borrowers**...............................................................................................9

    **D. The Proposed Class Representatives' Experiences with the
    Western Sky Enterprise are Typical of the Experiences of
    Other New Jersey Borrowers** ...............................................................11

    **E. Courts Continue to Find the Western Sky Enterprise Illegal or
    Otherwise Side with Consumers** ...........................................................13

**II.     PROCEDURAL HISTORY**.......................................................................14

**ARGUMENT** ...................................................................................................17

**I.     PLAINTIFFS HAVE SATISFIED THE REQUIREMENTS FOR
CLASS CERTIFICATION UNDER RULE 23(a)** ...................................18

**A. Rule 23(a)(1) – Numerosity is Satisfied** ..................................18

**B. The Putative Classes are Readily Ascertainable** .....................19

**C. Rule 23(a)(2) – Plaintiffs Raise Common Questions Central to the Validity of the Claims of the Putative Classes**.............................20

**D. Rule 23(a)(3) – Plaintiffs' Claims are Typical of the Claims of the Putative Classes** ...................................................................27

**E. Rule 23(a)(4) – The Class Representatives Will Fairly and Adequately Represent the Interests of the Members of the Putative Classes** ..........................................................................29

    1. The Class Representatives....................................................29

    2. Class Counsel .....................................................................31

**F. Rule 23(b)(3) – Common Questions Predominate Over Any Individual Issues, and a Class Action is Superior** ...............................33

    1. Predominance is Satisfied ....................................................33

    2. Superiority is Satisfied ........................................................36

**II.  THE COURT SHOULD APPROVE PLAINTIFFS' PROPOSED CLASS NOTICE FOR MAIL DISTRIBUTION** ..................................... 37

**CONCLUSION**..........................................................................................39

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Altman v. Altman*,
8 N.J. Super. 301 (Ch. Div. 1950) ........................................................21

*Amchem Prods., Inc. v. Windsor*,
 521 U.S. 591 (1997)............................................................................33

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)......................................................................18, 34

*Baby Neal for & by Kanter v. Casey*,
43 F.3d 48 (3d Cir. 1994)....................................................................28

*Bosland v. Warnock Dodge, Inc.*,
197 N.J. 543 (2009)..............................................................................22

*Byrd v. Aaron's Inc.*,
784 F.3d 154 (3d Cir. 2015)................................................................19

*CashCall, Inc. v. Morrisey*,
No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014) ......................4

*Consumer Fin. Prot. Bureau v. CashCall, Inc.*,
No. 2:15-cv-07522-JFW-RAO, 2016 WL 4820635
(C.D. Cal. Aug. 31, 2016)...............................................................13, 14

*Consumer Fin. Prot. Bureau v. CashCall, Inc.*,
2018 WL 485963 (C.D. Cal. Jan. 19, 2018),
*cross-appeals docketed*, 18-55479 (9th Cir.)........................................13

*Cox v. Sears Roebuck & Co.*,
138 N.J. 2 (1994)..................................................................................23

*Dopp v. Yari*,
927 F. Supp. 814 (D.N.J. 1996) ..........................................................21

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982)...............................................................................17

*Goldenstein v. Repossessors Inc.*,
815 F.3d 142 (3d Cir. 2016)...................................................................24

*Green v. Cont'l Rentals*,
292 N.J. Super. 241 (Law. Div. 1994) ...................................................23

*Hayes v. Delbert Servs. Corp.*,
811 F.3d 666 (4th Cir. 2016) ..........................................................13, 33

*Hayes v. Wal-Mart Stores, Inc.*,
725 F.3d 349 (3d Cir. 2013)...................................................................19

*Heldt v. Payday Financial, LLC*,
2016 WL 96156 (D.S.D. Jan. 8, 2016) ..................................................33

*Heyert v. Taddese*,
431 N.J. Super. 388 (App. Div. 2013) ...................................................23

*Hovermale v. Immediate Credit Recovery, Inc.*,
2018 WL 6322614 (D.N.J. Dec. 4, 2018)...............................................20

*Inetianbor v. CashCall, Inc.*,
No. 13-60066-CIV-COHN/SELTZER, ECF No. 284
(S.D. Fla. Sept. 19, 2016)...................................................13, 27, 36

*In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*,
795 F.3d 380 (3d Cir. 2015)..............................................................26, 34

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2009)...................................................................18

*In re Ins. Brokerage Antitrust Litig.*,
579 F.3d 241 (3d Cir. 2009).........................................................26, 34, 35

*In re Mercedes-Benz Tele Aid Contract Litig.*,
257 F.R.D. 46 (D.N.J. 2009)..................................................................26

iv

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016), *as amended* (May 2, 2016) ......................................30

*In re Schering Plough Corp. ERISA Litig.*,
589 F.3d 585 (3d Cir. 2009)....................................................................27, 30

*In re Thalomid and Revlimid Antitrust Litig.*,
2018 WL 6573118 (D.N.J. Oct. 30, 2018) ......................................................31, 35

*Jackson v. Payday Fin., LLC*,
764 F.3d 765 (7th Cir. 2014) .................................................................13

*James v. Glob. Tel*Link Corp.*,
2018 WL 3727371 (D.N.J. Aug. 6, 2018) ......................................................29, 35

*Kausar v. GC Servs. Ltd. P'ship*,
2018 WL 4676041 (D.N.J. Sept. 27, 2018) ...........................................................20

*Korrow v. Aaron's Inc.*,
2013 WL 5811496 (D.N.J. July 31, 2013)................................................................35

*Kugler v. Romain*,
58 N.J. 522 (1971)..........................................................................................23

*MacDonald v. CashCall, Inc.*,
883 F.3d 220 (3d Cir. 2018)...............................................................1-2, 10, 15, 27

*Neale v. Volvo Cars of N. Am., LLC*,
794 F.3d 353 (3d Cir. 2015)...............................................................................35

*Nepomuceno v. Midland Credit Mgmt., Inc.*,
2016 WL 3392299 (D.N.J. June 13, 2016)...........................................................20

*New Directions Treatment Servs. v. City of Reading*,
490 F.3d 293 (3d Cir. 2007)...............................................................................30

*Parnell v. W. Sky Fin., LLC*,
664 F. App'x 841 (11th Cir. 2016).........................................................................13

*Qureshi v. OPS 9, LLC*,
2016 WL 6434345 (D.N.J. Oct. 28, 2016) ............................................................20

*Reyes v. Netdeposit, LLC*,
802 F.3d 469 (3d Cir. 2015)................................................................24, 36

*Ryan v. Gina Marie, L.L.C.*,
420 N.J. Super. 215 (App. Div. 2011) ..................................................23

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011)...................................................................25

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016) ...........................................................................34

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338, 351 (2011)..................................................................18, 21

*West Virginia v CashCall, Inc.*,
No. 2008C1964, 2012 WL 11875220
(W. Va. Cir. Ct. Sep. 10, 2012) *aff'd sub nom* .........................................4

*Williams v. Jani-King of Philadelphia Inc.*,
837 F.3d 314 (3d Cir. 2016).....................................................................34

*Wozniak v. Pennella*,
373 N.J. Super. 445 (App. Div. 2004) ..................................................23

*Zaman v. Felton*,
219 N.J. 199 (2014)................................................................................22

## **RULES**

Fed. R. Civ. P. 23 ...............................................................17, 18, 34, 38

Fed. R. Civ. P. 23(a).................................................................................18, 19

Fed. R. Civ. P. 23(a)(1)..............................................................................18

Fed. R. Civ. P. 23(a)(2)..........................................................................20, 34

vi

Fed. R. Civ. P. 23(a)(3) ............................................................... 27

Fed. R. Civ. P. 23(a)(4) ............................................................... 29

Fed. R. Civ. P. 23(b) .................................................................. 18

Fed. R. Civ. P. 23(b)(3) .............................................. 19, 33, 34, 36, 37

Fed. R. Civ. P. 23(c)(2)(B) ........................................................... 37

Fed. R. Civ. P. 23(g) ............................................................. 31, 33

## **STATUTES**

18 U.S.C. § 1962(c) .................................................................. 24

18 U.S.C. § 1962(d) .................................................................. 24

18 U.S.C. § 1961(6) .................................................................. 24

New Jersey Consumer Finance Licensing Act ........................................ 14

New Jersey Consumer Fraud Act .................................................. *passim*

N.J. Stat. Ann. § 56:8-2 ............................................................. 22

N.J. Stat. § 31:1-1(a) ............................................................... 21

Racketeer Influenced and Corrupt Organizations Act .......................... *passim*

## **INTRODUCTION**

This case is about Defendants' illegal scheme to issue and collect on usurious consumer loans in New Jersey and across the country. Claiming affiliation with a Native American tribe and under the guise of tribal law, Defendants systematically issued loans with interest rates well over the legal limit imposed by New Jersey law—many as high as 139%. Using form loan agreements, Defendants issued these illegal loans to more than 11,000 New Jersey borrowers during the statutory period. The material terms of the agreement did not vary from borrower to borrower. Nor did the way in which the loan program functioned. Defendants' claim of tribal affiliation was similarly uniform, and was used as a blanket justification for the illegal conduct at issue.

This case is perfectly suited for class-wide resolution. The question of whether state and federal law applies to the loans at issue can be, and already has been, resolved on a class-wide basis. In denying Defendants' motion to dismiss, this Court declined to endorse Defendants' sham dispute resolution procedures, and explained that New Jersey law applies to this litigation. (*See* Op. on Mot. to Dismiss at 11-15, ECF No. 24.) On Defendants' interlocutory appeal from that order, the Third Circuit explicitly affirmed this holding, concluding that Defendants' reliance on tribal law "violated public policy" and that this Court was "correct to determine that New Jersey substantive law applies." *MacDonald v.*

1

*CashCall, Inc.*, 883 F.3d 220, 228 n.6 (3d Cir. 2018). Accordingly, the common question driving this litigation has already been resolved in Plaintiffs' favor.

As to the specific state and federal causes of action, they too can be resolved class-wide by examining Defendants' uniform conduct. Liability under New Jersey's usury law turns on whether Defendants charged interest rates that exceeded 16%. There is no dispute that they did. Similarly, both the New Jersey Consumer Fraud Act and the Racketeer Influenced and Corrupt Organizations Act ("RICO") impose liability per se when dealing with usurious loans and their collection. As to damages, Defendants have stipulated that they can produce loan and payment data for each class member, allowing for mathematical calculations of amounts paid. In short, there are numerous common questions capable of generating common answers, as well as a manageable and fair way of calculating damages, to resolve the claims in this case for all New Jersey borrowers.

For these reasons, the Court should grant class certification.

## RELEVANT BACKGROUND

## I.    FACTUAL BACKGROUND

### A. The Parties

The Defendants in this case are J. Paul Reddam ("Reddam"), a resident of California, and a series of related companies that he owns and controls. Defendant CashCall, Inc. ("CashCall") is a lending company. (Ex. A: CashCall Dep. 20, 35-

36.)[1] Reddam is CashCall's president, CEO, sole director, and sole shareholder. (*Id.* at 22.) Defendant WS Funding, LLC ("WS Funding") is a wholly owned subsidiary of CashCall. (*Id.* at 77.) ████████████████████████████ ████████████████████████████ Reddam likewise owned Delbert Services, Corp., ("Delbert") a Nevada collection company. (Ex. A: CashCall Dep. 163.)

Non-party Western Sky Financial, LLC ("Western Sky Financial") is a South Dakota limited liability company run by Martin "Butch" Webb ("Webb"). (*See* Ex. C: Reddam Dep. 26; Ex. A: CashCall Dep. 60; Ex. D: S.D. Sec. State. Bus. Listing.) Webb is a member of the Cheyenne River Sioux Tribe ("CRST"). (Ex. A: CashCall Dep. 60.) Western Sky Financial, together with Defendants, are referred to in this brief as the "Western Sky Enterprise."

Plaintiffs John MacDonald and Jessica Spearman ("Plaintiffs" or "Class Representatives") are New Jersey residents who took out loans from the Western Sky Enterprise. (*See* Ex. E: MacDonald form loan agreement; Ex. F: Spearman form loan agreements.) The proposed classes, defined below, include all New Jersey residents who had loans during the six- and four-year statutory periods for

---

[1] All exhibits cited herein are attached to the accompanying Declaration of Anna P. Prakash ("Prakash Decl."). CashCall designated a single corporate representative for its 30(b)(6) deposition in this case—its General Counsel, Dan Baren. (Ex. A: CashCall Dep. 8-18.)

the asserted claims.

**B. The Western Sky Enterprise Operated Uniformly Throughout the Country to Illegally Circumvent State and Federal Law**

    1. <u>Defendants Formed the Western Sky Enterprise to Circumvent State and Federal Law</u>

In or around 2003, CashCall began making unsecured consumer installment loans in California. (Ex. A: CashCall Dep. 20, 35-37.) CashCall sought to expand its portfolio into other states but was mindful of the interest rate limits imposed by state law. (*Id.* at 37-38, 67; *see* Ex. G: Meeks Dep. 18.) To try to evade usury laws, Reddam decided that CashCall would enter into arrangements with state-chartered federally regulated banks. (Ex. A: CashCall Dep. 38-39; *see* Ex. G: Meeks Dep. 16, 18.) But "the lending program established by CashCall with [these banks] was essentially a sham intended to make improper use of federal preemption in order to unlawfully evade [state] lender licensing and usury laws." *West Virginia v CashCall, Inc.*, No. 2008C1964, 2012 WL 11875220, at *1 (W. Va. Cir. Ct. Sep. 10, 2012). Following trial in an action brought by the West Virginia Attorney General, the court entered judgment against CashCall, finding that CashCall was the true lender and was subject to West Virginia state law. *Id.* at *15; *aff'd sub nom. CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014). Even Reddam himself could not hide the fiction of the bank affiliation when questioned. (Ex. C: Reddam Dep. 114-116 (testifying that CashCall

4

originated the bank loans, with "[o]rigination there mean[ing] that CashCall did all the functions on those loans up to underwriting and funding.").)

After abandoning this "rent-a-bank" model, CashCall and Reddam tried to replicate their scheme—this time claiming to be associated with a Native American tribe, CRST. In 2009, CashCall teamed up with Webb's company, Western Sky Financial. (Ex. A: CashCall Dep. 61-63 (CashCall's general counsel and corporate designee testifying, "I gave [Webb] a background on CashCall and our success on the bank model and what we were looking to do. I also explained to him [regulatory counsel's] suggestion that CashCall move to tribal model."); *see* Ex. G: Meeks Dep. 18.) The objective was clear: by nominally involving Western Sky Financial, CashCall could escape usury law. (Ex. A: CashCall Dep. 71; *see also* Ex. C: Reddam Dep. 73-74 (approximating range of interest rates to be 79 to 200 and stating, "I think most of the loans were done with an APR of about 139.").) This Western Sky Enterprise was national in scope, i.e., it did not vary from state to state. (*See* CashCall Dep. 70-71 ("[W]e elected to go with a national plan rather than a state-specific plan.").) CashCall's arrangement with Western Sky Financial was discussed with, approved of, and literally signed off on by Reddam. (*See id.* at 71-72; Ex. G: Meeks Dep. 14-15; Ex. H: *Inetianbor* 30(b)(6) Meeks Dep. 86-87; Ex. I: Reddam Dep. Exs. 2-6, Ex. 18.)

2. <u>Under the Western Sky Enterprise, CashCall Operated As the True Lender</u>

Under the terms of the agreements, Western Sky Financial would be the "originator" of the loans on paper. However, shortly after loans were issued, CashCall, through its wholly owned subsidiary WS Funding, would purchase the loan from Western Sky Financial for 5.145%, with a $10,000 minimum monthly amount due to Western Sky Financial. (Ex. A: CashCall Dep. 79-82, 156; Ex. J: CashCall Dep. Ex. 6 at 19397-98; Ex. G: Meeks Dep. 26.) Western Sky Financial, in turn, would pay CashCall a 2.02% fee. (Ex. A: CashCall Dep. 93-104; Ex. K: CashCall Dep. Ex. 8 at 19390-91.) Importantly, once CashCall purchased the loans, Western Sky Financial had no further involvement. (Ex. H: *Inetianbor* 30(b)(6) Meeks Dep. 66; Ex. A: CashCall Dep. 125 ("Because remember, CashCall is buying all of these loans, and CashCall is going to be on the hook if the borrowers are in default.").) Loans that were in default were assigned to Delbert for collection. (Ex. A: CashCall Dep. 164-69.)

Even leading up to the sale, however, CashCall and Reddam bore the risk and expense of the loans. The principal loaned to consumers came from CashCall. (Ex. C: Reddam Dep. 118-120; *see infra* fn.2.) CashCall also sought investors and, through subsidiaries, took out loans—including loans that Reddam and CashCall guaranteed—to fund the Western Sky loans. (*See e.g.*, Ex. C: Reddam Dep. 99-104; Ex. A: CashCall Dep. 150, 210 (identifying six to eight "funding partners"

6

with respect to Western Sky loans); Ex. G: Meeks Dep. 14-15, 27, 32-41, 60-61.



).)[2]

The agreement between CashCall and Western Sky Financial provided that CashCall would indemnify Western Sky Financial for fees and costs associated with legal actions. (Ex. A: CashCall Dep. 90-92; *see* Ex. J: CashCall Dep. Ex. 6 at CC-M-00019400.)

CashCall was heavily involved in every aspect of the program. Under the arrangement, CashCall was obligated to reimburse Western Sky Financial for expenses including, for example, office costs, bank fees, advertising, half the cost of a cell tower, and an office building. (Ex. A: CashCall Dep. 83-86.) CashCall

---

[2] ████████████████████████████████████████████████ CashCall, however, stopped purchasing Western Sky loans around September of 2013 at Reddam's direction. (Ex. A: CashCall Dep. 202-203; Ex. C: Reddam Dep. 24-25.) CashCall stopped servicing and collecting on outstanding New Jersey loans in September of 2016, based on the summary judgment order in the CFPB action discussed below. (Ex. A: CashCall Dep. 205-206.) If loans were sold to third parties, however, those third parties may still be collecting on the loans. (*Id.*)

provided inbound and outbound customer service support to Western Sky Financial, i.e. CashCall employees would take calls from consumers interested in Western Sky loans. (Ex. A: CashCall Dep. 99, 101.) CashCall provided Western Sky Financial with dozens of phone and fax numbers for incoming consumer calls, as well as loan agents. (*Id.* at 21, 102; 131-33.) CashCall sent emails to customers on behalf of Western Sky. (*Id.* at 102-03.) CashCall also provided assistance and support for Western Sky Financial's servers and used CashCall servers to accommodate Western Sky Financial's needs. (*Id.* at 100-101.)

"CashCall assisted and drafted a lot of advertising for the [Western Sky] program." (*Id.* at 96-97.) CashCall worked with Western Sky Financial to put together the Western Sky website. (*Id.* at 129.) Even the Western Sky loans themselves were generally patterned after CashCall's non-tribal loans. (*Id.* at 111-119 (explaining, among other things, similar loan amounts, no balloon payments, fixed payment schedules, no prepayment penalties, and general characteristics of borrowers having lower credit scores).) CashCall employees would review the underwriting criteria for Western Sky loans. (*Id.* at 100.)

In short, consumers saw ads paid for by CashCall,[3] called numbers or visited the website provided or supported by CashCall, spoke with representatives—many

---

[3] All ads were run nationally and were not state-specific. (Ex. A: CashCall Dep. 193.)

of whom were CashCall employees—and applied for loans that were funded through CashCall and/or otherwise modeled or approved by CashCall. The loans were promptly sold to CashCall and, if the borrower defaulted, would be collected on by Reddam-owned Delbert Services. (*See* Ex. A: CashCall Dep. 167 (as to collections, "New Jersey would be no different than any other state under the Western Sky model,"), 170 (same as to origination).)

> 3. The Western Sky Enterprise Was Not Affiliated with the Cheyenne River Sioux Tribe

Although Defendants used their purported affiliation with a Native American tribe to try to evade state and federal law, the fiction of tribal affiliation is made clear by Defendants' admissions that the CRST did not and does not own Western Sky Financial. (*Id.* at 106; *see also* Ex. D: S.D. Sec. State. Bus. Listing.). Western Sky Financial never received funding from the CRST. (Ex. A: CashCall Dep. 106.) The CRST never owned the land or buildings where Western Sky Financial was located. (*Id.* at 106-108; Ex. N: CashCall Dep. Ex. 10 at ¶¶ 1-9.) There were likewise no contracts or business arrangements between CashCall and the CRST. (Ex. A: CashCall Dep. 108.) CashCall, Delbert, and WS Funding were never owned, operated, directed, or controlled by the CRST. (*Id.* at 108-109.)

**C. The Western Sky Enterprise Greatly Affected New Jersey Borrowers**

Since May 17, 2010, Defendants have issued 12,518 loans to 11,158 New Jersey consumers through the Western Sky Enterprise. (Ex. O: Defs' Interrog.

9

Response Nos. 4; Ex. A: CashCall Dep. 72-73 (confirming same).) Defendants issued 8,121 of those loans to 7,520 New Jersey consumers on or after May 17, 2012. (Ex. O: Defs' Interrog. Response No. 5; Ex. A: CashCall Dep. 73-74.)

The loan agreement governing these 12,518 loans is a form agreement titled the "Western Sky Consumer Loan Agreement." (Ex. P: Form Western Sky Consumer Loan Agreements produced in this litigation.) While the form was modified from time to time, the modifications were minor and the substance of the agreement remained the same—namely, misrepresentations about the application of tribal law, misidentification of Western Sky Financial as the lender authorized by the laws of the CRST, and the general loan structure of principal, simple but high interest, and an amortization schedule providing for fixed payments. (*See id.*, *see also* Ex. A: CashCall Dep. 175-77, 179-187; Ex. Q (redlined comparison showing changes to the form agreements over time).[4, 5]

---

[4] While Defendants modified the arbitration language in the form agreements, the modification merely purports to add an additional arbitration option. As this Court has already held, the modification does not save the agreement from being a "transparent attempt to hijack the FAA to deprive aggrieved parties of an opportunity to meaningfully adjudicate their claims. Although the FAA has a broad reach, courts will not enforce a prospective waiver of statutory rights, whether in an arbitration agreement or any other contract." (Op. on Mot. to Dismiss at 10, ECF No. 24 (quotations omitted)); *MacDonald v. CashCall, Inc.*, 883 F.3d 220 (3d Cir. 2018) (affirming decision).

[5] (*See* Prakash Decl. ¶ 3 (explaining Ex. Q).) Further, when a change was made to the form loan agreement, that change was put into effect "[i]n every state where loans were being offered[,]" including New Jersey. (Ex. A: CashCall Dep. 177.)

For each of the 12,518 loans, Defendants can produce data showing, among other things, the principal balance at the time the loan was funded, the rate of interest per annum, and payment history, including total amount paid and applied to interest. (*See* Ex. R: Stip. re: Class Data.) During the statutory period, Defendants have loaned more than $32,000,000 in principal to New Jersey borrowers and the amount of interest paid on the same is knowable from Defendants' records. (*See id.*; Ex. S: Let. from counsel.)

### D. The Proposed Class Representatives' Experiences with the Western Sky Enterprise are Typical of the Experiences of Other New Jersey Borrowers

As this Court has stated, "Plaintiff's experience epitomizes Defendants' lending scheme." (Op. on Mot. to Dismiss at 2, ECF No. 24.) In 2012, Mr. MacDonald was searching for a loan. Through Google, he happened upon the Western Sky website and saw it marketed that the loans were a convenient way to get money fast. (Ex. T: MacDonald Dep. 76-80.) On December 18, 2012, he took out a $5,000 loan by filling out the "Western Sky Consumer Loan Agreement" online. (*Id.* at 82-85; Ex. E: MacDonald Dep. Ex. 4 (form loan agreement). ████

████████████████████████████████████████████████████

On December 26, 2012, Mr. MacDonald received an email notifying him that his loan had been sold to WS Funding and that CashCall would service the loan. (Ex. U: MacDonald notices and transaction history at MacDonald Dep. Ex. 6.) On

August 13, 2013, he received an email informing him that Delbert would take over the servicing of his loan and instructing him to direct future loan payments to Delbert. (*Id.* at MacDonald Dep. Ex. 7.) The loan was transferred back to CashCall in November 2014. (*Id*. at MacDonald Dep. Ex. 8.) As of April 2016, Defendants had collected more than $15,000 from Mr. MacDonald on his $5,000 loan. (*Id.* at MacDonald Dep. Ex. 12.)

In 2012, Ms. Spearman saw a print ad for Western Sky loans and then applied for the loan online. (Ex. V: Spearman Dep. 32-34.) She ended up taking out three separate loans from the Western Sky Enterprise, two for $2,525 each (with annual percentage rates of 139.13%), and one for $5,000 (with an annual percentage rate of 116.57%). (Ex. F: Spearman Dep. Exs. 2, 7, 11 (form loan agreements).) For each, she filled out the "Western Sky Consumer Loan Agreement." (*Id.*) As with Mr. MacDonald, each of her form agreements identified the lender as Western Sky Financial but were promptly sold and CashCall and/or Delbert took over servicing. (Ex. W: Spearman notices and transaction history at Spearman Dep. Ex. 4, CC-M-00104876-77, CC-M-00104934, and CC-M-00104953.)

## E. Courts Continue to Find the Western Sky Enterprise Illegal or Otherwise Side with Consumers

Across the country, Defendants are being forced to answer for their failed attempts to circumvent state usury and consumer protection laws. *See e.g., Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. 2:15-cv-07522-JFW-RAO, 2016 WL 4820635, at *9-13 (C.D. Cal. Aug. 31, 2016) (granting summary judgment for the Bureau and concluding, among other things, that the tribal law provision in the loan agreements is unenforceable and that Reddam is individually liable); 2018 WL 485963, at *16 (C.D. Cal. Jan. 19, 2018) (imposing, after trial, a statutory penalty of more than ten million dollars), *cross-appeals docketed*, 18-55479 (9th Cir.) (challenging, among other things, denial of claim for restitution and award of statutory penalty); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV-COHN/SELTZER, ECF No. 284 (S.D. Fla. Sept. 19, 2016) (granting class certification of Florida classes challenging Western Sky Enterprise under state consumer protection laws); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 676 (4th Cir. 2016) (reversing district court order compelling arbitration in case challenging Western Sky Enterprise and stating, "rather than use arbitration as a just and efficient means of dispute resolution, Delbert seeks to deploy it to avoid state and federal law and to game the entire system"); *Parnell v. W. Sky Fin., LLC*, 664 F. App'x 841, 844 (11th Cir. 2016) (affirming denial of CashCall's motion to compel arbitration); *see also Jackson v. Payday Fin., LLC*, 764 F.3d 765, 786 (7th Cir.

2014) ("Additionally, the courts of the Cheyenne River Sioux Tribe do not have subject matter jurisdiction over the Plaintiffs' claims. Nor have the Defendants raised a colorable claim of tribal jurisdiction necessary to invoke the rule of tribal exhaustion."). This is the only case brought exclusively on behalf of New Jersey consumers under New Jersey law.[6]

## II.    PROCEDURAL HISTORY

Plaintiff MacDonald filed this proposed class action on May 17, 2016, alleging violations of RICO, New Jersey's usury law and the New Jersey Consumer Fraud Act, as well as claims for restitution and unjust enrichment, a declaration that tribal law does not apply, and a declaration that the arbitration provision in the Western Sky Loan Agreement is void.[7] (Compl., ECF No. 1.) Ms. Spearman was added as a proposed Class Representative on September 25, 2018. (Amend. Compl., ECF No. 69.) The Class Representatives bring this action on behalf of two proposed classes:

<u>**Six Year Class**</u>
All individuals who, on or after May 17, 2010, made payments to one or more Defendants on loans originated by the Western Sky

---

[6] The Consumer Financial Protection Bureau action seeks relief for consumers in numerous states, including New Jersey, but was brought under the Consumer Finance Protection Act and not individual state's laws. *See Consumer Fin. Prot. Bureau*, 2016 WL 4820635, at *4.

[7] The initial complaint asserted a claim under the New Jersey Consumer Finance Licensing Act, which claim Plaintiff has since voluntarily withdrawn.

Enterprise where the borrower was located in the State of New Jersey at the time the loan was originated.

### Four Year Class

All individuals who, on or after May 17, 2012, made payments to one or more Defendants on loans originated by the Western Sky Enterprise where the borrower was located in the State of New Jersey at the time the loan was originated.

(*Id.*, ¶¶ 63-64.) The Six-Year Class covers all asserted claims aside from RICO, which has a four-year statute of limitations and is, thus, asserted on behalf of the Four-Year class. (*Id.* ¶¶ 73-101.)

Shortly after this action was filed, Defendants moved to compel arbitration or dismiss. This Court denied the motion, "declin[ing] to endorse the Loan Agreement's sham dispute resolution procedures" and explaining that "the choice-of-law provision will not be enforced and New Jersey law will apply to this dispute." (Op. on Mot. to Dismiss at 11-15, ECF No. 24.) Defendants appealed, and the parties' counsel, as well as Mr. MacDonald, attended the Third Circuit's mandatory mediation session by telephone. (Prakash Decl. ¶ 4.) Mediation was unsuccessful, and the Third Circuit affirmed this Court's decision. *MacDonald*, 883 F.3d at 223, 228 ("Because the parties' agreement directs arbitration to an illusory forum, and the forum selection clause is not severable, the entire agreement to arbitrate, including the delegation clause, is unenforceable, and we will therefore affirm…. As a threshold matter, we must determine what substantive law governs our interpretation. The District Court concluded that, notwithstanding

the parties' choice of CRST law, New Jersey law applies to this dispute. We agree.").

Discovery commenced in the summer of 2018. Mr. MacDonald and Ms. Spearman both provided written responses to interrogatories and document requests. Both searched for and provided documents for production, including personal emails. They met with counsel to prepare for their depositions, and each took time off from work to travel to and attend their depositions, with Mr. MacDonald traveling nearly an hour to reach his deposition and Ms. Spearman traveling nearly 50 miles for her deposition.[8] They have demonstrated adequate knowledge concerning the litigation (*see, e.g.*, Ex. T: MacDonald Dep. at 223-227, 247-248; Ex. V: Spearman Dep. at 107-109, 120, 134-137), have stayed in contact with counsel throughout discovery via email and phone, and have stayed abreast of litigation developments. (Prakash Decl. ¶¶ 4-5.)

Defendant CashCall was deposed, as was CashCall's chief financial officer. Defendants produced numerous documents, including transcripts of CashCall's and Reddam's depositions in the *Inetianbor* and *CFPB* actions listed above. As to class-wide data, the parties entered into a stipulation making clear that Defendants

---

[8] Defendants also deposed Mr. MacDonald's ex-wife, who had no information relevant to his claims, and was not a party to the loan at issue.

would be able to produce class data upon receipt of a valid request or court order. (Ex. R, ¶ 4.)[9]

The parties appeared in front of Magistrate Judge Wettre on various discovery disputes. In an order denying discovery into Plaintiff Spearman's prior consumer loans, Magistrate Judge Wettre made clear that a plaintiff's subjective experience or understanding of loan agreements is irrelevant under the New Jersey Consumer Fraud Act. (*See* Ex. X: Hearing Tr. at 6-9.) Discovery closed on January 25, 2019. (ECF No. 83.)

Both Plaintiffs took time off from work to travel to the court-ordered settlement conference in this matter in late 2018. (Prakash Decl. ¶¶ 4-5.) The case did not settle, and Plaintiffs now move to certify the above-defined classes under Fed. R. Civ. P. 23.

## ARGUMENT

A class action "saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion[.]" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (quotations and modifications omitted). The party seeking certification must

---

[9] (*See also* Ex. S (declining to produce class data until such time as a class is certified).) Plaintiffs raised this issue with Magistrate Judge Wettre, seeking a brief period of discovery following certification in order to request and receive class data. Magistrate Judge Wettre advised Plaintiffs to remind her of this request should a class be certified. (Ex. X at 9.)

demonstrate that Rule 23 is satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Every class action must meet the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). A class action must also be maintainable under Rule 23(b). *See* Fed. R. Civ. P. 23(b).

The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2009). The district court may grant certification only after conducting a "rigorous analysis" confirming that the requirements are met. *Wal-Mart*, 564 U.S. at 351. However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. As set forth below, Plaintiffs have more than met their burden. The Court should grant class certification.

## I.   PLAINTIFFS HAVE SATISFIED THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(a)

### A. Rule 23(a)(1) – Numerosity is Satisfied

Numerosity requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the putative Four-Year

Class contains more than 7,500 members, and the Six-Year Class contains more than 11,000 members. (*See supra* Relevant Background, Pt. I.C.) Numerosity is satisfied.

**B. The Putative Classes are Readily Ascertainable**

In addition to the enumerated requirements of Rule 23(a), the Third Circuit requires that "[a] plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). This requires that: (1) the class is defined with reference to objective criteria; and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Id.* at 163 (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)). Ascertainability does not require that all class members be identified at the certification stage—a plaintiff need only show that the members *can* be identified. *Id.*

The Amended Complaint defines each class with reference to objective criteria: (1) location in New Jersey at the time of the loan; and (2) making payments to Defendants on Western Sky loans during the class period. (*See* ECF No. 69, Am. Compl. ¶¶ 63-64.) Likewise, there is a reliable and administratively feasible way to determine whether class members fall within the class definitions. Defendants have stipulated that they maintain loan level data and can produce

detailed data identifying each of the class members and the relevant information concerning their loans. (*See supra* Relevant Background, Pt. I.C.; Ex. R.) If the classes are certified, Plaintiffs will obtain this information to establish liability and damages for each class.[10]

Both components of the ascertainabilty requirement are satisfied. *See, e.g.*, *Hovermale v. Immediate Credit Recovery, Inc.*, 2018 WL 6322614, at *7 (D.N.J. Dec. 4, 2018) ("Class members are . . . easily identified through ICR's business and mailing records[.]"); *Kausar v. GC Servs. Ltd. P'ship*, 2018 WL 4676041, at *7 (D.N.J. Sept. 27, 2018) (ascertainability satisfied where class members could be identified from records maintained by the defendant); *Nepomuceno v. Midland Credit Mgmt., Inc.*, 2016 WL 3392299, at *3 (D.N.J. June 13, 2016) (same); *see also Qureshi v. OPS 9, LLC*, 2016 WL 6434345, at *2 (D.N.J. Oct. 28, 2016) (class member identities obtained through review of relevant business records).

## C. Rule 23(a)(2) – Plaintiffs Raise Common Questions Central to the Validity of the Claims of the Putative Classes

The commonality requirement of Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). All questions need not be

---

[10] Damages for Plaintiffs and the classes will be presented through expert testimony. The deadlines for expert disclosures and discovery have not yet been set. (*See* Sched. Order, ECF No. 56 ¶¶ 15-18.) At Magistrate Judge Wettre's direction, the production of that data will be addressed following the Court's decision on class certification. (*See* Ex. X at 9.)

common—"even a single common question will do." *Wal-Mart*, 564 U.S. at 359 (internal quotation marks and modifications omitted). What matters is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 350. There must be a contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Here, each of Plaintiffs' asserted claims involves questions of law and fact that are common to the putative classes and will drive the ultimate resolution of this litigation:

**New Jersey Usury (Count I)** – The maximum interest rate chargeable to consumers under New Jersey law is 16%. *See* N.J. Stat. § 31:1-1(a). A claim for violation of New Jersey usury law requires: (1) a loan of money; (2) an absolute obligation to repay the principal; and (3) the exaction of a greater compensation than that allowed by law. *Dopp v. Yari*, 927 F. Supp. 814, 820 (D.N.J. 1996). The violation must be intentional. *See Altman v. Altman*, 8 N.J. Super. 301, 309 (Ch. Div. 1950).

There are common questions of law and fact with respect to the usury claim. Each of the elements of Plaintiffs' and the class members' claims will be proven through Defendants' records, which identify the loans made to each class member,

the applicable interest rates, and the amounts of money paid on the loans. (*See* Ex. R.) Intent will be established through common evidence of Defendants' tribal affiliation scheme, the purpose of which was a deliberate attempt to evade the laws of New Jersey. (*See supra* Relevant Background, Pt. I.B.)

**New Jersey Consumer Fraud Act (Count II)** – Claims under the New Jersey Consumer Fraud Act require proof of three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss. *Zaman v. Felton*, 219 N.J. 199, 222 (2014) (quoting *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009)). Unlawful conduct includes:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise[.]

N.J. Stat. Ann. § 56:8-2 (emphasis added). The Consumer Fraud Act deems the conduct set forth above unlawful "whether or not any person has in fact been misled, deceived or damaged thereby[.]" *Id.* Accordingly, as Magistrate Judge Wettre held in the course of discovery, the subjective experience of any individual plaintiff or class member is irrelevant to the inquiry. (*See* Ex. X at 6-9.)

Although an "unconscionable commercial practice" is not defined under the Consumer Fraud Act, the statute contemplates a "lack of 'good faith, honesty in

fact and observance of fair dealing.'" *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994) (quoting *Kugler v. Romain*, 58 N.J. 522, 544 (1971)). Charging interest on loans in excess of the maximum allowed by law is by definition an unconscionable practice. *See Green v. Cont'l Rentals*, 292 N.J. Super. 241, 256-57 (Law. Div. 1994) ("The interest rates here far exceed that limitation and constitute an unconscionable practice."); *see also Heyert v. Taddese*, 431 N.J. Super. 388, 415 (App. Div. 2013) (charging rent in excess of that allowed by local rent control ordinance violates the Consumer Fraud Act); *Ryan v. Gina Marie, L.L.C.*, 420 N.J. Super. 215, 227 (App. Div. 2011) (same); *Wozniak v. Pennella*, 373 N.J. Super. 445, 456 (App. Div. 2004) (same).

Like the usury claim, Plaintiffs' Consumer Fraud Act claim involves common questions that can be resolved through class-wide evidence. Defendants committed the same unlawful conduct with respect to each class member— charging unconscionable and illegal interest rates under the Western Sky loan program. (*See supra* Relevant Background, Pt. I.) The loss suffered by each class member can be ascertained through Defendants' records of the rates charged and payments made, and was plainly caused by the illegal conduct at issue. *See, e.g.*, *Heyert*, 373 N.J. at 422 (loss causation where landlord overcharged tenants, causing them "to lose money every month that they paid they illegal rent").

23

**Civil RICO (Count V)** – RICO prohibits the use of an enterprise for the collection of unlawful debt:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). RICO likewise prohibits a conspiracy to use an enterprise for the collection of unlawful debt. 18 U.S.C. § 1962(d). An unlawful debt includes that "which was incurred in connection with . . . the business of lending money . . . a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6). Under § 1962(c), the plaintiff must prove that a RICO defendant participated in (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity or collection of unlawful debt. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 147 (3d Cir. 2016).

Plaintiffs' RICO claims also raise common questions capable of class-wide resolution. "When a party seeks to certify a class to bring a RICO claim, the focus is on the defendant's conduct." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015). As the Third Circuit has noted, RICO allegations "will often contain common issues because, like commonality, a RICO allegation[] is informed by the defendant's conduct as to all class members and any resulting injuries common to

24

all class members." *Id.* (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (en banc) (modifications and internal quotation marks omitted).

Plaintiffs have set forth overwhelming evidence that Defendants, along with non-party Western Sky Financial, engaged in an enterprise to collect unlawful debt over the course of the relevant statutory period. Examples of this common evidence include:

- CashCall's arrangement with Western Sky Financial under which loans were made to consumers in New Jersey and other states, while purporting to be exempt from state or federal regulation based on fictitious assertions of tribal affiliation;

- CashCall providing financing used to fund Western Sky loans;

- CashCall providing substantial resources in furtherance of the scheme, including: (1) website hosting and support services for Western Sky Financial; (2) assistance and support for Western Sky Financial's server; (3) reimbursement to Western Sky Financial for office, personnel, and other expenses; (4) taking loan applications from potential borrowers; (5) paying for and participating in the marketing of Western Sky Financial and Western Sky loans, including advertising and other promotional materials; (6) indemnification of Western Sky Financial for all legal actions;

- WS Funding entering into agreements with Western Sky and purchasing usurious loans from Western Sky;

- Company records detailing the thousands of illegal loans made to New Jersey residents, including the unconscionable interest rates charged and all amounts collected;

- CashCall and Delbert Services servicing and collecting on Western Sky loans.

(*See supra* Relevant Background, Pts. I.B-C.) This common evidence will establish RICO violations and damages for the entire class. Commonality is satisfied. *See, e.g.*, *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 399 (3d Cir. 2015) (finding commonality in RICO action where "the class was subjected to the same kind of illegal conduct by the same entities, and that class members were harmed in the same way, albeit to potentially different extents"); *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 269-70 (3d Cir. 2009) ("Thus, each element of the alleged RICO violation involves common questions of law and fact.").

**Restitution and Unjust Enrichment (Count III)** – For the same reasons already stated, the alternative claims for restitution and unjust enrichment also involve common questions. The same common evidence described above will prove (1) the benefits received by Defendants (principal, interest, and other receipts on Western Sky loans), as well as (2) the inequity in allowing Defendants to retain those benefits. *See, e.g.*, *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 72-73 (D.N.J. 2009) ("In this case, an examination of the elements [of] Plaintiffs' two causes of action—unjust enrichment and consumer fraud— reveals that virtually all of the legal and factual issues which will be adjudicated at trial are common to the class.").

**Declaratory Relief (Count IV) –** Finally, Plaintiffs' claims for declaratory relief raise common questions and have already been resolved in favor of Plaintiffs and the class. In denying Defendants' motion to dismiss, the Court held that: (1) the arbitration provision in the Western Sky Loan Agreement is unenforceable; (2) the forum selection clause is also unenforceable; and (3) New Jersey—not tribal law—applies. (*See* Op. on Mot. to Dismiss at 6-21, ECF No. 24.) The Third Circuit affirmed. *MacDonald*, 883 F.3d 220.

Plaintiffs have established that the elements of each asserted cause of action will be proven at summary judgment or trial through common evidence, applicable to all class members. Commonality is satisfied. *See Inetianbor*, No. 13-60066-CIV-COHN/SELTZER at 17-18 (finding commonality in class action against CashCall and Reddam alleging violations resulting from Western Sky loan program). (Ex. Y.)

## D. Rule 23(a)(3) – Plaintiffs' Claims are Typical of the Claims of the Putative Classes

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The requirement ensures "that the class representatives are sufficiently similar to the rest of the class . . . so that certifying those individuals to represent the class will be fair to the rest of the proposed class." *In re Schering Plough Corp. ERISA Litig.*,

589 F.3d 585, 597 (3d Cir. 2009). The typicality analysis focusses on three related issues: "(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." *Id.* at 599. "[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994).

The legal claims of proposed Class Representatives MacDonald and Spearman are identical to those of the classes they seek to represent. The Class Representatives, like the members of the putative classes, seek relief under New Jersey's usury law, the New Jersey Consumer Fraud Act, and RICO, and have also brought claims for restitution and unjust enrichment, a declaration that tribal law does not apply, and declaration that the arbitration provision in the Western Sky Loan Agreement is void.

The factual circumstances giving rise to the Class Representatives' claims are also typical of the putative classes. Like the class members, Mr. MacDonald

28

and Ms. Spearman are New Jersey residents who paid illegal, usurious interest rates to Defendants under the Western Sky tribal lending program. (*See supra* Relevant Background, Pt. I.D; Exs. E-F.) As discussed in the context of commonality, the core facts that will drive liability and damages are identical for both the Class Representatives and the classes that they seek to represent.

Further, there are no legitimate defenses that would apply only to Mr. MacDonald or Ms. Spearman and would be inapplicable to the other classes members. The interests and incentives of the Class Representatives are aligned with those of the putative classes that they seek to represent. Typicality is satisfied. *See, e.g.*, *James v. Glob. Tel\*Link Corp.*, 2018 WL 3727371, at \*5 (D.N.J. Aug. 6, 2018) (typicality where plaintiffs were subject to the same allegedly illegal fees and pursued the same legal theories as the putative class).

## E. Rule 23(a)(4) – The Class Representatives Will Fairly and Adequately Represent the Interests of the Members of the Putative Classes

The adequacy inquiry ensures that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement applies to both class representatives and their counsel.

### 1. The Class Representatives

With respect to the class representatives, "the adequacy inquiry seeks to uncover conflicts of interest between named parties and the class they seek to

29

represent." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 602 (internal quotation marks omitted). In addition, "[a] class representative must represent a class capably and diligently." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 430 (3d Cir. 2016), *as amended* (May 2, 2016). However, a class representative need only possess a "minimal degree" of knowledge about the litigation. *Id.* (citing *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)).

There are no conflicts or other questions concerning the adequacy of the Class Representatives in this case. The Class Representatives and the putative classes share a common interest in seeking relief from Defendants' illegal lending practices. Both Mr. MacDonald and Ms. Spearman have demonstrated a commitment to the classes and have represented them capably and diligently. They have assisted in the preparation of the Complaints, searched for and produced documents, responded to written discovery, traveled on more than one occasion for this case, been deposed and demonstrated adequate knowledge concerning the litigation, maintained regular contact with counsel, and attended mediation. (*See* supra Relevant Background, Pt. II.) They are committed to this case and are adequate Class Representatives.

2. Class Counsel

With respect to class counsel, the adequacy inquiry requires that counsel be "qualified, experienced, and generally able to conduct the proposed litigation[.]" *In re Thalomid and Revlimid Antitrust Litig.*, 2018 WL 6573118, at *10 (D.N.J. Oct. 30, 2018). The analysis is governed by Rule 23(g), which provides a non-exclusive list of factors for consideration: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. *See* Fed. R. Civ. P. 23(g).

There is no question here that class counsel are able to fairly and adequately represent the members of the putative classes. To date, counsel have vigorously and effectively prosecuted the case, including: investigating the claims and filing the Complaints; successfully opposing Defendants' motion to dismiss, including an appeal to the Third Circuit; and moving the case efficiently through discovery. (Prakash Decl. ¶ 6.)

Counsel have demonstrated knowledge of the applicable law, and have considerable experience litigating complex consumer class actions. Counsel from Nichols Kaster, PLLP are well-qualified, experienced, and able to conduct this litigation. (Prakash Decl. ¶¶ 7-8; Ex. Z: Nichols Kaster firm resume.) Over the

course of its forty-five year history, Nichols Kaster has earned the reputation of being a top plaintiffs' litigation firm. (Ex. Z at p. 2.) The firm represents consumers and employees across the country in individual, collective, and class litigation. (*Id.*) Its lawyers are routinely lauded for their work and high quality of representation. (*Id.* at pp. 4-8.) The firm has been appointed class or collective counsel on numerous occasions in federal courts around the country. (*Id.* at pp. 16-18.) Counsel in the instant matter are well-versed in class action law, have a depth of experience litigating complex class actions, routinely speak on class and consumer matters at seminars around the country, and are dedicated the serving the classes they represent. (*Id.* at pp. 22, 24-26; Prakash Decl. ¶¶ 7-8.) The firm and counsel's proven results show that they are willing to put forward the resources necessary to pursue the case through verdict. (*See* Ex. Z at pp. 9-19 (discussing trial and arbitration awards, appellate achievements, and settlement results).)

Gupta Wessler PLLC likewise has the skill and experience to litigate actions such as this action. (Declaration of Matthew W.H. Wessler Decl. ¶¶ 2-7.) Gupta Wessler's practice is focused on Supreme Court, appellate, and complex litigation with an emphasis on class-action issues and consumer-protection law, and counsel has argued before the U.S. Supreme Court on behalf of plaintiffs in a number of major consumer and worker rights cases. (*Id.*) Gupta Wessler has built an unparalleled track record in handling payday-lending issues and appeals, as

demonstrated by the Third Circuit victory in this case and *Hayes*, 811 F.3d 666, which led to one of the largest settlements against a payday lender in Virginia, as well as *Heldt v. Payday Financial, LLC*, 2016 WL 96156, at \*10 (D.S.D. Jan. 8, 2016), in which counsel successfully intervened to prevent an inadequate settlement from extinguishing the claims of borrowers challenging the Western Sky Enterprise. (*Id.*)

Proposed Class Counsel are more than adequate. Pursuant to Rule 23(g), the Court should appoint Nichols Kaster and Gupta Wessler as co-lead class counsel.

### F. Rule 23(b)(3) – Common Questions Predominate Over Any Individual Issues, and a Class Action is Superior

1. Predominance is Satisfied

A class may be certified under Rule 23(b)(3) if "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Individual questions are those where class members "will need to present evidence that varies from member to member," while common questions are those where "the same evidence will suffice for each member to make a prima facie showing

[or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

Predominance turns on the "nature of the evidence" and whether "proof of the essential elements of the cause of action requires individual treatment."[11] *Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314, 319 (3d Cir. 2016). Accordingly, the court must examine the elements of the claims at issue "through the prism" of Rule 23 to determine whether predominance is satisfied. *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 399 (3d Cir. 2015). Because the commonality requirement of Rule 23(a)(2) is essentially incorporated into the more stringent predominance requirement of Rule 23(b)(3), it is appropriate to consider both factors together. *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009).

As already explained in detail in the context of commonality, each of the essential elements of Plaintiffs' causes of action will be met through common proof, applicable to the classes as a whole. (*See supra* Argument, Pt. I.C.) There

---

[11] However, Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen*, 568 U.S. at 469 (quotations and modifications omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 136 S. Ct. at 1045.

are no individualized issues—the Western Sky Enterprise operated such that all loans exceeded the applicable limit in New Jersey, and the relevant conduct did not differ borrower to borrower. Rather, Defendants ran a uniform scheme and its legality will rise or fall as a whole. Damages, too, present no individualized issues capable of predominating. Predominance may be met, and a class certified, even where class members' damages are not susceptible to a formula for class-wide measurement. *See Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374-75 (3d Cir. 2015). Here, however, Plaintiffs will be able to calculate the precise amount of damages for *each class member* using detailed records kept by Defendants concerning the interest rates applicable to each class member's loans, along with all charges and payments made. (*See supra* Relevant Background, Pt. I.C; Ex. R.)

In sum, this action presents the Court exclusively with issues that can be resolved class-wide, using common evidence. Predominance is satisfied. *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 269-70 (finding predominance in RICO class action); *James*, 2018 WL 3727371, at *7 (predominance in action alleging unconscionable rates and fees under Consumer Fraud Act); *In re Thalomid and Revlimid Antitrust Litig.*, 2018 WL 6573118, at *17 ("Common to all class members . . . is whether Defendant unjustly acquired additional revenue or profits[.]"); *Korrow v. Aaron's Inc.*, 2013 WL 5811496, at *9 (D.N.J. July 31,

35

2013) (finding predominance where "a single determination of the legality of the fees charged by Defendant will determine liability for the entire class").

2. Superiority is Satisfied

A class action may be certified under Rule 23(b)(3) if the court finds that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Relevant considerations include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

A finding of superiority is warranted. Any interest by class members in controlling the prosecution of their individual claims is far outweighed by the efficiency in adjudicating the claims as a class action. *See, e.g.*, *Reyes*, 802 F.3d at 491-92 (outlining the benefits of class actions for consumers). And, although Defendants have suggested that the outcome of the Consumer Financial Protection Bureau's action in California will have some bearing here, the existence of that litigation does not undermine superiority. *See Inetianbor*, No. 13-60066-CIV-COHN/SELTZER, pp. 9-16 (S.D. Fla. Sept. 19, 2016) (existence of government action supports, rather than diminishes, superiority). Further, there is no question

36

that this District is the most appropriate forum for trial, since the action involves exclusively New Jersey consumers. Finally, as explained in detail above, the claims of Plaintiffs and the putative class members can be managed in a single trial using common, class-wide proof, and with the same core of evidence establishing both liability and damages for each member of the putative classes.

## II.    THE COURT SHOULD APPROVE PLAINTIFFS' PROPOSED CLASS NOTICE FOR MAIL DISTRIBUTION

When a class is certified under Rule 23(b)(3), the court "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The notice must explain, in easily understood language: (1) the nature of the action; (2) the class definition; (3) the claims, issues, and defenses; (4) that a class member may enter an appearance through their own attorney; (5) that class members may request exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment. *Id.* The notice may be sent by U.S. mail, electronic means, or any other appropriate method. *Id.*

Plaintiffs' proposed notice (Ex. AA), is modeled off of the Federal Judicial Center's illustrative forms of class notice, is easy to understand, and contains all of the content required under Rule 23(c)(2)(B). Defendants have each borrower's last known mailing address (Ex. R at ¶ 3.c), making notice by U.S. mail the best notice

practicable under the circumstance. *See* Fed. R. Civ. P. 23, advisory committee notes, 2018 amendments (explaining that notice by U.S. mail "may often be the preferred primary method of giving notice"). Plaintiffs' propose that the notice be distributed by a reputable class action administrator, with class members given 60 days to request exclusion, and with class member addresses updated through National Change of Address database.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that they Court grant class certification and authorize class notice.

Dated: <u>February 8, 2019</u>          <u>s/Patricia A. Barasch</u>

**NICHOLS KASTER, PLLP**
Anna P. Prakash, MN Bar No. 0351362*
Brock J. Specht, MN Bar No. 0388343*
Robert L. Schug, MN Bar No. 0387013*
Matthew H. Morgan, MN Bar No. 304657*
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878
aprakash@nka.com
bspecht@nka.com
schug@nka.com
morgan@nka.com

**GUPTA WESSLER PLLC**
Matthew Wessler*
1735 20th Street NW
Washington, DC 20009
Telephone: (202) 888-1741

Facsimile: (202) 888-7792
matt@guptawessler.com

**SCHALL & BARASCH, LLC**
Patricia A. Barasch, NJ Bar No. 0055480
Moorestown Office Center
110 Marter Ave, Suite 302
Moorestown, NJ 08057
Telephone: (856) 914-9200
Facsimile: (856) 914-9420
pbarasch@schallandbarasch.com

\* Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs John MacDonald
and Jessica Spearman*

39