# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JOHN S. MACDONALD, et. al.,** | |
| *Plaintiffs*, | Civil Action No. 16-2781 |
| *v.* | OPINION |
| **CASHCALL, INC., et al.** | |
| *Defendants*. | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of Plaintiffs John S. MacDonald's ("MacDonald") and Jessica C. Spearman's ("Spearman," and together with MacDonald "Plaintiffs") Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23. Defendants Cashcall, Inc. ("Cashcall"), WS Funding, LLC ("WS Funding"), Delbert Services Corp. ("Delbert") and J. Paul Reddam ("Reddam," and collectively with Cashcall, WS Funding and Delbert, "Defendants") oppose the motion. ECF No. 96. For the reasons that follow, Plaintiffs' Motion is granted, and the class is certified.

## I. BACKGROUND

### A. Factual Background

This action seeks to recover damages for unlawfully originated short term loans. In brief, Plaintiffs allege that Defendants lent them money at exorbitant interest rates, in violation of state and federal law. They seek to represent a class of plaintiffs who made payments on those loans.

Cashcall is a California corporation with its principal place of business in Orange, California. Cashcall 30(b)(6) Dep. at 18:20-23, ECF No. 93.4. WS Funding is a wholly-owned

1

subsidiary of Cashcall.  Id. at 77:17-20.  Reddam is Cashcall's President, Chief Executive Officer,

sole director and sole shareholder.  Id. at 22:2-9.  He is also president and Chief Executive Officer

of WS Funding and the sole owner of Delbert.  Id. at 163:18-23.  Cashcall is in the business of

originating and servicing short-term, unsecured loans to consumers.  Id. at 20:12-21:4.

Plaintiffs claim that Cashcall has been attempting to evade state law usury limits and lend

money at extremely high interest rates.  After previously attempting to evade such laws by having

state-chartered but federally regulated banks originate such loans,[1] Plaintiffs claim that Cashcall

has now attempted to use the sovereignty of an Indian tribe to evade those same limits.

In  December  2009,  Cashcall  entered  into  an  agreement  with  nonparty  Western  Sky

Financial, LLC ("Western Sky").  Under this arrangement, Cashcall agreed to purchase consumer

loans that Western Sky originated.[2]  Western Sky is a South Dakota limited liability company run

by Martin "Butch" Webb, a member of the Cheyenne River Sioux Tribe ("CRST").  Id. at 60:4-

23.  Most Western Sky loans carried an annual percentage interest rate of 139%, but ranged from

approximately  79%  to  200%,  depending  on  the  principal  amount  borrowed.  Reddam Dep. at

---

[1] Cashcall previously entered into agreements with the First Bank and Trust of Millbank, South Dakota, ("FB&T")
whereby that Bank would originate short term loans with usurious interest rates but would assign those loans to
Cashcall.  See W. Virginia v. CashCall, Inc., 605 F. Supp. 2d 781, 783 (S.D.W. Va. 2009) (describing arrangement).
As a federally-regulated Bank, FB&T could make usurious loans outside its home state under the Federal Deposit
Insurance Act, which Cashcall claimed permitted the arrangement.  Id.  The Court rejected this argument and held that
the State of West Virginia's claims against Cashcall could proceed.  Id. at 788.

[2] This arrangement is well documented in the record.  See Agreement for the Assignment and Purchase of Promissory
Notes dated December 28, 2009, ECF No. 94.4 (agreement between Cashcall subsidiary WS Financial and Western
Sky under which the subsidiary will purchase consumer loans "on a daily basis" from Western Sky).  The parties
entered substantially similar agreements on February 1, 2010, ECF No. 94.4, and October 28, 2010, ECF No. 94.5.
Under each such agreement, Cashcall agreed to pay a premium of either 5.02% (the December 2009 agreement) or
5.145% (the other agreements).  Cashcall and Western Sky also entered into Service Agreements, whereby Cashcall
would provide Western Sky with services including underwriting review, customer service support, marketing
services, web hosting, a toll-free telephone number, and electronic communications with customers.  See Agreement
for Service dated December 28, 2009, ECF No. 94.4.  Cashcall charged Western Sky 2% of the face value of each
approved and executed loan transaction.  Id.  Under this agreement, Cashcall representatives would assist at every
stage of the loan origination process, including answering prospective borrower's questions.  Cashcall 30(b)(6) Dep.
at 99:12-21.

73:18-74:2, ECF No. 93.5. The loan agreements included an arbitration clause and a choice of law provision claiming that the notes were governed exclusively by CRST law, and would not be subject to either state or federal law. See, e.g. Standard Form Loan Agreements, ECF No. 93.15-16 ("This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the [CRST]" and including arbitration provision). Any disputes between the borrower and lender were to be resolved by a CRST-affiliated arbitrator. Id. (the borrower "agree[s] that any Dispute . . . will be resolved by arbitration, which shall be conducted by the [CRST] Nation by an authorized representative"). All Western Sky-originated loans were assigned to Cashcall, normally within three days of origination. Cashcall 30(b)(6) Dep. at

Plaintiffs contend that this arrangement was little more than Cashcall operating under another name. They argue that what appeared to be Western Sky originating loans that were subsequently purchased and serviced by Cashcall was in fact a scheme to deceive consumers into believing they were taking out loans associated with an Indian tribe, allowing Cashcall to avoid state law usury limits.

In support of this argument, Plaintiffs have submitted agreements between Cashcall and Western Sky showing that Cashcall was deeply engaged in Western Sky's affairs. Under the terms of the agreements between Western Sky and Cashcall, Cashcall would purchase all loans that Western Sky originated, generally "within three days of origination." Id. at 79:5-9, 79:10-80:1, 125:2-3. Cashcall paid a premium for each loan Western Sky originated. Id. at 80:20-81:12; see also supra, n. 2. Cashcall devised underwriting standards in conjunction with Western Sky for Western Sky's loans, and Cashcall employees reviewed each loan application to determine whether it met those guidelines. Id. at 99:21-100:21. Cashcall would collect all payments on the loans. Id. at 80:3-7.

Cashcall also funded much of Western Sky's operations: it provided Western Sky financing to enable it to make loans to consumers and shouldered a significant portion of the administrative costs associated with the origination process. Id. at 150:21-25; see also Promissory Note dated December 28, 2009 (Cashcall subsidiary WS Financial lending $500,000 to "operate its business" which is described as "the business of lending money."). Cashcall paid Western Sky at least $10,000 per month in administrative fees to cover Western Sky's operating expenses, and agreed to reimburse Western Sky for "any and all fees associated with [the] assignment and purchase" of the loans, including "additional office or personnel cost," and wiring and bank fees. Cashcall 30(b)(6) Dep. at 83:5-84:14.

Western Sky found potential borrowers by through advertising, primarily on basic cable television, and would encourage customers to either call a toll-free telephone number or to visit their website. Id. at 170:2-11. Cashcall paid for some of Western Sky's advertising and marketing expenses and "drafted a lot of the advertising" for Western Sky loans. Id. at 85:25-86:5. It helped Western Sky construct and maintain its website, and provided "dozens" of toll free telephone and fax numbers to enable Western Sky to communicate with potential borrowers. Id. at 102:2-4, 129:13-16.

Cashcall's counsel was also responsible for drafting the loan agreements that borrowers were required to sign to obtain their loans. Id. at 177:19-22. Cashcall's 30(b)(6) deponent, General Counsel Daniel Baren testified that it was Cashcall's counsel who suggested and implemented changes to the terms of these notes, while Western Sky's counsel suggested only changes that related to Indian Law aspects of the loan agreements. Id. at 179:2-81:17. If a borrower on a Western Sky-originated loan defaulted, Cashcall would assign the loan to Delbert, which generally collected on delinquent loans for Cashcall, among other companies. Id. at 164:11-13.

Plaintiffs in this action are two New Jersey residents, both of whom took out short term consumer loans from Western Sky. On December 18, 2012, Macdonald borrowed $5,000 from Western Sky. MacDonald Western Sky Consumer Loan Agreement at 1, ECF No. 94.2. The loan bore a 116.73% annual percentage interest rate, resulting in a finance charge of $35,944.28. Id. As of April 2016, Cashcall had collected more than $15,000 on his loan. MacDonald Dep. Ex. 12, ECF No. 93.21.

Spearman obtained three separate loans from Western Sky. On October 16, 2012, and again on January 15, 2013, Spearman borrowed $2,525, each time at an annual percentage rate of 138.13%. Spearman Western Sky Loan Agreements at 2, 8, ECF No. 93.7. On August 26, 2013, Spearman borrowed $5,000 from Western Sky, at an annual percentage rate of 116.57%, resulting in a finance charge of $35,864.59. Id. at 14. She paid off each of her loans in full. Spearman Dep. at 66:9-12, ECF No. 96.2.

**B.     Procedural History**

MacDonald filed this action on May 17, 2016. Compl. ECF No. 1. Defendants responded by moving to compel arbitration under the terms of MacDonald's Western Sky loan agreement, arguing that his claims were subject arbitration, and that CRST law governed this action. ECF No. 11. On April 28, 2017, this Court found that the arbitration provision in the promissory note was unenforceable, that New Jersey law governed, and largely denied Defendants' motion to dismiss, dismissing only a single cause of action under New Jersey's Consumer Finance Licensing Act ("NJCFLA"). ECF No. 24. On February 27, 2018, the Court of Appeals for the Third Circuit affirmed that order. See MacDonald v. CashCall, Inc, 883 F.3d 220, 232 (3d Cir. 2018).

On September 6, 2018, Plaintiffs amended their complaint pursuant to a stipulation with Defendants, eliminating the dismissed NJCFLA claim and adding Spearman as a named plaintiff.

5

ECF Nos. 69, 70. The Amended Complaint asserts claims of: (1) usury in violation of N.J.S.A. §§ 13:1-1(a) and 2C:21-19 (Count I), Am. Compl. ¶¶ 73-75; (2) violation of the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. § 56:8-2, Am. Compl. ¶¶ 76-82 (Count II); (3) common law restitution and unjust enrichment (Count III), Am. Compl. ¶¶ 83-85; (4) a declaration that tribal law does not apply to the Classes' loans and that the arbitration provision and class waiver are unenforceable (Count IV), Am. Compl. ¶¶ 86-91; and (5) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., (Count V), Am. Compl. ¶¶ 92-101. Defendants answered the Amended Complaint on October 9, 2018. ECF No. 76.

On February 8, 2019, Plaintiffs filed this Motion for Class Certification.

## II.  LEGAL STANDARD

Every putative class action must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy. City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d 434, 438 (3d Cir. 2017) (citations omitted). In addition to the Rule 23(a) requirements, a class action must be one of the types recognized by Rule 23(b). Boyle v. Progressive Specialty Ins. Co., No. 09-5515, 2018 WL 2770166, at *4 (E.D. Pa. June 7, 2018). Here, Plaintiff has moved for certification under subsections (b)(2) and (b)(3).

The Rule 23 requirements are "not mere pleading standards;" rather, "[p]roper analysis under Rule 23 requires rigorous consideration of all the evidence and arguments offered by the parties." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 316, 321 (3d Cir.2008). A district court must "consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met before certifying a class." Id. at 320. Additionally, "the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits ... [and] [f]actual determinations necessary to make Rule 23 findings must be made

by a preponderance of the evidence." Id. at 307, 320. "Weighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands." Id. at 323. See also In re Thalomid & Revlimid Antitrust Litig., No. 14-6997, 2018 WL 6573118, at *78 (D.N.J. Oct. 30, 2018).

## III.    PROPOSED CLASSES

Plaintiffs seek certification of two classes, a "four-year class" and a "six-year class." Other than the date on which each class period begins, the two classes are identically defined as:

> All individuals who, on or after [May 17, 2010 or May 17, 2012], made payments
> to one or more Defendants on loans originated by the Western Sky Enterprise where
> the borrower was located in the State of New Jersey at the time the loan was
> originated.

Pl. Mem. at 14-15, ECF No. 94. For the purposes of this motion, Plaintiffs define "Western Sky Enterprise" to include each Defendant and Western Sky Financial. Pl. Mem. at 3, 14-15, ECF No. 93.1.[3]

## IV.    ANALYSIS

Defendants raise several arguments as to why the classes should not be certified, focusing on Rule 23(b)(3)'s predominance and superiority requirements. The Court concludes that Plaintiffs have carried their burden of affirmatively demonstrating compliance with Rule 23(a)'s and (b)(3)'s requirements, and that the putative classes is sufficiently ascertainable.

---

[3] Plaintiffs' Amended Complaint does not clearly define "Western Sky Enterprise" that applies to the proposed class definitions. See Am. Compl. ¶ 18. Defendants' argument that "Western Sky Enterprise" refers to underfined unlawful conduct as opposed to individuals and entities strains credulity. For the purposes of this motion, the Court will use the definition of "Western Sky Enterprise" Plaintiffs provide in their brief in support of this motion. See infra at section IV.B.1.

## A.    Rule 23(a) Requirements

### 1.    Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no minimum number of plaintiffs required to show that a class is sufficiently numerous, but generally, where a plaintiff can demonstrate that there are more than 40 potential plaintiffs, they have met their burden of demonstrating numerosity. Mielo v. Steak 'n Shake Operations, Inc., 897 F.3d 467, 486 (3d Cir. 2018) (citing Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001)). Here, Defendants have stipulated that 11,158 individuals provided a New Jersey address on loan agreements executed on or after May 17, 2010 (the Six Year Class), and that 7,520 individuals listed a New Jersey address on loan agreements executed on or after May 17, 2012 (the Four Year Class). ECF No. 93.18 ¶¶ 1-2. Defendants do not dispute that these figures show the class is sufficiently numerous. The Court therefore finds that Plaintiffs have satisfied the numerosity requirement.

### 2.    Commonality

Rule 23(a)(2) requires a finding that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Unlike the more searching predominance inquiry under Rule 23(b)(3), "[e]ven a single question of law or fact common to the members of the class will satisfy the commonality requirement," Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 369 (2011) (quoting Nagareda, The Preexistence Principle and the Structure of the Class Action, 103 Colum. L.Rev. 149, 176, n.110 (2003)) (internal quotation marks omitted). In this Circuit, "Rule 23(b)'s predominance requirement incorporates Rule 23(a)'s commonality requirement because the former, although similar, is 'far more demanding' than the latter." Reinig v. RBS Citizens, N.A., 912 F.3d 115, 127 (3d Cir. 2018) (quoting In re Warfarin Sodium Antitrust Litig., 391 F.3d 516,

528 (3d Cir. 2004)).  Courts may therefore analyze commonality and predominance together, and where a plaintiff demonstrates predominance, they necessarily show commonality.  Id. (citing In re LifeUSA Holding Inc., 242 F.3d 136, 144 (3d Cir. 2001)).

As noted in Section II.B.3 infra, the Court finds that common questions predominate over individual ones, and for that reason, Plaintiffs have satisfied Rule 23(a)(2)'s less demanding commonality requirement.  For the sake of completeness, the Court also finds that there are common questions of law and fact.  As to each class, the questions of whether Defendants charged interest at rates in excess of those permitted by New Jersey law will be common, as will questions of whether Defendants and Western Sky together formed an enterprise sufficient for liability under RICO.

### 3.      Typicality

Rule 23(a)(3) requires Plaintiffs to demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  This ensures that "the class representatives are sufficiently similar to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed class."  In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 597 (3d Cir. 2009).  The logic underlying the typicality requirement is "that a class representative will adequately pursue her own claims, and if those claims are 'typical' of those of the rest of the class, then her pursuit of her own interest will necessarily benefit the class as well."  W. Rubenstein, 1 Newberg on Class Actions § 3:28 (5th ed. 2012); Baby Neal for & by Kanter v. Casey, 43 F.3d 48, 55 (3d Cir. 1994) ("Typicality asks whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class.").

To show typicality, a plaintiff must demonstrate that the putative class representatives' legal claims and theories, factual circumstances, and stake in the case are typical of the class as a whole. This requires the Court to compare the attributes of the class to those of the named plaintiffs to determine if they are sufficiently similar. In re Schering Plough, 589 F.3d at 597. After such a comparison, the Court must be satisfied that: (1) the claims of the representatives are generally the same as those of the class, both in terms of the legal theory and factual circumstances underlying that theory; (2) the representatives are not subject to a defense that is inapplicable to many of the class members and likely to become a major focus of the litigation; and (3) the interests and incentives of the representatives are sufficiently aligned to those of the class. Id. at 599. For each inquiry, the representative plaintiffs' claims do not have to align perfectly with those of the class. Factual differences between the representative plaintiffs' claims and the absent class members will not preclude a finding of typicality where the claims arise from the same event, practice, or course of conduct. Baby Neal, 43 F.3d at 58; see also Beck v. Maximus, Inc., 457 F.3d 291, 296 (3d Cir. 2006).

As to the first prong, Plaintiffs have shown that their claims are legally identical to those of the class, as they obtained loans from Western Sky at allegedly usurious interest rates, under loan agreements purporting to be governed exclusively by CRST law. These are precisely the theories and claims under which each class seeks to recover.

On the second and third prongs, Defendants contend that factual differences between the Plaintiffs and the classes either render their claims atypical or subject them to unique defenses that are inapplicable to many members and likely to become a focus of the litigation. As to MacDonald, Defendants argue that his testimony that he could not articulate any loss arising from his Western Sky loans, that the loans were valid (despite seeking a declaration of invalidity) and that he

10

received exactly what was promised undermine his CFA claims and render him atypical. As to Spearman, Defendants argue that her testimony on the clarity of Western Sky's documentation, the validity of her loan, and the fact that Spearman took out three Western Sky loans, suggesting she was satisfied with her experience with them. They also argue that both Plaintiffs undermined their CFA claims by testifying that terms such as the interest rate, governing law, finance charges, amount of payments or the arbitration provision did not factor into their decisions to take out Western Sky loans. See Spearman Dep. at 52-55; MacDonald Dep. at 81, 233-36; Defs. Mem. at 26-28, ECF No. 96. The Court disagrees.

None of this testimony renders Plaintiffs' claims atypical. As to their usury claims in Count I, their restitution claims in Count III and their RICO claims in Count V, Plaintiffs have carried their burden of demonstrating that the Plaintiffs' factual circumstances are sufficiently similar to those of the class to satisfy Rule 23(a)(3)'s typicality requirement. As for the CFA claims, Defendants contend that because Plaintiffs testified that they understood the terms of the loan agreements, that they could not have been deceived. This position misunderstands the Classes' claims. Plaintiffs' CFA claims allege that charging usurious interest is an affirmative act, and itself unlawful conduct under the CFA. See Cox v. Sears Roebuck & Co., 138 N.J. 2, 17 (1994) (unlawful conduct falls "into three general categories: affirmative acts, knowing omissions, and regulation violations.") Thus, Plaintiffs' CFA claims do not depend on their understanding of the agreement, or whether any of its terms were important to them in reaching their decision to take out Western Sky loans. But even if Plaintiffs attempt to prove their CFA claims by arguing that the presentation of Western Sky loans was deceptive because Western Sky was a "front" to conceal Cashcall's unlawful consumer lending operation, their testimony would not render their claims atypical. Am. Compl. ¶ 78. That Plaintiffs understood the terms of the loans offered by

11

Defendants does not undermine Plaintiffs' assertion that these representations were false or deceptive. A plaintiff may still be deceived by a false statement that they understand. To hold otherwise would be to permit Defendants to deceive others, provided that their deceptions are successful.

As to the declaratory relief claims in Count V, Defendants misrepresent Plaintiffs testimony: Spearman did not testify that she thought the loans were valid, but rather that she "believe[d]" they were valid "when [she] received the -- the loans." Spearman Dep. at 106:13-21. This testimony concerns her recollections of her thoughts at the time, not her current contention that her loans were invalid <u>ab initio</u>. Similarly, MacDonald merely testified that his Western Sky loan "was valid" as of December 26, 2012, implying that he no longer believes the loan is valid. MacDonald Dep. at 113:6-11. This statement is too ambiguous for the Court to conclude that Plaintiff believes that his loan is still valid. In any event, neither statement indicates that either Plaintiff currently believes that their loans are valid. Their contentions concerning declaratory relief are sufficiently factually similar to the remainder of the classes' interests as to render them typical.[4]

Finally, that Spearman took out three Western Sky loans and inquired about potentially obtaining a mortgage from Western Sky does not render her atypical. Her purported satisfaction with her Western Sky loans does undermine any of her causes of action. The Court finds that Plaintiffs' claims are sufficiently similar to those of the absent class members to render them typical under Rule 23(a)(3).

---

[4] The Court also finds that these questions called for Plaintiffs opinions as to the ultimate legal conclusions in this case, and for that reason, should not be considered on this motion.

### 4.       Adequacy

Rule 23(a)(4) requires the Court to find that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig., 795 F.3d 380, 393 (3d Cir. 2015). The Court must also consider whether any conflicts of interest between the named class members and the remainder of the class preclude adequate representation. Beck, 457 F.3d at 296 (citing Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625 (1997)). Additionally, Rule 23(g), requires a court certifying a class to determine whether class counsel is adequate, and directs the court to appoint class counsel after considering:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the class

or other matters pertinent to class counsel's ability to fairly and adequately represent the class. Fed. R. Civ. P. 23(g)(1)(A), (B).

Plaintiffs here are adequate representatives of the class. There is nothing in the record to suggest that either proposed class representative has a claim or interest antagonistic to the remainder of the class: both MacDonald and Spearman took out loans from Western Sky allegedly at usurious interest rates. The only potential difference between the named plaintiffs here and the remainder of the classes is that Spearman took out multiple loans and allegedly had a positive experience with Western Sky. But this argument supports certification, as she has potentially suffered more damages from usury by taking out more loans.

13

Defendants' argument that MacDonald's lack of credibility renders him an inadequate representative is unpersuasive. For a named plaintiff's lack of credibility to preclude a finding of adequacy, it must be so serious as to subject the named plaintiff to a unique defense. Coyle v. Hornell Brewing Co., No. 08-2797, 2011 WL 2147218, at *4 (D.N.J. May 26, 2011). "[O]nly significant credibility concerns that 'go to the heart of the claims or defenses' at issue in the case will create a risk of inadequate representation." Williams v. Sweet Home Healthcare, LLC, 325 F.R.D. 113, 123 (E.D. Pa. 2018) (quoting Sherman v. Am. Eagle Exp., Inc., No. 09-575, 2012 WL 748400, at *7 (E.D. Pa. Mar. 8, 2012)), leave to appeal denied, No. 18-8014, 2018 WL 4008363 (3d Cir. Mar. 6, 2018). See also Weikel v. Tower Semiconductor Ltd., 183 F.R.D. 377, 397 (D.N.J. 1998) (noting that "[p]roblems of credibility, when sufficiently serious, can prevent a named plaintiff from being certified as a class representative," but finding named plaintiff's inability to recall certain facts and "evasiveness" insufficiently serious to preclude finding of adequacy); Hoffman Elec., Inc. v. Emerson Elec. Co., 754 F. Supp. 1070, 1076 (W.D. Pa. 1991) (finding uncertainty in answering deposition questions, without "obvious contradictions" in responses, is "no reason to preclude class certification.").

Here, MacDonald's inability to recall certain facts is not so serious as to create a conflict of interest with absent class members. His inability to recall the date he took out the loan, the "sales pitch," the advertised interest rate, or why he stopped making payments are all immaterial to the claims of the classes in this action, as the relevant date of any loan at can be shown through documentary evidence, Plaintiffs do not allege that the "sales pitch" is the basis for liability, and the reason that any Plaintiff stopped making payments on their loans does not bear on the question of whether they are usurious or originated in violation of the CFA or RICO. To the extent that Defendants' arguments could be understood as suggesting that Macdonald has insufficient

14

knowledge of this action to serve as a representative, it is similarly unpersuasive. "A class representative need only possess 'a minimal degree of knowledge necessary to meet the adequacy standard.'" <u>New Directions Treatment Servs. v. City of Reading</u>, 490 F.3d 293, 313 (3d Cir. 2007) (quoting <u>Szczubelek v. Cendant Mortgage Corp.</u>, 215 F.R.D. 107, 119 (D.N.J. 2003)). Here, Plaintiffs have shown that both MacDonald and Spearman have such a minimal degree of knowledge.[5]

The Court also finds that class counsel is adequate. They have developed the claims at issue in this action and engaged in extensive discovery. They have submitted firm resumes showing extensive experience in consumer class actions, are knowledgeable as to the applicable law, and have demonstrated that they have sufficient resources to pursue this action. Defendants briefly argue that Plaintiffs have not made any showing as to how Schall & Barasch, LLC, their New Jersey local counsel, are adequate to represent Plaintiffs, but the Court finds that they are sufficiently experienced in class action matters to serve as local counsel in this action. <u>See</u> Declaration of Patricia Barasch, ECF No. 97.5. The Court thus finds all class counsel adequate.

### B. Rule 23(b)(3) Requirements

In addition to the requirements under Rule 23(a), Plaintiffs must also affirmatively demonstrate that they meet the requirements of one of the categories of class action enumerated in Rule 23(b). Plaintiffs here seek certification under Rule 23(b)(3), which requires the Court to find that "the questions of law or fact common to class members predominate over any questions

---

[5] Defendants' suggestion that a "third party" initiated this action rather than MacDonald is insufficient to show that he is not an adequate class representative. The "third party" here was MacDonald's then-wife, who testified that she contacted counsel on MacDonald's behalf because she "did everything in the home." Ilissa Martinez Dep. at 53, ECF No. 96.6. This does not suggest that MacDonald himself is either unfamiliar with this action or his duties as a proposed class representative

affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Under this rule, Plaintiffs must also demonstrate that class members are sufficiently ascertainable.

### 1. Ascertainability

Defendants argue that Plaintiffs' proposed classes are not ascertainable because they are based on the borrower's physical location at the time each loan was originated, and because the two classes are impermissible "fail-safe" classes. Defs. Mem. at 15. The Court disagrees as to both points.

Where plaintiffs seek to certify a class under Federal Rule of Civil Procedure 23(b)(3), they bear the burden of demonstrating that "'(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" <u>City Select Auto Sales</u>, 867 F.3d at 439 (quoting <u>Byrd v. Aaron's Inc.</u>, 784 F.3d 154, 163 (3d Cir. 2015)) (internal quotation marks and footnote omitted).

As an initial matter, Defendants' argument that Plaintiffs have proposed impermissible "fail-safe" classes misreads Plaintiffs' brief. Defs. Mem. at 15. "A 'fail-safe' class is 'one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim.'" <u>Grubb v. Green Tree Servicing, LLC</u>, No. 13-07421, 2017 WL 3191521, at *14 (D.N.J. July 27, 2017) (quoting <u>Messner v. Northshore University HealthSystem</u>, 669 F.3d 802, 825 (7th Cir. 2012)). Defendants' argue that the proposed classes are fail-safe because they use the phrase "Western Sky Enterprise" in the class definitions, which is defined in the Amended Complaint to be a "an enterprise to make, service, and collect unlawful, usurious, and unconscionable consumer loans," and therefore depends on a merits finding. Am. Compl. ¶ 18. As explained in footnote 3,

*supra*, this misreads the proposed class definitions on the present motion, where Plaintiffs clarify that "Western Sky Financial, together with [Defendants Cashcall, WS Funding, Delbert and Reddam] are referred to . . . as the "Western Sky Enterprise." Pl. Mem. at 3. The Court will accept Plaintiffs' definitions to include each named defendant and Western Sky Financial.

Defendants also raise an objection concerning the use of the "location" of a borrower as a criterion for class membership. As currently defined, only borrowers who made a payment on a loan obtained "where the borrower was located in the State of New Jersey at the time the loan was originated" will be a member of the class. Pl. Mem. at 14-15. Defendants argue that this is distinct from the residence that a borrower listed on their loan application to Western Sky, and thus Defendants' data regarding the residence that a borrower listed on their loan agreement cannot determine where any putative plaintiff was physically located at the time of origination. Defs. Mem. at 16. Plaintiffs have offered to modify this definition to avoid any such problem by expressly limiting the limiting the class definitions to only New Jersey residents. Pls. Reply at 6, ECF No. 97. The Court will accept Plaintiffs' offer, such that the class definition will cover:

> All individuals who, on or after [May 17, 2010 or May 17, 2012], made payments
> to one or more Defendants on loans originated by Cashcall, Inc., WS Funding, LLC,
> Delbert Services Corp, J. Paul Reddam, or Western Sky Financial, LLC where the
> borrower was a New Jersey resident.

As modified, the two proposed classes meet the ascertainability standard. The classes are defined by reference to objective criteria, namely, whether a borrower made payments on a loan, originated during a given time period, and was a New Jersey resident. Second, there is an administratively feasible way of determining whether putative class members fall within the definition. Defendants have stipulated that they can produce records showing the addresses that borrowers listed on their

loan applications. See Stipulation Regarding Class Data, ECF No. 93.18. Each class is therefore sufficiently ascertainable to be certified.

### 2. Superiority

Plaintiffs also bear the burden of demonstrating that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Rule includes four factors relevant to this determination: the class members' interests in individually controlling the litigation, the extent and nature of any litigation concerning the controversy "already begun by or against class members," the desirability of concentrating the litigation in a particular forum, and the likely difficulties of managing the action. Id. 23(b)(3)(A)-(D). "The superiority requirement 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'" In re Warfarin, 391 F.3d at 533-34 (quoting In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998)).

Defendants first argue that this action is an inferior to two actions brought by governmental agencies: an action brought by the Consumer Financial Protection Bureau ("CFPB"), another action brought by the New Jersey Department of Banking ("NJDOB"). Defs. Mem. at 9-13. Defendants also argue that this action is inferior to individual actions. Id. at 14. The Court disagrees.

### i. The CFPB Action

On December 16, 2013, the CFPB brought suit against Cashcall in the United States District Court for the District of Massachusetts, alleging that loans made by Western Sky under its arrangement with Cashcall constituted unfair, deceptive, or abusive acts or practices in violation of the Consumer Financial Protection Act, 12 U.S.C. § 5536(a)(1)(b). See Am. Compl., Consumer

18

Financial Protection Bureau v. Cashcall, Inc., No. 15-7522 (C.D. Cal.), ECF No. 96.18 (the "CFPB Action"). The CFPB claimed that Western Sky loans were originated in violation of a number of state laws, including New Jersey's consumer finance licensing requirements, and sought restitution on behalf of all New Jersey borrowers of Western Sky loans, in the amount of all interest, fees and principal collected on Western Sky Loans. See id. (Demand for Relief, ¶ 4). On September 23, 2015, the CFPB Action was transferred to the United States District Court for the Central District of California. Barloon Cert. ¶ 4, ECF No. 96.17.

On August 31, 2016, the California District Court granted the CFPB's motion for partial summary judgment, finding Defendants liable on all counts, and the parties then proceeded to a bench trial on remedies. CFPB Action Summary Judgment Order at 16, ECF No. 96.19. On January 19, 2018, after trial, the California District Court imposed a $10.3 million civil penalty on Defendants, but found that "the CFPB did not satisfy its burden of proving that restitution is an appropriate remedy in this action," and did not require Defendants to make restitution. CFPB Action Findings of Fact and Conclusions of Law at 14, ECF No. 96.20. Both the CFPB and Defendants are appealing various aspects of the judgment in the CFPB Action.[6] Barloon Cert. ¶¶ 8-9, ECF No. 96.17.

Incredibly, Defendants argue that this CFPB action, which denied any recovery to the putative class members here, is a superior means for them to obtain relief. While Defendants correctly argue that the CFPB Action involves identical issues as the present action, that it seeks relief on behalf of the same borrowers, and that it is more advanced than this action, Defendants elide the point that the CFPB Action denied recovery to the borrowers, and thus cannot be a fairer

---

[6] The California District Court entered final judgment in the CFPB Action on January 26, 2018, assessing only the civil penalty. Judgment at 2, Consumer Fin. Protection Bureau v. Cashcall, Inc., No. 15-7522, ECF No. 321.

or more efficient means for the borrowers to obtain relief.  In re Warfarin, 391 F.3d at 533-34. As Plaintiffs in this action have a chance to prove their claims and gain some measure of relief, this action is superior to the CFPB Action, the outcome of the appeal in that action notwithstanding.

### ii.    The NJDOB Action

Second, Defendants argue an administrative proceeding brought by the NJDOB is superior to this class action.  Defendants refer to this as the NJDOB "action," but there is no evidence that the NJDOB ever filed an action in any court pertaining to these claims.  See Defs. Mem. at 13. The only evidence Defendants offer to show the NJDOB action is superior is an undated order— apparently issued at some point in 2016—which seeks to have Defendants cease and desist from making loans in New Jersey, make restitution to New Jersey borrowers, and to pay civil penalties. Defs. Mem. Ex. N, ECF No. 96.16.  There is no indication in the record of what happened after the NJDOB issued this order.  There is no suggestion that the NJDOB assessed any civil penalty (which still would not provide any recovery to borrowers here), filed any action, or obtained any settlement that provided some measure of relief to Plaintiffs.  Without some showing that the NJDOB is still pursuing relief on behalf of New Jersey borrowers, the Court cannot conclude that it is superior to this class action.

### iii.    Individual Actions

Finally, Defendants contend that this action is inferior to individual actions, as the availability of treble damages, costs and attorney's fees under the CFA eliminates the financial barriers that might prevent individual plaintiffs from bringing suit.  Defs. Mem. at 14.  Even assuming this weighs against certification here, Plaintiffs have carried their burden of demonstrating that the remaining factors under Rule 23(b)(3) weigh in favor of certification.  There do not appear to be other individual actions filed on behalf of New Jersey residents, indicating that

a lack of individual interest in control over their actions.  Given that all class members are New Jersey residents, it is desirable to concentrate litigation seeking relief in this judicial district.  Further, there are no management problems that would preclude certification.   Because the Rule 23(b)(3) factors are satisfied, the Court finds that a class action is superior to other methods of adjudication.

### 3.   Predominance

Under Third Circuit caselaw, the Court must undertake a searching review to determine whether plaintiffs demonstrated predominance for each of the claims for which Plaintiffs seek class certification.  The predominance inquiry "asks whether common issues of law or fact in the case predominate over non-common, individualized issues of law or fact."  Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353, 370 (3d Cir. 2015).  As the Supreme Court has explained:

> An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'

Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) (quoting Newberg on Class Actions § 4:50).  "[T]he nature of the evidence that will suffice to resolve a question" determines whether common questions predominate.  In re Hydrogen Peroxide, 552 F.3d at 311 (quoting Blades v. Monsanto Co. 400 F.3d 562, 566 (8th Cir. 2005)).  A court's predominance analysis "begins, of course, with the elements of the underlying cause of action" to determine what evidence a plaintiff must marshal in support of her claims.  Neale, 794 F.3d at 370 (quoting Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011)).  This inquiry requires the district court predict how certain issues will play out at trial, and to determine whether the proposed class-wide evidence will "actually be sufficient for the class to prevail on the predominant issues in the case."

Harnish v. Widener Univ. Sch. of Law, 833 F.3d 298, 305 (3d Cir. 2016). Although these determinations may necessarily entail "judging credibility, weighing evidence, or deciding issues that overlap with the merits of a plaintiff's claims," courts should endeavor not to address merits-based issues beyond what is necessary to determine whether certain elements may be shown through common or individualized proof. Id. at 304-05. And while Rule 23(b)(3) generally requires plaintiffs seeking certification to affirmatively demonstrate predominance, plaintiffs need not produce evidence on an issue or element where the relevant claims will rise or fall in unison. Id. at 305. The Court concludes that Plaintiffs have shown that common questions will predominate for each of their claims in this action.

### i. Usury

Plaintiffs bring their usury claims under two New Jersey statutes, N.J.S.A. §§ 31:1-1, 2C:21-19.[7] Under either statute, Plaintiffs must "establish three elements: (1) a loan of money, (2) an absolute obligation to repay the principal and (3) the exaction of a greater compensation than that allowed by law for the use of the money." Dopp v. Yari, 927 F. Supp. 814, 820 (D.N.J. 1996). The civil remedy for a usurious loan is to sever the interest portion of the loan and permit recovery only of the principal. Id.

Here, documentary evidence—in the form of the class members' loan agreements—will suffice to show all three elements of usury. The loan agreements are largely identical: each shows a loan of money, an obligation to repay, and each specifies an interest rate. See Form Loan Agreements, ECF No. 93.15-16; Redlined Comparison of Loan Agreements, ECF No. 19.17.

---

[7] Under N.J.S.A. § 31:1-1(e)(1), loans "in the amount of $50,000 or more" may generally accrue "interest at any such rate, . . . nothwithstanding that it exceeds a rate" above the civil usury limit of 16%, subject to certain exceptions. Loans above this limit are still subject to the criminal usury statute, N.J.S.A. § 2C:21-19. See Stuchin v. Kasirer, 237 N.J. Super. 604, 610 & n.3 (App. Div. 1990).

Each loan agreement was in a standard form, substantially identical to those governing Plaintiffs' loans. See MacDonald Loan Agreement, ECF No. 94.2; Spearman Loan Agreements, ECF No. 93.7. Under these conditions, questions of law and fact common to the class will predominate, such as whether each contract was an absolute obligation to repay a usurious loan and whether the compensation of each loan amounted to usury. Damages may then be calculated on a purely individual basis.

Under each of these loan agreements, there is a fixed payment schedule, with a first month payment slightly lower than the remaining, equally sized payments. Each loan bears an interest rate of between approximately 116% and 319%. ECF Nos. 93.7, 93.16. New Jersey's usury limit is 16% per annum. Thus any person who made payments in excess of 16% per year will have a cause of action for damages from Defendants.

In opposition, Defendants argue that Plaintiffs cannot show the fact of injury (i.e., that each class member has indeed been damaged)[8] through common proof. Under New Jersey's civil usury statutes, where a borrower asserts an affirmative claim for usury (rather than a defense to a lender's action to recover on a usurious debt), the borrower's recovery is limited to only the interest "usuriously paid, and the lender can retain the legal interest." Speare v. Consol. Assets Corp., 367 F.2d 208, 212 (2d Cir. 1966) (interpreting New Jersey law and collecting cases); see also Neuscheler v. See, 131 N.J.L. 368, 371 (Sup. Ct. 1944) (same). Defendants argue that this limitation precludes certification of a class of borrowers, as they can only meet the required showing of injury if each member can prove that they paid interest at a usurious rate. The Court disagrees.

---

[8] Despite using terms that could be understood as relating to Article III standing, the Court does not read Defendants' briefs as suggesting that the named Plaintiffs lack constitutional standing to bring this action.

First, this argument assumes that Plaintiffs are required to show the fact of injury in order to assert a usury claim. This argument misreads New Jersey law. For certain claims, such as those asserting an antitrust injury, a plaintiff is required to show the fact of injury on a classwide basis because an injury "is an essential element of an antitrust claim." In re Thalomid, 2018 WL 6573118, at *11. As noted above, to state a claim for usury, a Plaintiff need not demonstrate that they actually paid usurious interest, only that they entered into a contract to do so. Dopp, 927 F. Supp. at 820. As Plaintiffs are not required to show the fact of payment to state a usury claim, they need not be able to show the fact of injury on a classwide basis.

Second, even if Plaintiffs were required to show the fact of injury on a classwide basis, Defendants' argument assumes that they only relevant injury is the payment of usurious interest. But New Jersey's laws give borrowers under usurious loans remedies beyond simply recovery of the usurious portion of interest. In Speare, the court held that where a borrower brought an action to set aside a loan as usurious, the borrower was entitled to simply tender the remaining principal of the loan to extinguish the obligation, and that "that no interest is due or need be tendered." 367 F.2d at 213. Thus, under New Jersey law, a plaintiff is injured merely by entering into an obligation to pay usurious interest, and may obtain relief from having to pay any interest at all. Defendants' argument that those who made payments under usurious loans for less than lawful interest are uninjured is incorrect: these plaintiffs (including those who only made one partial loan repayment) have been injured by their continued obligation to pay any interest at all.

Finally, Defendants' argument is also belied by the structure of their loan agreements, which requires repayment on a fixed schedule of payments, with a portion of each payment directed to interest, and a portion directed to principal. See MacDonald Amortization Schedule, ECF No. 96.13 (showing an interest portion in every single payment under the loan). Because the

24

interest rate on MacDonald's loan was 116.73%, ECF No. 96.5, his very first payment carried usurious interest. As noted above, every loan agreement for Western Sky had an identical structure, with interest amortized over a fixed payment schedule. Where Plaintiffs can show a usurious rate of interest, they can show that borrowers paid such interest by making a single payment.

Thus, while Plaintiffs here do not need to demonstrate the fact of injury on a classwide basis to show predominance on their usury claim, they are able to do so under Western Sky's agreements from the existence of a usurious loan and the making of a single payment. Plaintiffs can answer the question of whether a loan agreement is usurious by using the common evidence of the agreements themselves, which will suffice to demonstrate their claims. Plaintiffs have shown that common questions predominate as to their usury cause of action.

### ii.     New Jersey Consumer Fraud Act

To prove their claims under the CFA, Plaintiffs must show (1) unlawful conduct by Defendants; (2) an ascertainable loss by Plaintiffs; and (3) a causal connection between the two. Harnish, 833 F.3d at 305. Unlawful conduct includes any "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation" or the knowing concealment of a material fact with the intent that others rely on the concealment. N.J.S.A. § 56:8-2. Unlawful conduct falls "into three general categories: affirmative acts, knowing omissions, and regulation violations." Cox v. Sears Roebuck & Co., 138 N.J. 2, 17 (1994). An "ascertainable loss" is "'either an out-of-pocket loss or a demonstration of loss in value' that is 'quantifiable or measurable.'" Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 606 (3d Cir. 2012) (quoting Thiedemann v. Mercedes–Benz U.S.A., LLC, 183 N.J. 234 (2005)). "The out-of-pocket rule applies when a plaintiff can demonstrate that he paid money, and is now, out-of-pocket." Dicuio v. Brother Int'l

<u>Corp.</u>, No. 11-1447, 2012 WL 3278917, at *7 (D.N.J. Aug. 9, 2012). To prove a CFA claim, a plaintiff does not need to show reliance; that is, the CFA "does not require proof that a consumer would not have purchased a product absent the alleged unlawful practice or even proof that the unlawful practice played a substantial part in his or her decisionmaking." <u>Marcus</u>, 687 F.3d at 606. All the CFA requires is that "the alleged unlawful practice must be a proximate cause of the plaintiff's ascertainable loss." <u>Id.</u>

Plaintiffs contend that a violation of the criminal usury statute, N.J.S.A. § 2C:21-19, is itself an unconscionable commercial practice that may give rise to liability under the CFA. <u>See Green v. Cont'l Rentals</u>, 292 N.J. Super. 241, 257 (Law. Div. 1994) ("N.J.S.A. 2C:21–19 prohibits a loan or forbearance with an interest rate exceeding 30% per annum. The interest rates here far exceed that limitation and constitute an unconscionable practice."). Under this theory, Plaintiffs' ascertainable loss is the amount paid over the criminal usury limit, and the causal connection is that Plaintiffs would not have paid this additional interest without Defendants charging it.

Defendants counter that accepting this argument would have the effect of eliminating the causation element of a CFA claim, which requires the Court to evaluate both a defendant's conduct and a plaintiffs' conduct to determine if it is sufficiently uniform to be subject to proof on a classwide basis. The Court disagrees, as Defendants' position misreads the relevant caselaw.

First, the cases that Defendants use to argue that usurious interest is not a <u>per se</u> violation of the CFA are inapposite. In <u>Ciser v. Nestle Waters North America Inc.</u>, the Court of Appeals held that a flat late payment fee, unrelated to any cost to the defendant, could not form the basis of a CFA claim because it was fully disclosed, and thus lacked the required "element of deceptive conduct, explicit or implicit, to be actionable as an unlawful commercial practice." 596 F. App'x 157, 162 (3d Cir. 2015). This case does not shed light on whether a breach of the usury statute

26

constitutes an unconscionable commercial practice because charging the late fee did not violate another statute.[9]

New Jersey's courts regularly find that the violation of a different statute or even municipal ordinance may also violate the CFA as an affirmative act.  See Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 275 (1997) (finding CFA prohibits practice of "loan packing," selling insurance to borrowers by increasing the principal borrowed, despite extensive additional regulation of the sale of insurance, including by statute); Heyert v. Taddese, 431 N.J. Super. 388, 415 (App. Div. 2013) (charging rent above limits of local rent control ordinance qualifies as unconscionable commercial practice under CFA).  Defendants have not given the Court any basis to distinguish the sale of credit insurance from usurious loans, thus the Court concludes that Plaintiffs may prove that Defendants violated the CFA by making loans at usurious rates, and may use the same evidence in support of their CFA claim.

Second, Defendants misstate what a plaintiff must demonstrate to show that common questions predominate on a CFA claim.  Their argument that Plaintiffs must show not only that defendants acted in a uniform manner, but also that plaintiffs responded in a sufficiently uniform fashion misunderstands Plaintiffs' theories under the CFA.  This requirement only applies if a plaintiff seeks to rely on a presumption of causation under the CFA based on a misrepresentation or omission.  As the Third Circuit has made clear, where a CFA plaintiff "knows the truth behind a fraudulent misrepresentation or omission, that plaintiff may not succeed."  Marcus, 687 F.3d at 609.  In order to accommodate this rule, to certify a CFA claim based on a misrepresentation or

---

[9] Cox, 138 N.J. at 19, a leading case on the definition of an unconscionable commercial practice, makes a related point:  that an unconscionable commercial practice implies a "lack of 'good faith, honesty in fact and observance of fair dealing,'" and that ordinary breaches of contract or warranty do not constitutes per se violations of the CFA. Id. at 18 (quoting Kugler v. Romain, 58 N.J. 522, 544 (1971)).

omission, courts can apply a presumption that a misrepresentation or omission caused purchasers of a product to incur a loss, provided that the plaintiff can show that class members reacted to the truth, if knowable, in a uniform manner. Id. This rule is inapposite here: Plaintiff's claim is not premised on a misrepresentation or omission, but rather on the affirmative act of charging usurious interest.[10] Plaintiff can demonstrate that the affirmative act of charging usurious interest caused an ascertainable loss in the form of interest payments, and there is no question that charging the interest is the proximate cause of the Plaintiffs' out-of-pocket loss.

Plaintiffs have therefore shown that they can use common evidence to prove their CFA claims, and that common questions predominate. Namely the nearly identical, allegedly usurious loan agreements, which caused an out of pocket loss in the form of usurious interest.

### iii. Unjust Enrichment

Plaintiffs have also shown that common issues predominate on their unjust enrichment claim. To prevail on this claim, Plaintiffs must demonstrate that "(1) they conferred a benefit on [Defendants], and (2) retention of that benefit without payment would be unjust." In re Mercedes-Benz Tele Aid Contract Litig., 257 F.R.D. 46, 72 (D.N.J. 2009), opinion clarified, 267 F.R.D. 113 (D.N.J. 2010), opinion modified on reconsideration, 2010 WL 2976496 (D.N.J. July 22, 2010). Here, Plaintiffs can show all elements of this claim with common evidence, as each plaintiff allegedly conferred a benefit on Defendants in the form of loan payments made under substantively

---

[10] More succinctly, "if the truth behind alleged [misrepresentations or omissions] is knowable and if evidence suggests that class members did not react to information about the product they purchased or leased in a sufficiently similar manner such that common issues of fact would predominate, then certification is improper." Marcus, 687 F.3d 609. Indeed, where there is "no evidence that class members could have known the truth behind [a] defendant's representations," a plaintiff need not show that their reaction was in some manner uniform. Id. See also McNair v. Synapse Grp., Inc., No. 06-5072, 2009 WL 1873582, at *10 (D.N.J. June 29, 2009) (requiring such a showing where alleged unlawful conduct involved deceptive or misleading prompts in automated telephone system for magazine renewals).

identical agreements, and thus the common question for trial on these claims is whether Defendants' retention of their payments is unjust. The relevant circumstances that could make retention of these benefits unjust all relate to Defendants' conduct in operating their loan business, including whether the putative plaintiffs' payments under the allegedly usurious loan agreements were retained unjustly, or whether Defendants representations regarding the allegedly sham tribal affiliation render retention of the benefits unjust. Here, all loan agreements are allegedly defective in the same manner, and the lack of significant variation between them and the uniform circumstances under which Plaintiffs made payments indicate that common questions will predominate on Plaintiffs' unjust enrichment claim.

### iv.    Declaratory Relief

Plaintiffs also seek a declaration that CRST law does not apply to the loan agreements, and that the arbitration agreement and class action waivers in the agreements are void. Plaintiffs correctly note that this Court has already ruled on these issues as to the named Plaintiffs in ruling on Defendants' motion to dismiss and compel arbitration. See MacDonald, 2017 WL 1536427, at *10. The Court concludes that common questions of law and fact predominate on these claims. Under the Declaratory Judgment Act, in any case or controversy within the Court's jurisdiction, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. In determining which law applies to the loan agreements and whether their arbitration and class waiver provisions are enforceable, the Court will look to the agreements themselves, all of which have substantially identical choice of law, arbitration and class waivers, and the locations of the parties in entering into the contracts, which for the purposes of the class definition here, is New Jersey. Plaintiffs

have thus shown that this claim can be proven by common evidence, and thus common questions will predominate under Rule 23(b)(3).

### v.     RICO Claims

Finally, Plaintiffs' RICO claims are also appropriate for class treatment.  The RICO statute prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through . . . collection of unlawful debt."  18 U.S.C. § 1962(c).  The statute defines "unlawful debt" as a debt which is "unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury" and which was incurred in "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).  Under this definition, "the prohibition on the 'collection of unlawful debt' under the statute encompasses efforts to collect on a usurious loan."  Goldenstein v. Repossessors Inc., 815 F.3d 142, 148 (3d Cir. 2016).

Thus, to prevail, Plaintiffs must prove that defendants participated in (1) the conduct (2) of an enterprise (3) through the collection of unlawful debt (4) resulting in an injury to business or property.  Goldenstein, 815 F.3d at 147; see also Reyes v. Netdeposit, LLC, 802 F.3d 469, 483 (3d Cir. 2015) (describing elements and requiring plaintiffs to show that the RICO violation was the but for proximate cause of their injury).   Where a plaintiff claims that the collection of unlawful debt is the basis of a RICO claim, "[o]nly one act of collecting or attempting to collect unlawful debt is necessary to establish that predicate act.  An actual exchange of cash need not be shown, only a single act which would tend to induce another to repay on an unlawful debt incurred in the

business of lending money." United States v. Eufrasio, 935 F.2d 553, 576 (3d Cir. 1991) (citations omitted).

In RICO cases, predominance is satisfied if "each element of the alleged RICO violation involves common questions of law and fact capable of proof by evidence common to the class." Reyes, 802 F.3d at 489. This requires the Court to determine whether there are reliable means for proving classwide injury. Id.

Here, Plaintiffs have shown that common questions predominate for each of the elements of their RICO claim. Whether Defendants engaged in conduct as part of RICO enterprise is common to the class (and raises no individual issues whatsoever), as is whether they did so through the collection of unlawful debt. Plaintiffs can show that Defendants conducted their alleged RICO enterprise through common documentary evidence concerning the relationships between Western Sky Financial and Defendants and the testimony of their officers and employees.

Defendants argue that Plaintiffs cannot demonstrate causation through common evidence, as the cases Plaintiffs rely on involved schemes where purchasers of products received no value whatsoever for their products, while here Plaintiffs did received value in the form of a loan. The Court disagrees. Plaintiffs' injury is the payment of usurious interest, which they allege they would not have paid had Defendants not conducted a sham enterprise to appear as if a tribal entity was loaning their money, beyond usurious rates. As noted above, there is substantial similarity between of the loan agreements here, each of which includes loans of at least twice the usurious rate. ECF Nos. 93.7, 93.16 (showing interest rates of 116% or higher). While the ultimate question of causation remains for the trier of fact, Plaintiffs have carried their burden of demonstrating that injury and causation can be shown on a classwide basis.

### C.   Waiver

Finally, Defendants argue that Plaintiffs waived any right to bring a class action due to a waiver of such rights in the arbitration agreement contained in their loan agreements.  The Court disagrees.  The class action waiver that Defendants seek to enforce is an integral part of the arbitration agreement which the Third Circuit has already held to be unenforceable.  See MacDonald, 883 F.3d at 232.  The Court rejects its applicability here.

### V.   CONCLUSION

For the reasons stated above, Plaintiffs' motion for class certification is **GRANTED** and the class, as modified, is certified.  An appropriate order follows.

*/s Madeline Cox Arleo*_____
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**